**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JULIAN CRAIG<br>2113 Parkside Drive<br>Bowie, MD  20721<br><br>Plaintiff,<br><br>v.<br><br>NOT-FOR-PROFIT HOSPITAL<br>CORPORATION D/B/A UNITED<br>MEDICAL CENTER<br>1310 Southern Avenue, SE<br>Washington, DC 20032;<br><br>VERITAS OF WASHINGTON, LLC<br>3520 Massachusetts Avenue, NW<br>Washington, DC 20007;<br><br>CORBETT PRICE<br>3520 Massachusetts Ave, NW<br>Washington, DC  20007;<br><br>LUIS HERNANDEZ<br>4569 Bridgepointe Way Unit 151<br>Vero Beach, FL 32967<br><br>Defendants. | Case No. 1:18-CV-347 |

**COMPLAINT AND JURY DEMAND**

**Preliminary Statement and Introduction**

1.      This is a civil action against Defendant Not-For-Profit Hospital Corporation,

doing business as United Medical Center ("the Hospital" or "UMC") and Veritas of Washington,

LLC ("Veritas"), for declaratory, injunctive, and monetary relief for injuries Plaintiff Julian

Craig, M.D. sustained as a result of adverse employment actions, culminating in his termination,

in retaliation for his investigation of, internal reports about, and testimony before the D.C. City Council regarding the Hospital's improper admission practices, malfeasance affecting patient health and safety, and submission of fraudulent statements to Medicare and Medicaid at the direction of Veritas.  Plaintiff brings his claims for whistleblower retaliation under the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h), the District of Columbia False Claims Act, D.C. Code § 2-381.04, the District of Columbia Whistleblower Protection Act ("DCWPA"), D.C. Code § 2-223.01(3), and the common law of the District of Columbia.

2.      Dr. Craig is an accomplished physician who has dedicated his career to providing healthcare to poor and underserved populations in Wards 7 and 8 in Washington, D.C.  In 2015, he accepted a position as the Chief Medical Officer ("CMO") of UMC, the only public hospital in the District of Columbia.  While serving as CMO, Defendant UMC awarded a $4.4 million no-bid contract to Veritas of Washington, LLC ("Veritas"), a management company owned by large campaign donors to Mayor Muriel E. Bowser, to take over as UMC's operator.  Upon assuming management control of UMC, Veritas engaged in inappropriate and unlawful practices for the purported purpose of improving the Hospital's finances.  Under Veritas' direction, UMC eliminated positions that were critical for protecting patient health and safety, unilaterally attempted to reduce Dr. Craig's pay and hours, and forced other Hospital executives who objected to these practices into involuntary resignations.  UMC's Chief Executive Officer ("CEO"), an executive of Veritas, pressured doctors to admit patients who did not meet the medical criteria under Medicare and Medicaid laws, for the express purpose of improving the Hospital's finances.  After Dr. Craig was informed about an audit that had been conducted by an outside firm that demonstrated that the Hospital had billed Medicare for the admission of patients who did not meet the inpatient admission criteria for short stays, he filed a formal complaint with

the Hospital and thereafter informed Hospital administrators and UMC's counsel that he believed Veritas was pressuring physicians to engage in admissions practices that violated federal and District of Columbia law.  Defendants UMC and Veritas failed to adequately investigate or address Dr. Craig's concerns about inpatient admissions, fraudulent billing to Medicare and Medicaid, and other practices that he reasonably believed compromised patient health and safety, including actions to withhold resources from the Hospital's Obstetrics department in a deliberate effort to force its closure, as a cost-cutting measure.  Accordingly, on November 3, 2017, Dr. Craig reported his concerns to the District of Columbia City Council ("the City Council"), first, in writing, and then in testimony before the City Council.

3.      In retaliation for these protected disclosures and Dr. Craig's investigation which might have led to an action under the federal and D.C. False Claims Act, Defendants retaliated against him, culminating in his termination 15 days after he testified before the City Council. Several members of the City Council who voted not to extend the Veritas contract objected to Dr. Craig's termination.  In interviews with *The Washington Post* Council Member Mary M. Cheh (D-Ward 3) stated, "This looks like a classic retaliation to me."  Council Member Elissa Silverman (I-At Large), confirmed that "Dr. Craig provided valuable testimony about the operations at UMC…. [and that] [y]ou shouldn't be fired for being a whistleblower."

4.      This is also an action against Defendants UMC and Veritas for declaratory, injunctive, and monetary relief for injuries Dr. Craig sustained as a result of UMC's refusal to pay his contractually-agreed compensation at the time it was due, in breach of his employment contract and in violation of the District of Columbia Wage Payment and Collection Law, as amended by the Wage Theft Prevention Act of 2014 ("DCWPCL"), D.C. Code § 32-1301 *et seq*.

5.      This is also an action against Veritas, Defendant Corbett Price, Executive Chairman of Veritas, and Defendant Luis Hernandez, Chief Restructuring Officer of Veritas, for tortiously interfering with Dr. Craig's employment contract with UMC.  Defendant Price had a checkered history of entering into lucrative management contracts with economically distressed hospitals, slashing key personnel and forcing the closure of departments.  After Veritas took over the management of UMC, Defendant Price directed that actions be taken that were eerily similar to practices he had engaged in and been rebuked for in other settings that led to the closure of an Obstetrics department and that drove one hospital into bankruptcy.  Defendant Hernandez carried Defendant Price's improper instructions, and pressured doctors to admit patients who did not meet the medical criteria under Medicare and Medicaid laws.  Dr. Craig objected to those practices, including in testimony before the City Council.  After Dr. Craig testified about Veritas' malfeasance, Defendants took actions that culminated in the termination of Dr. Craig's employment.

**Jurisdiction and Venue**

6.      This Court has jurisdiction over Dr. Craig's claims under 28 U.S.C. § 1331, as this matter concerns a federal question.  This Court has supplemental jurisdiction over Dr. Craig's state law claims under 28 U.S.C. § 1367(a).

7.      This Court also has jurisdiction over Dr. Craig's claims under 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000 and there is complete diversity of citizenship.

8.      Venue is proper under 28 U.S.C. §§ 1391(a)(1) and (b)(2), as the events or omissions giving rise to Dr. Craig's claims occurred in the District of Columbia.

## Parties

9.      Plaintiff Dr. Julian Craig is a resident of the state of Maryland.  He was employed by Defendant UMC as its Chief Medical Officer from June 2015 until December 17, 2017. During his tenure as CMO, the Hospital twice named him Physician of the Year.  Dr. Craig is an employee within the meaning of the False Claims Act, 31 U.S.C. § 3730(h); the District of Columbia False Claims Act ("DCFCA"), D.C. Code § 2–381.04; the District of Columbia Whistleblower Protection Act ("DCWPA"), D.C. Code § 2-223.01(3); the District of Columbia Wage Payment and Collection Law ("DCWPCL"), D.C. Code § 32-1301(2), and D.C. common law.

10.      Defendant Not-For-Profit Hospital Corporation, doing business as United Medical Center, is a not-for-profit corporation and an instrumentality of the District of Columbia government, established under D.C. Code § 44-951.02, with a separate legal existence from the District of Columbia government.  It conducts business and maintains its premises within the District of Columbia.  Defendant UMC is an employer within the meaning of the False Claims Act, 31 U.S.C. § 3730(h); the DCFCA, D.C. Code § 2–381.04; the DCWPA, D.C. Code § 2-223.01(3); the DCWPCL, D.C. Code § 32-1301(1B), and D.C. common law.

11.      Defendant Veritas of Washington, LLC is a limited liability corporation that conducts business and maintains its premises within the District of Columbia.  Defendant Veritas, founded in 2015, was awarded a $4.2 million no-bid contract to manage operations at UMC from April 15, 2016, to the present.  Defendant Veritas is a joint-employer of Dr. Craig, making it an employer within the meaning of the False Claims Act, 31 U.S.C. § 3730(h); the DCFCA, D.C. Code § 2–381.04; the DCWPA, D.C. Code § 2-223.01(3); the DCWPCL, D.C. Code § 32-1301(1B), and D.C. common law.  Veritas President Chrystie Boucree and her

husband, Defendant Corbett Price, Executive Chairman of Veritas, were major donors to Mayor

Muriel Bowser.  Ms. Boucree had no prior experience with management of economically

distressed hospitals.

12.     Defendant Corbett Price is a resident of the District of Columbia.  He is Executive

Chairman of Defendant Veritas.  Mr. Price directed or participated in carrying out the adverse

employment actions against Dr. Craig complained of herein.  Defendant Price is an alter-ego of

Defendant Veritas.

13.      Defendant Luis Hernandez is a resident of Florida.  He is an officer of Veritas

and served first as Chief Restructuring officer of UMC and then Chief Executive Officer.  Mr.

Hernandez directed or participated in carrying out the adverse employment actions against Dr.

Craig complained of herein.

### Factual Background

14.     Dr. Craig is a pulmonary/critical care physician and is licensed to practice

Medicine and Surgery in the District of Columbia and Maryland.  He holds certifications in

Internal Medicine and Pulmonary Disease by the American Board of Internal Medicine and is a

Fellow of the American College of Chest Physicians.  Before being recruited to join UMC as its

CMO, Dr. Craig was a founding member of a successful critical-care practice, Premium Critical

Care Solutions, in Washington, D.C., and had served on the UMC Board of Directors ("UMC

Board" or "Board").  In addition to running his own practice, Dr. Craig served in a number of

high-level positions at hospitals in the area and had held the prestigious position as Board

President of the Medical Society of the District of Columbia from 2016 to 2017.  He currently

serves on the Board of Directors of the Medical Society as Immediate Past President.

15.     On June 3, 2015, Dr. Craig accepted the CMO position with UMC and signed an offer letter that set out the terms of his employment, which included a base salary of $320,000 per year, working 32 hours per week or 0.8 full time equivalent ("FTE") status, plus benefits.

16.     Dr. Craig's employment contract ("Employment Contract") later memorialized these and other terms of his employment.  The Employment Contract included a $320,000 annual rate of compensation (equal to an approximate hourly rate of $192.32) in Section 5.1(a), and stated in Section 4 that the agreement lasted for one year with the option of renewing the contract for additional one-year terms up to five total years.  In Section 18, the Employment Contract stated that the agreement could be modified "only by a written instrument signed by both Parties or, in the case of a waiver, by the Party waiving compliance."  Defendant UMC certified later in 2015 that the contract and offer letter were fully and properly executed by Dr. Craig and UMC. UMC's Board of Directors ratified the Employment Contract.

17.     As CMO, Dr. Craig also held a non-voting seat on the UMCs Board.  As detailed *supra*, despite a series of efforts by UMC to negotiate other, less remunerative, contracts with Dr. Craig during his tenure with the Hospital, this initial Employment Contract was the sole contract that was executed by all legally required parties, including the UMC Board, and is the operative employment contract in this matter.

18.     Upon joining UMC, Dr. Craig agreed to resign from his outside pulmonary critical-care practice, foregoing over $380,000 per year in income in order to take the CMO position.  He did so because of his deep commitment to ensuring that poor and underserved communities, like those in Ward 7 and Ward 8, are able to receive high-quality medical services. In joining UMC, Dr. Craig believed that he could apply his experience as President of the Medical Society of the District of Columbia and as a Board Certified physician in both Internal

Medicine and Pulmonary disease to be an effective liaison between the Hospital administration and medical staff and to ensure that appropriate and efficient clinical services were offered to the community.

19.     In February 2016, the District of Columbia Department of Health Care Finance ("DHCF") informed the UMC Board that a management company needed to assume control of UMC operations after significant financial losses in 2015.  DHCF recommended that UMC's Board award a no-bid contract to Veritas, a company owned and led by major campaign donors of D.C. Mayor Muriel Bowser.  The UMC Board approved the award of the no-bid $4.2 million contract to Veritas later that month.  Mayor Bowser appointed six members of the 11 voting members of UMC Board and its Chair.

20.     On April 15, 2016, Veritas assumed control of UMC operations.  Four Veritas employees, Defendant Hernandez, Chief Restructuring Officer; David Boucree, Executive Vice President for Analysis and Planning; Diane Kelly, a Quality Consultant; and Devin Price, the son of Corbett Price, worked at UMC daily and Mr. Hernandez oversaw the operations of all of the departments.  The Hospital's then Chief Executive Officer ("CEO") Andrew L. Davis was required to report to Mr. Hernandez.

21.     Upon information and belief, Defendant Price is the final decision-maker for all important matters at Veritas, including those involving the management of UMC.  Mr. Price had a checkered career in hospital management roles, and had previously come under fire for his mismanagement of Interfaith Medical Center, a New York City hospital that was driven into bankruptcy in 2013.  The New York State Department of Health barred Mr. Price's company Kurron from continuing to manage the hospital as a result of his malfeasance, which included among other things, his forced closure of the hospital's obstetrics unit in a futile cost-savings

measure.  Similarly, the Bermuda Hospital Board cut short a lucrative contract for Kurron after government officials raised concerns about overspending and cronyism by Defendant Price, and before that, Defendant Price faced criticism when his company laid off hundreds of workers and cut services during its management of a hospital in Prince George's County.

22.     Shortly after Veritas took over management of UMC, Mr. Davis informed Dr. Craig that UMC would reduce his work hours to 20 hours per week (0.5 FTE status), with an annual compensation of $100,000.  Mr. Davis told Dr. Craig that the reduction in pay was non-negotiable and that Mr. Hernandez had made the decision that the Hospital did not need a full-time CMO.  Dr. Craig responded that he was being pressured to quit but would not do so because of his commitment to the community and UMC.

23.     Upon information and belief, Mr. Price made the decision to reduce Dr. Craig's pay.

24.     On April 29, 2016, Mr. Davis sent Dr. Craig a letter stating that, effective May 1, 2017, UMC would reduce his work hours to 20 hours per week (0.5 FTE status), with an annual compensation of $100,000.  In so doing, Veritas undermined the CMO's position and Dr. Craig's authority, thus impeding his ability to do his job.  Members of UMC's leadership, including the Chair of the Board's Patient Safety and Quality Committee, objected to the reduction in Dr. Craig's role and stated publicly that a full-time CMO was required for UMC to effectively serve the community.

25.     Dr. Craig did not execute a written modification to the Employment Contract as required by the original contract's terms.  Dr. Craig continued to work a minimum of 32 hours per week, though Defendant UMC paid him at a new hourly rate of $96.15, half of his agreed-upon rate.  UMC was aware that Dr. Craig's work hours did not fall below 32 hours per week.

26.     After taking over management at UMC, Veritas cut personnel resources that were vital to UMC's quality of care over Dr. Craig's repeated objections.  Within its first month at UMC, Veritas terminated the employment of Keisha Wright, the Patient Advocate leading the Patient Experience Department, and Stanley Pierre, the Manager of the Quality Department.  In another misguided cost-savings measure, Veritas also eliminated the positions of Patient Experience Coordinator, the Director of Risk Management, Performance Improvement Coordinator, and Infection Control Coordinator.  Only four individuals remained in the Quality Department and those individuals performed only chart-audit functions.  Dr. Craig raised objections to UMC's CEO and to other medical-staff leaders regarding the dismissal of Ms. Wright and Mr. Pierre, and the elimination of these other key positions, noting that Veritas' decisions impeded much needed efforts to maintain and improve patient safety and quality.

27.     Veritas also reduced the responsibilities of then-Chief Operating Officer ("COO") Pamela Lee, the executive leading the Quality Department.  In early May 2016, she told Mr. Hernandez that she disagreed with the employee reductions that Veritas was implementing and that the reductions left the Hospital fractured and without the infrastructure necessary for delivery of safe patient care.  Veritas management ignored her concerns and took actions to strip Ms. Lee of key responsibilities.  After witnessing these and other organizational changes that Mr. Hernandez had made that compromised patient care, Ms. Lee was forced to resign her employment concluding that Veritas made it impossible for her to effectively do her job.

28.     In July 2016, Mr. Davis resigned his position and Mr. Hernandez became the new CEO of UMC.  Around this same time, Charletta Washington, previously Vice President of Ambulatory Care Services, became the new COO of UMC.

29.     Soon after Ms. Washington became COO, Dr. Craig talked to her about the cuts that Veritas had made to key personnel and his ongoing concerns about patient health and safety. He also raised concerns about the cut in his pay and hours and requested that UMC restore his compensation to the rate set out in his Employment Contract.  Ms. Washington acknowledged that the CMO position needed to be a full-time position and agreed to renew his contract on the same terms as his original contract.

30.     On July 22, 2016, Dr. Craig and Ms. Washington, on behalf of Defendant UMC, each signed a renewal contract, which contained substantially the same terms as Dr. Craig's Employment Contract, including his full compensation of $320,000 per year at 0.8 FTE status.

31.     Dr. Craig continued to work at least 32 hours per week for UMC in reliance on UMC's representation that through the renewal contract that he would be working for the originally-agreed upon rate.  However, UMC continued to pay him at a reduced hourly rate of $96.15, in breach of his Employment Contract, and inconsistent with the renewal agreement he entered into with Ms. Washington on July 22, 2016.

32.     In late July or early August 2016, Ms. Washington told Dr. Craig that Mr. Hernandez and Veritas would not agree to restore his compensation to the original amount despite their knowledge that he was continuing to work at 0.8 FTE status and the acknowledgment by Ms. Washington and other key members of the Hospital organization that the CMO role needed to be a full-time role.  She assured him she would work to rectify the issue.

33.     Dr. Craig continued to seek to restore his compensation to the amount of $320,000 per year, as set out in his Employment Contract.  UMC executives, including Ms. Washington, told Dr. Craig that they were working on obtaining approval for the agreement he signed in July 2016.  Dr. Craig believed that if he cut back his hours to half-time, the patient

population would suffer because there would be no physician in a management role to advocate

on their behalf.  Despite support for Dr. Craig by various executives and board members, UMC

did not restore Dr. Craig's compensation to $320,000 at 0.8 FTE status, in breach of the terms of

the Employment Contract.

34.     From about October to December 2016, Mr. Hernandez pressured Dr. Craig to

formalize his compensation at 20 hours per week (0.5 FTE status) and $200,000 per year.  This

agreement would have formally cut Dr. Craig's hours but provided for his original hourly rate of

$192.32.  The prospective agreement ("December 2016 prospective agreement"), which was

labeled "NFPHC-316," would have transitioned Dr. Craig into an independent contractor role.

35.     UMC did not sign the December 2016 prospective agreement and the Board did

not approve it.  Accordingly, the December 2016 prospective agreement never became operative.

Mr. Hernandez and Veritas refused to approve any arrangement that would have increased Dr.

Craig's pay to the originally agreed upon rate, despite being advised by UMC Chief Financial

Officer ("CFO") Lilian Chukwuma that UMC had the funds to restore Dr. Craig's pay and that

the CMO position should be a full-time position.

36.     Dr. Craig continued to receive compensation at an hourly rate of $96.15,

substantially less than the amount due under this Employment Contract.  UMC continued to treat

Dr. Craig as an employee and not as an independent contractor.  Dr. Craig never completed any

tax paperwork to become an independent contractor and never submitted invoices billing UMC

for his time.  UMC continued to withhold taxes from Dr. Craig's paycheck and never issued an

Internal Revenue Service 1099 form, applicable to independent contractors, to Dr. Craig.

37.     Despite UMC and Veritas's failure to approve yet another contract that would

have mitigated Dr. Craig's economic losses and compensated him for the work he had

performed, Dr. Craig understood from Ms. Washington that UMC would continue to work with him to resolve his compensation issues and to restore him to his original pay rate, with back pay.

38.     Members of the Hospital medical staff treated Dr. Craig with respect, and acknowledged his significant contributions to UMC.  This stood in stark contrast to Defendant Hernandez's treatment of him.  After taking over as CEO, Mr. Hernandez increasingly isolated Dr. Craig and stopped holding CMO-CEO dialogues with him.  Mr. Hernandez stopped inviting Dr. Craig to meetings between the CEO and other key physicians, including the Emergency Room Director and the Hospitalist group.  Both of these entities are responsible for patient flow and admissions.

39.     Beginning in the fall of 2016 and continuing through early 2017, Dr. Craig became concerned that the Hospital was engaged in some practices that compromised patient care and safety, and other practices that he reasonably believed violated federal and District of Columbia law.  Dr. Craig was informed by a member of the Hospitalist group that Mr. Hernandez and Veritas were pressuring UMC employees to increase hospital admissions numbers in order to improve the hospital's financial outlook.  Dr. Craig saw a number of examples of patients admitted to UMC for issues that did not meet admissions criteria, or for whom there lacked appropriate documentation to support an admission decision.  On a number of occasions, Dr. Craig directed UMC hospitalists not to admit certain patients who did not meet admissions criteria.  Doctors told him that the emergency room had been instructed by Mr. Hernandez and other Veritas executives to admit those patients in order to keep admissions numbers high.

40.     Dr. Craig repeatedly expressed concerns to UMC management that Veritas was not adequately staffing and supporting its Quality Department and advocated for UMC to hire a

new staff member to oversee the Quality Department.  In December 2016, UMC hired Maria

Costino to be its Executive Director of Quality and Regulatory Affairs.  Dr. Craig supported Ms.

Costino's efforts to push UMC and Veritas to develop a management action plan that included

quantitative assessments of patient safety and care.

41.     On February 23, 2017, Ms. Chukwuma called Dr. Craig into a meeting with the

Directors of Quality and Medical Records.  She informed them that the Hospital had received a

letter from KEPRO, a Medicare beneficiary responsible for review of UMC medical services.

The letter was sent to the Hospital earlier in 2016.  The letter detailed KEPRO's findings that

100% of the charts that were audited for short stays of less than two midnights did not meet

criteria for inpatient admission, an indication that the Hospital should not have billed Medicare

for their admissions.

42.     These findings confirmed Dr. Craig's fear that Veritas, acting through Defendants

Price and Hernandez, had created a culture at UMC in which physicians were pressured to admit

patients who did not meet the legal requirements for admission and documentation in violation of

federal and District of Columbia law.

43.     The next day, February 24, 2017, Dr. Craig submitted an "official complaint" to

the Hospital's Executive Director of Human Resources, Eric Johnson.  Dr. Craig's complaint

alleged that Mr. Hernandez's actions had put "the United Medical Center at serious federal

regulatory and financial risk."   He further charged that Veritas' actions had put Dr. Craig's and

members of medical staff's careers and medical licenses in jeopardy.

44.     Within two days of receipt of Dr. Craig's complaint, Mr. Johnson, Dr. Erica

Alexander, a UMC Compliance Officer, and Hospital attorneys, including Steven A. Pozefsky,

met with Dr. Craig to discuss the factual basis for his complaint.  Dr. Craig reported that he had

learned from physicians that Mr. Hernandez had pressured UMC employees to increase hospital admissions, without regard to medical necessity and proper documentation, to improve the UMC's finances.  Dr. Craig objected to these practices and elaborated that he and other physicians could lose their licenses by participating in this illegal behavior.  Dr. Craig informed them that he believed he had a legal responsibility to come forward.  Dr. Craig also raised concerns that Mr. Hernandez and Veritas had deliberately undermined his role as CMO by excluding him from meetings with fellow doctors and reducing his pay by half, and these actions had a negative impact on the Hospital and the patient population.

45. Mr. Johnson and the others present acknowledged that the concerns that Dr. Craig had raised were serious ones and told him that they would investigate them.  Dr. Craig was never interviewed in connection with any such investigation.  To Dr. Craig's knowledge, no *bona fide* investigation was ever undertaken.

46. Upon information and belief, Mr. Hernandez and other Veritas officials became aware of the formal complaint Dr. Craig had filed and the concerns he conveyed.   Mr. Hernandez and Veritas became even more determined to remove him as CMO as a result of Dr. Craig's complaints.

47. During this period, Dr. Craig learned that Ms. Chukwuma had conducted an audit of patient admission records and had determined that UMC would likely have to return $5 million to Medicare and Medicaid for monies improperly billed for these patient stays.

48. In March 2017, Ms. Washington resigned from UMC.

49. The UMC Board tasked the Strategic Planning Committee, of which Dr. Craig was a member, with evaluating Veritas' performance.  The Committee was scheduled to present its findings about Veritas' performance at the April 29, 2017, Board meeting.  On April 19,

2017, the Strategic Planning Committee announced an emergency meeting to discuss its evaluation of Veritas.  Within a few hours, the meeting was canceled.  Recognizing that Veritas' performance could not be found to be satisfactory by any objective measure, the Board postponed the presentation indefinitely, thus preventing the evaluation from becoming public.

50.     On April 11, 2017, the Patient Safety Committee met and its minutes reflect that "Dr. J. Craig's hours have been approved for .8 FTE; pending approval by the BOD on April 29th."

51.     On April 21, 2017, Mr. Pozefsky presented Dr. Craig with two modifications to his original contract that would have resolved Dr. Craig's concerns about the Hospital's unilateral reduction in his pay.  The first modification provided for an extension of Dr. Craig's original employment agreement, including his annual pay of $320,000, for the term of June 1, 2016, through May 31, 2017 – essentially the same agreement Dr. Craig and UMC COO Charletta Washington had signed in July 2016.  The second modification provided for a similar extension from June 1, 2017, through May 31, 2018.  Dr. Craig signed both.  Mr. Pozefsky told him the two contract modifications would be submitted to the Board for final approval at the upcoming April 29, 2017, Board meeting.

52.     Dr. Craig understood that UMC executives had already approved the contract modifications, since Board approval was the final step once the parties had otherwise agreed to a contract.  Pursuant to these contract modifications, UMC agreed to pay Dr. Craig back pay for monies withheld from his paychecks and to restore his compensation to that provided in the Employment Contract.  Mr. Pozefsky acknowledged that Dr. Craig and been treated unfairly and assured him that the Board would make him whole.

53.     On April 29, 2017, the Board met in open session, followed by a closed session meeting, which Dr. Craig was not permitted to attend.  During the closed session meeting, Board members were advised that an official complaint had been made against Veritas, through its agent Mr. Hernandez.  Upon information and belief, some members of the Board, including the newly appointed board member LaRuby May, were aware that Dr. Craig was the individual who had filed the formal complaint referenced in paragraph 43, above.  The Board was told that an investigation into this complaint was being undertaken.  The Board directed that it be briefed about that investigation during its next full meeting.  During this same session, the Board deliberated Dr. Craig's employment at UMC and the contract modifications referenced in paragraph 51, above.  Mr. Hernandez urged the Board not only to reject the contract modifications but to remove Dr. Craig as CMO altogether.  Outside the meeting, he and another Veritas official disparaged Dr. Craig and insisted that he was not capable of handling the CMO position.  Dr. Diane Kelly, a UMC Quality Consultant employed by Veritas, stated that he was not "savvy" enough for the job.  At Mr. Hernandez's insistence, the Board refused to approve the contract modifications Dr. Craig entered into with Mr. Pozefsky.

54.     Immediately after the Board's closed session meeting, Mr. Pozefsky called Dr. Craig into a meeting with Ms. Chukwuma and Mr. Hernandez.  Mr. Pozefsky told Dr. Craig that the Board did not vote on his contract and needed more time to obtain information.  Dr. Craig asked Mr. Hernandez if he was responsible for blocking the approval.  Mr. Hernandez did not respond to the question but instead stated that newly incoming board member, Ms. May, who had been appointed by Mayor Bowser to take over as Board Chair, directed him to tell Dr. Craig that when he comes to work the next day it should be with the assumption of working at 0.5 FTE

status for $200,000 in annual compensation – the schedule and salary from the December 2016 prospective agreement which was never implemented – pending further action by the Board.

55.     Following this Board meeting, Mr. Pozefsky apologized to Dr. Craig for the Board's refusal to restore his pay and to pay him the back pay that Mr. Pozefsky acknowledged was due to him.

56.     Mr. Pozefsky would not have presented the two contract modifications to Dr. Craig for signature without an indication that UMC and Veritas were agreeable to these modifications.  UMC and Veritas reneged on the prior approval of the contract extension and modifications shortly after Dr. Craig submitted his formal complaint to the Hospital's Executive Director of Human Resources and discussed his concerns about UMC's violation of Medicare laws with UMC officials and UMC counsel.  Dr. Craig continued to receive compensation at the reduced hourly rate of $96.15, which does not total $200,000 per year at either 0.5 FTE or his original 0.8 FTE status up to the date of his termination.

57.     As a result of the concerns Dr. Craig had raised about violations of Medicare and Medicaid billing and other improper Hospital admissions practices, Dr. Craig found himself increasingly marginalized by Mr. Hernandez, Veritas, and the Board and learned that Mr. Hernandez was seeking his removal as CMO.  This information confirmed what Dr. Craig surmised from the way that Mr. Hernandez and other Veritas officials were treating him, and made it increasingly difficult for him to work in such a retaliatory hostile work environment.

58.     On May 1, 2017, the *Washington Post* ran a story about financial woes at UMC stemming in large part from recently recognized errors in Medicare billing that could require extensive repayments to the federal government.  In explaining the Hospital's precarious fiscal position, Wayne Turnage, Director of DHCF, blamed physicians for overbilling Medicare.  In

actuality, the physicians generally do not make Medicare billing decisions.  This statement supported Dr. Craig's concerns that the admission practices were illegal and that physicians, including Dr. Craig, would be blamed for the activity.

59.     The quality of medical care being provided to patients at UMC continued to decline along with the Hospital's reputation, as Veritas emphasized financial objectives over quality of care.  In July 2017, Ms. Costino was forced to resign her employment after clashing with Veritas for months regarding the deteriorating state of patient care at UMC, including at its nursing home facilities, its implementation of inappropriate cost-saving measures, and after being directed by Veritas not to disclose issues of concern, and given its implementation of inappropriate cost-saving measures.

60.     In early June, 2017, Mr. Hernandez directed that Dr. Craig's reporting line be changed from reporting to him to reporting to Adam Winebarger, Vice President of Clinical Operations.  This was an inappropriate reporting relationship as Mr. Winebarger, a nurse, would not be qualified to supervise the CMO function.  Moreover, this change in the reporting relationship was perceived by Dr. Craig and others as a demotion.  Mr. Hernandez limited his interactions with Dr. Craig, excluding him from meetings and having no one-on-one meetings with him.

61.     In yet another effort to cut costs to the detriment of patients and the community that UMC serves, Veritas refused to address declining conditions in the Hospital's Obstetrics department, including issues cited by the D.C. Department of Health in March of 2017.  Veritas declined to devote adequate staff or resources to the nursery and delivery rooms, creating conditions that potentially put patients at risk.  Instead, unbeknownst to Dr. Craig, they embarked on a secret initiative to close UMC's Obstetrics Department, citing its drain on hospital finances

– a plan that was eerily reminiscent of the one Mr. Price apparently implemented in New York City ultimately contributing to the Hospital's bankruptcy.  David Boucree emailed the proposal on August 6, 2017, to Chairwoman May, with copies to Defendant Price, Ms. Boucree, and Mr. Hernandez, along with a board resolution to close the Obstetrics department immediately.

62.     The following day, on August 7, 2017, the D.C. Department of Health provisionally closed UMC's pbstetric program.  In its letter revoking the program's license to operate for a 90 day period, the Department of Health referenced allegations that the Hospital did not take necessary measures to ensure that a mother with HIV did not transmit the disease to her newborn and the improper monitoring and treatment of a 35-week pregnant woman with a history of blood-pressure problems.  Dr. Craig believed that the closure was the result of Veritas' refusal to invest sufficient resources into improving patient care in the obstetrics unit in a deliberate effort to force its closure to meet financial objectives to the detriment of the underserved patient population in D.C. Wards 7 and 8.  This plan would have, and likely did, endanger patients in pursuit of Veritas' financial goals.

63.     On August 25, 2017, a 47-year-old AIDS patient at UMC's nursing home died of a heart attack after repeatedly crying out for help and complaining of shortness of breath.  The nursing staff left the patient lying on the floor and failed to render medical care for a significant period of time.  UMC failed to report critical details of the patient's death to regulators with the D.C. Health Department, in derogation of its legal duties, leading health experts to question the accuracy of UMC's other reporting.

64.     On September 22, 2017, the D.C. Committee on Health, chaired by Councilman Vincent Gray, held a hearing regarding the temporary license restriction imposed on UMC by the D.C. Department of Health.  Veritas failed to inform the Council that it had been formulating a

plan with the Department of Health to eliminate obstetrics services at UMC, and claimed that the actions by the D.C. Department of Health had taken UMC by surprise.  Mr. Boucree and other officials from UMC, including Director Turnage, testified that they were considering proposals to reopen the unit.  This testimony was misleading or false.

65.     Also at the hearing, Director Turnage testified to something that Dr. Craig believed was misleading, and Dr. Craig testified in contradiction to Turnage.  Director Turnage stated that UMC did not respond to concerns raised by D.C. Health Department Director LaQuandra Nesbitt at a retreat for the Governing Board on March 25, 2017, regarding patient safety and quality at UMC.  Based on assurances that had previously been made to him, Dr. Craig told the Council during the hearing that he believed that UMC had submitted a written response to concerns that the Department of Health raised.

66.     On September 25, 2017, Mr. Boucree sent a letter to Councilman Gray stating that UMC had not sent any such response, and suggested that Dr. Craig had misspoken at that hearing.  In fact, Dr. Craig was correct and both Boucree and Turnage were incorrect.  On April 28, 2017, Ms. Costino, UMC's then Executive Director of Quality and Regulatory Affairs, had sent a detailed Plan of Correction, signed by Mr. Hernandez, to the Department of Health that responded to the concerns raised at the March 25, 2017, retreat.  Mr. Boucree's letter to Councilman Gray left the false impression that Dr. Craig had presented incorrect information at the hearing, and represented another effort to discredit Dr. Craig.  Dr. Craig believed that the Hospital was trying to scapegoat him for the conditions at the Obstetrics department and that Veritas had deliberately created conditions to force its closure given Veritas' concern that the Obstetrics department created a financial drain on the Hospital's finances.  Dr. Craig sent a letter of his own correcting the record, which further fueled Veritas' retaliatory motives.

67.    On October 17, 2017, six members of the City Council, citing Veritas'

consistently poor performance, filed a resolution disapproving of the proposed $4.2 million

contract for Veritas to continue its hospital management in 2018.  By letter dated October 18,

2017, Veritas President, Ms. Boucree, informed the city's Department of Health that Mr.

Hernandez was being removed immediately as CEO of UMC.  She requested that the UMC

Board appoint her cousin, David Boucree, as Interim CEO of UMC.  Mr. Boucree did not have

the requisite hospital management experience to assume this critical role.

68.    In light of the temporary closure of the Obstetrics department and some other

publicized breakdowns in patient care, the City Council began evaluating Veritas' management

of UMC.

69.    On November 3, 2017, Ms. Costino, who had served as UMC's Director of

Quality, testified in a Public Oversight Roundtable hearing before the City Council's Committee

on Health about Veritas' interference with her ability to perform her job.  She detailed directions

that had been given to her by Veritas to not discuss weaknesses in UMC's patient-safety program

because of concerns that "Veritas will be blamed for this."  Ms. Costino testified that she was

retaliated against for the concerns she raised and was forced to resign from her position in June

2017, after only 7 months on the job.  After hearing Ms. Costino's testimony, Dr. Craig felt duty-

bound to inform the D.C. City Council of the concerns he too held about Veritas' malfeasance

and mismanagement of UMC.

70.    Accordingly, on the afternoon of November 3, 2017, Dr. Craig sent a letter to the

District of Columbia City Council ("the City Council") reporting his reasonable good-faith belief

that Veritas had mismanaged UMC and had engaged in other improper conduct that harmed the

Hospital and the patient community.  He reported that "Veritas has disregarded patient care and

committed malfeasance in its efforts to increase patient volume." Dr. Craig also reported that

Veritas emphasized finances over quality and patient safety and that it had reduced personnel

resources that were necessary to ensure UMC's quality of care, including the elimination of

positions for two key employees who oversaw quality of care. He also reported that he believed

Veritas had committed malfeasance by encouraging doctors to admit patients for the express

purpose of keeping admissions numbers high, a practice he stated "would result in unnecessary

treatment and expense for medically unnecessary services to a number of UMC patients" and

"unjustifiable charges to the government." "Unjustifiable charges to the government" is

equivalent to a "false claim." Dr. Craig noted that this practice put the Hospital "at serious

federal regulatory and financial risk" and put the medical staff's careers and medical licenses in

jeopardy." He also reported that Veritas did not devote sufficient resources to the Obstetrics

department, which resulted in the D.C. Health Department provisional revocation of Obstetrics

department's license. Dr. Craig cited Veritas' failure to make appropriate investments in the

department, including budge approval for the implementation of a 2016 Management Action

Plan, that would have transformed the department into a robust women's health program, and its

failure to take corrective action to address the concerns cited by the D.C. Health Department, as

causing the loss of a critical component of health services to residents in Wards 7 and 8.

    71.    After submitting this letter, Dr. Craig came to the Public Oversight Roundtable

hearing before the City Council's Committee on Health to listen to the testimony of other

witnesses. Council Member Vincent Gray requested that Dr. Craig testify. Dr. Craig agreed to

do so and explained the basis for his statement that Veritas had committed malfeasance, noting

that the hospital's tenuous financial situation under Veritas had come at the expense of patients.

He testified, "I think they've done tremendous damage to the hospital already. Patient safety and quality has suffered."

72.     On November 5, 2017, Veritas President Chrystie Boucree sent Ms. May a letter responding to Dr. Craig's letter to the City Council. The letter referenced sections of Dr. Craig's letter to the City Council – misquoting it in at least three sections – and labeled each section with the words "FALSE" or "MISLEADING." Ms. Boucree asserted that the UMC Board had hired an independent legal team to investigate the complaint Dr. Craig had made in February 2017, referenced in paragraph 43, above, about Mr. Hernandez's improper instructions to doctors to admit patients to the hospital to drive up revenue. She stated, "While Veritas has not seen the report of the results of this investigation, Mr. Hernandez was informed by the hospital's counsel in June 2017, that the findings indicated no wrongdoing on his part." Ms. Boucree sent this letter to the D.C. Council and the media, in an attempt to discredit Dr. Craig and impugn his motivations for coming forward to testify.

73.     The next day, on November 6, 2017, Dr. Craig sent a second letter the City Council reaffirming his concerns about Veritas and rebutting assertions made in Ms. Boucree's letter. He provided the Council with a sworn statement from Pamela Lee, UMC's former Chief Operating Officer, substantiating his concerns and attesting to the fact that "after Veritas became UMC's operator, the quality department was taken apart in a number of ways." Ms. Lee averred that Veritas – and not prior UMC management as Ms. Boucree contended – had directed the elimination of key quality and patient safety departments, leading to "organizational suicide."

74.     Also on November 6, 2017, Interim Corporate Secretary Mike Austin sent an email on behalf of Ms. May to the UMC Board proposing that the Board issue a statement to the City Council adopting verbatim the language of the letter Ms. Boucree sent to Ms. May the day

before.  Instead, the Board issued a statement to the City Council supporting Veritas but calling for more communication with medical staff leadership.

75.     On November 7, 2017, the City Council voted not to extend Veritas' $300,000 per month contract with UMC.  Two members of the D.C. Council stated that Dr. Craig's testimony regarding Veritas' mismanagement of UMC was an important factor in their decision to vote against renewal of the contract.

76.     After the D.C. Council vote, many members of UMC's medical staff thanked Dr. Craig for his courage in testifying and for publicly disclosing the truth about Veritas' mismanagement of the Hospital and the harm that Veritas had caused the patient population.  In sharp contrast, Veritas and UMC's Board became livid with Dr. Craig for his testimony, and swiftly retaliated against him.

77.     On November 8, 2017, Dr. Craig attended an executive team leadership meeting with Vice President of Clinical Operations Adam Winebarger, Mr. Boucree, and other UMC executives.  Mr. Boucree claimed that Dr. Craig did not fulfill his duties in supervising UMC's primary care clinic and threatened at least two times in the meeting to close the primary care clinic.  After the meeting, Dr. Craig received an email from Mr. Winebarger addressed to Dr. Craig and Mr. Boucree.  The email asked Dr. Craig to provide information about his role in supervising UMC's primary care clinic.  Mr. Boucree responded with his own email insinuating that Dr. Craig was derelict in his duties related to the primary care clinic and threatened to close the clinic.  Dr. Craig responded to Mr. Boucree that same day and explained that he had performed all of the duties that Ms. Washington, former COO, assigned him relating to the primary care clinic.

78.     Mr. Boucree's false charges and threats to close the clinic came just five days after Dr. Craig first reported Veritas' mismanagement and wrongdoing to the City Council.  On November 10, 2017, Dr. Craig sent a letter to the UMC Board informing board members of his belief that Mr. Boucree was "attempting to discredit me and harm my professional reputation," and was "retaliating against me for reporting Veritas's conduct to the City Council."  He requested that the Board "take swift measures to ensure that I do not experience further retaliation from Mr. Boucree or anyone else at UMC."  Despite the serious nature of his concerns, the UMC Board failed to contact him about his concerns or direct that any type of investigation be undertaken.

79.     On November 18, 2017, just fifteen days after Dr. Craig first reported Veritas' wrongdoing to the City Council, UMC sent Dr. Craig a letter informing him that it would not renew his contract and that, therefore, he would no longer be CMO as of December 18, 2017. The letter, dated November 17, 2017, and signed by Contracting Officer Cynthia Mann and Ms. May, stated in full:

> This letter serves as Not-For-Profit-Hospital-Corporation aka United Medical Center official thirty (30) day notice of Non-renewal of contract NFPHC-316, Chief Medical Officer position with United Medical Center, with December 18, 2017 as the last day of the contract period. Thank you for your cooperation in this matter.

Although the December 2016 prospective agreement, NFPHC-316, never went into effect, UMC's notice of non-renewal indicated its decision to terminate Dr. Craig's employment.  This decision was dated only 14 days after Dr. Craig testified at the DC Council Hearing.

80.     At the time Dr. Craig received the notice of his termination, he had the support of the medical staff at UMC.  UMC's non-renewal of his contract was not the result of any deficiency in Dr. Craig's performance.  Rather, it was in retaliation for Dr. Craig's protected

activity, including his internal complaint about possible fraudulent Medicare and Medicaid billing, and his letters to and testimony before the City Council.  Upon information and belief, Veritas officials, including Defendants Price and Hernandez, participated in the decision to terminate Dr. Craig's employment.

81.    Upon learning of Dr. Craig's termination, on November 21, 2017, members of the City Council told *The Washington Post* that Dr. Craig had "provided valuable testimony about the operations at UMC," and that Dr. Craig's termination "looks like a class retaliation."

82.    On November 20, 2017, UMC's Board of Directors voted unanimously to extend Veritas' $300,000 a month contract on a month-to-month basis for up to 60 days.

83.    On December 12, 2017, Veritas announced that UMC's finance committee determined that a $17.1 million taxpayer bailout would be needed to keep UMC afloat, including $2 million to repay Medicare for the fraudulent billing practices Dr. Craig had raised concerns about in February of 2017.

84.    On December 13, 2017, UMC's Board of Directors voted in a closed session to permanently close the hospital's Obstetrics department, leaving patients in Wards 7 and 8 without a local hospital in which women can give birth and seek prenatal care.  This closed session was later determined to be in violation of the Open Meetings Act and Freedom of Information Act by the D.C. Office of Open Government.

85.    December 18, 2017, was Dr. Craig's last day in his position as CMO.  As a result, he has suffered and will continue to suffer financial hardship, emotional distress, and reputational damage.

86.    On January 26, 2018, UMC's Board of Directors voted to hire Mazars USA, an accounting and financial consulting firm, to run UMC.  Although Veritas was touted as a

financial turnaround firm that was being brought in to stabilize UMC at the time it was hired,

D.C. Chief Financial Officer Jeffrey S. DeWitt acknowledged that the Hospital is functionally

bankrupt, and laid blame for a sizable part of the Hospital's operating losses on Veritas'

mismanagement of UMC.

## COUNT I

### RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT AGAINST DEFENDANTS UMC AND VERITAS

87.     Plaintiff hereby incorporates as though restated all of the factual allegations

herein.

88.     The False Claims Act, 31 U.S.C. § 3730(h), prohibits retaliation by employers

against employees who investigate and/or report false statements within the meaning of 31

U.S.C. § 3729.   31 U.S.C. § 3729 holds liable any person who, *inter alia*, "knowingly makes,

uses, or causes to be made or used, a false . . . statement to get a false or fraudulent claim paid or

approved by the Government."  31 U.S.C. § 3729(a)(2).  Each claim for payment pursuant to a

contract induced by false statements is itself false and fraudulent within the meaning of this

provision.  Dr. Craig's actions in investigating and reporting Defendants' fraud in obtaining

payments from Medicare could reasonably have led to a viable False Claims Act suit pursuant to

31 U.S.C. § 3729.

89.     The False Claims Act entitles an individual to relief from retaliation if he shows

that he engaged in protected activity and was discriminated against because of that activity.

Protected activity includes lawful acts done by the employee . . . in furtherance of an action'

under the [FCA] and 'other efforts to stop 1 or more violations of' the [FCA]."  Id. at 161–62

(quoting 31 U.S.C. § 3730(h)).

90.     Dr. Craig engaged in protected activity when he reported in an "official complaint" to UMC's Executive Director of Human Resources, Eric Johnson, his reasonable good-faith belief that Mr. Hernandez had engaged in activity that put the Hospital at serious federal regulatory and financial risk and when he met with Mr. Johnson, Dr. Alexander, and hospital attorneys to discuss his complaint.  Subsequent oral conversations relating to this complaint were also protected activity.  In his complaint and subsequent meeting, Dr. Craig reported that he believed Mr. Hernandez was pressuring doctors to admit patients without regard to medical necessity and proper documentation, resulting in UMC illegally receiving payment from Medicare for patients who did not meet the criteria to be admitted.

91.     Because Dr. Craig reported Mr. Hernandez's wrongdoing directly to UMC executives and UMC's lawyers, Defendant UMC had knowledge of Dr. Craig's protected activity.  Veritas, as UMC's operator, and Mr. Hernandez, UMC's CEO, also had knowledge of Dr. Craig's protected activity.  Defendant Price, in his role running Veritas, also had knowledge of Dr. Craig's protected activity.

92.     Dr. Craig also engaged in protected activity on November 3, 2017, when he wrote a letter to and testified before the City Council reporting his reasonable good-faith belief that Veritas, as the operator of UMC, had caused UMC to violate the law when Mr. Hernandez pressured doctors to admit patients without regard to medical necessity.  He further engaged in protected activity on November 6, 2017, when he wrote a second letter to the City Council reiterating and clarifying his concerns.

93.     Defendant UMC and Veritas had knowledge of Dr. Craig's protected activity and publicly responded to it.

94.     Defendants UMC and Veritas retaliated against Dr. Craig by various acts, including, but not limited to, excluding him from meetings, marginalizing him and stripping his duties and responsibilities, attempting to change his reporting line, and on April 29, 2017, by refusing  to approve the restoration of his full compensation and the payment of wages that had been wrongfully withheld.  Defendant Veritas retaliated against Dr. Craig during and after the April 29, 2017, session closed Board meeting by urging Dr. Craig's dismissal and disparaging his performance as CMO.

95.     Following Dr. Craig's submission of letters to the City Council and his November 3, 2017, testimony to the City Council, Defendants UMC and Veritas escalated their retaliation against Dr. Craig by making false statements about him to the City Council; publicly impugning Dr. Craig's motivations for testifying; falsely accusing him of being derelict in his duties; and terminating his employment by letter dated November 17, 2017,  just fourteen days after Dr. Craig first reported UMC and Veritas to the City Council.

96.     Defendant UMC's and Veritas' retaliatory actions were motivated by Dr. Craig's protected activity.

97.     Defendants UMC's and Veritas' termination of Dr. Craig violated 31 U.S.C. § 3730(h), which prohibits retaliation by employers against employees who investigate or report false statements within the meaning of 31 U.S.C. § 3729.

98.     As a direct and proximate result of the foregoing, Dr. Craig has lost the benefits and privileges of employment, and has suffered additional economic and non-economic damages, including emotional anguish and continuing harm to his reputation and career.

## COUNT II

**RETALIATION IN VIOLATION OF**
**THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT, D.C. CODE § 2-381.04**
**AGAINST DEFENDANT DISTRICT OF COLUMBIA**

99.     Plaintiff hereby incorporates as though restated all of the factual allegations

herein.

100.     The DCFCA, D.C. Code § 2–381.04, prohibits an employer, including the District

of Columbia, from discharging, demoting, suspending or in any manner discriminating against

an employee because of in the terms and conditions of employment because of lawful acts done

in furtherance of an action under the DCFCA or to stop one or more violations of the DCFCA.

101.     Dr. Craig engaged in protected activity when he reported in an "official

complaint" to UMC's Executive Director of Human Resources, Eric Johnson, his reasonable

good-faith belief that Mr. Hernandez had engaged in activity that put the Hospital at serious

federal regulatory and financial risk and when he met with Mr. Johnson, Dr. Alexander, and

hospital attorneys to discuss his complaint.  In his complaint and subsequent meeting, Dr. Craig

reported that he believed Mr. Hernandez was pressuring doctors to admit patients without regard

to medical necessity and proper documentation, resulting in UMC illegally receiving payment

from Medicare for patients who did not meet the criteria to be admitted.

102.     Because Dr. Craig reported Mr. Hernandez's wrongdoing directly to UMC

executives and UMC's lawyers, Defendant UMC had knowledge of Dr. Craig's protected

activity.  Veritas, as UMC's operator, and Mr. Hernandez, UMC's CEO, also had knowledge of

Dr. Craig's protected activity.  Defendant Price, in his role as ultimate decision-maker for

Veritas, also had knowledge.

103.    Dr. Craig also engaged in protected activity on November 3, 2017, when he wrote a letter to and testified before the City Council reporting his reasonable good-faith belief that Veritas, as the operator of UMC, had caused UMC to violate the law when Mr. Hernandez pressured doctors to admit patients without regard to medical necessity.  He further engaged in protected activity on November 6, 2017, when he wrote a second letter to the City Council reiterating and clarifying his concerns.

104.    Defendant UMC and Veritas had knowledge of Dr. Craig's protected activity and publicly responded to it.

105.    Defendants UMC and Veritas retaliated against Dr. Craig in various ways, including, but not limited to, by excluding him from meetings, marginalizing him and stripping his duties and responsibilities, and on April 29, 2017, by refusing  to approve the restoration of his full compensation and the payment of wages that had been wrongfully withheld.  Defendant Veritas retaliated against Dr. Craig during and after the April 29, 2017, session closed Board meeting by urging Dr. Craig's dismissal and disparaging his performance as CMO.  Thereafter, Defendant Hernandez attempted to demote Dr. Craig by changing his reporting relationship.

106.    Following Dr. Craig's submission of letters to the City Council and his November 3, 2017, testimony to the City Council, Defendants UMC and Veritas escalated their retaliation against Dr. Craig by making false statements about him to the City Council, publicly impugning Dr. Craig's motivations for testifying; falsely accusing him of being derelict in his duties, and terminating his employment by letter dated November 17, 2017,  just fourteen days after Dr. Craig first reported UMC and Veritas to the City Council.

107.    Defendant UMC's and Veritas' retaliatory actions were motivated by Dr. Craig's protected activity.

108.     Defendants' termination of Dr. Craig violated the DCFCA which prohibits retaliation by employers against employees who investigate or report false statements within the meaning of D.C. Code § 2–381.04.

109.     As a direct and proximate result of the foregoing, Dr. Craig has lost the benefits and privileges of employment, and has suffered additional economic and non-economic damages, including severe emotional anguish and continuing harm to his reputation and career.

## COUNT III

### VIOLATION OF THE D.C. WHISTLEBLOWER PROTECTION ACT AGAINST DEFENDANTS UMC AND VERITAS

110.     Plaintiff hereby incorporates as though restated all of the factual allegations herein.

111.     The D.C. Whistleblower Protection Act ("DCWPA") prohibits a supervisor from discriminating against an employee for making a protected disclosure.  D.C. Code § 2-223.02.

112.     Defendants UMC and Veritas are Dr. Craig's joint-employers and are subject to liability under the DCWPA.  See D.C. Code § 2-223.02 (defining supervisor); D.C. Code § 2-223.03 (providing a civil cause of action and listing available remedies).  In the alternative, Veritas was Dr. Craig's supervisor.

113.     "Protected disclosures" include disclosures to a public body that the employee reasonably believes amount to gross mismanagement in connection with the administration of a public program or the execution of a public contract; gross misuse or waste of public funds; a violation of a law, rule, or regulation, or a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or a substantial and specific danger to the public health and safety.  D.C. Code § 2-223.01(7).

33

114.     Dr. Craig made a protected disclosure when he reported to Mr. Johnson his reasonable good-faith belief that Mr. Hernandez had engaged in activity that put the hospital at serious federal regulatory and financial risk and when he met with Mr. Johnson, Dr. Alexander, and hospital attorneys to discuss his complaint.  In his complaint and subsequent meeting, Dr. Craig reported that he believed Mr. Hernandez was pressuring doctors to admit patients without regard to medical necessity and proper documentation, for the express purpose of improving the hospital's finances.  He believed that these unnecessary inpatient admissions would result in UMC illegally receiving payments from Medicare for patients who did not meet the criteria to be admitted.

115.     Dr. Craig made another protected disclosure when he wrote a letter to the City Council and testified in a City Council hearing reporting his reasonable good-faith belief that Veritas, as the operator of UMC, had caused UMC to violate the law when Mr. Hernandez pressured doctors to admit patients who did not meet the admissions criteria.  He made further protected disclosures when, on November 6, 2017, he wrote a second letter to the City Council reiterating and clarifying his concerns.

116.     Defendants UMC and Veritas had knowledge of Dr. Craig's protected disclosures and publicly responded to them.

117.     Defendants UMC and Veritas took a material adverse action against Dr. Craig when, on April 29, 2017, it did not approve the restoration of his full compensation and the renewal of his employment contract.  Defendants UMC and Veritas also took a material adverse action against Dr. Craig when, by letter dated November 17, 2017, they terminated his employment as CMO.

118.    Dr. Craig's protected disclosures were contributing factors to Defendants UMC and Veritas' material adverse actions against Dr. Craig.

119.    As a direct and proximate result of Defendants UMC and Veritas' discrimination, Dr. Craig has suffered, and will suffer in the future, significant economic, reputational, and emotional damages.

## COUNT IV

### WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY AGAINST UMC AND VERITAS

120.    Plaintiff hereby incorporates as though restated all of the factual allegations herein.

121.    District of Columbia common law prohibits the discharge of an employee for his refusal to violate the law or for his actions in furtherance of a public policy of the District as manifested in a statute or regulation. Defendants UMC and Veritas are Dr. Craig's joint-employers and are subject to liability under District of Columbia common law.

122.    The District of Columbia's municipal regulations reflect a clear policy requiring proper recordkeeping in hospitals. 22-B D.C. Mun. Regs. § 2030. The District of Columbia's municipal regulations also reflect a clear policy of ensuring that patient care and treatment meets prevailing professional standards. 22-B D.C. Mun. Regs. § 2024.

123.    Dr. Craig took actions in furtherance of the District of Columbia's public policies in favor of proper recordkeeping and patient care and safety when, among other actions, he submitted a complaint to Mr. Johnson and in a subsequent meeting reported that he believed Mr. Hernandez was pressuring doctors to admit patients without regard to medical necessity and proper documentation. Dr. Craig again furthered these public policies when he submitted two letters and testified before the City Council about Veritas' mismanagement and malfeasance at

35

UMC. He stated that he had seen patients admitted to UMC for whom there lacked appropriate documentation and that Veritas' actions at UMC had jeopardized patient care and safety.

124.   Defendants UMC and Veritas knew of Dr. Craig's actions in furtherance of D.C. public policy.

125.   In response to Dr. Craig's actions in furtherance of D.C. public policy, Defendants UMC and Veritas retaliated against Dr. Craig by terminating his employment as CMO.

126.   Dr. Craig's protected activity was causally connected to the adverse actions he suffered.

127.   As a direct and proximate result of Defendants UMC and Veritas' actions, Dr. Craig has suffered, and will suffer into the future, significant economic, reputational, and emotional damages.

## COUNT V

### BREACH OF CONTRACT AGAINST UMC

128.   Plaintiff hereby incorporates as though restated all the factual allegations herein.

129.   Defendant UMC and Dr. Craig were parties to an Employment Contract executed on June 3, 2015.  Both Dr. Craig and the then-Chairman of the UMC Board of Directors, C. Matthew Hudson signed the agreement, which described the terms of Dr. Craig's employment that were later further memorialized in Dr. Craig's employment contract.

130.   In the Employment Contract, Dr. Craig agreed to work 32 hours per week on 0.8 FTE status for Defendant UMC as CMO in exchange for an annual base salary of $320,000 per year, plus benefits.  These same terms appeared in the employment contract memorializing the agreement.  The contract also stated, in Section 18, that the agreement could be modified "only

by a written instrument signed by both Parties or, in the case of a waiver, by the Party waiving compliance."

131. In the absence of an express written modification to the Employment Contract, the terms of the original June 3, 2015, agreement controlled Dr. Craig's rate and schedule throughout his employment at UMC.

132. Defendant UMC breached the Employment Contract by unilaterally reducing Dr. Craig's annual compensation of $100,000 with a purported but ineffective reduction of his work hours to 0.5 FTE. Beginning in May 2016 and continuing to the last date of his employment, December 17, 2017, Defendant UMC paid Dr. Craig at a reduced hourly rate of $96.15, half the agreed-upon rate.

133. As a direct and proximate result of Defendant UMC's breach of Dr. Craig's Employment Contract, Dr. Craig has suffered economic damages.

## COUNT VI

### VIOLATION OF THE DISTRICT OF COLUMBIA WAGE PAYMENT AND COLLECTION LAW AGAINST UMC AND VERITAS

134. Plaintiff hereby incorporates as though restated all of the factual allegations herein.

135. The District of Columbia Wage Payment and Collection Law, as amended by the Wage Theft Prevention Act of 2014 ("DCWPCL" or "the Act"), requires an employer to pay its employees all wages owed at the time they are due. D.C. Code § 32-1301(3).

136. UMC and Veritas are employers under the Act. Id. at § 32-1301(1). Dr. Craig is an employee under the Act. Id. at § 32-1301(2). Defendant UMC has employed Dr. Craig as CMO from June 2015 to December 18, 2017. Defendant Veritas has been Dr. Craig's joint employer since April 15, 2016.

137.     Under the DCWPCL, wages include "all monetary compensation owed by an employer", including but not limited to "other remuneration promised or owed … pursuant to a contract for employment, whether written or oral" or pursuant to any other "contract between an employer and another person or entity." Id. at § 32-1301(3)(i)-(ii).

138.     An employer violates the DCWPCL if it does not pay an employee wages owed at the time they are due.  Id. at §32-1302.

139.     Defendant UMC and Dr. Craig were parties to an Employment Agreement executed on June 3, 2015, pursuant to which Dr. Craig agreed to work 32 hours per week on 0.8 full time equivalent ("FTE") status for Defendant UMC as CMO in exchange for an annual base salary of $320,000 per year, plus benefits.  Thus, the agreed hourly rate was $192.32.   The same terms were later memorialized in Dr. Craig's employment contract.  At all relevant times, Dr. Craig worked at least 32 hours per week or 0.8 FTE.  This Agreement was the only valid agreement governing the compensation for Dr. Craig's employment as CMO.

140.     Defendant Veritas became Dr. Craig's joint employer when it became UMC's operator on April 15, 2016.  Defendant Veritas oversaw all the day-to-day activities at the hospital.  Veritas and its employees occupied positions on UMC's executive leadership team.  Veritas' management role was indistinguishable from UMC.  Veritas controlled the means and manner of Dr. Craig's performance to an equal or greater extent as UMC.  Mr. Hernandez was an agent of Veritas and also Dr. Craig's immediate supervisor with the usual duties of a supervisor.

141.     An employer violates the DCWPCL if it does not pay an employee wages owed at the time they are due.  Id. at §32-1302.  On May 1, 2016, Defendants UMC and Veritas began paying Dr. Craig at a reduced rate of $96.15 per hour.  Defendants UMC and Veritas paid Dr.

Craig at this reduced rate, contrary to their agreement with Dr. Craig up until the date of his termination on December 18, 2017.

142.    Dr. Craig was injured as a direct and proximate result of UMC's failure to pay compensation that it owed Dr. Craig and has incurred costs and attorney's fees in seeking to recover the compensation owed.

## COUNT VII

### TORTIOUS INTERFERENCE WITH CONTRACT AGAINST DEFENDANTS VERITAS, PRICE AND HERNANDEZ

143.    Plaintiff hereby incorporates as though restated all of the factual allegations herein.

144.    Dr. Craig and Defendant UMC entered into an Employment Contract on June 3, 2015.  Under its terms, Dr. Craig would work for UMC at 0.8 FTE status for $320,000 annually.

145.    Defendants Veritas, Price and Hernandez Price had knowledge of Dr. Craig's Employment Contract with UMC.

146.    Defendants Veritas, Price, and Hernandez intentionally procured a breach of the Employment Contract when, upon information and belief, Mr. Price and Mr. Hernandez decided to reduce Dr. Craig's pay and that decision was carried out by Mr. Davis at the direction of Mr. Hernandez.  Upon information and belief, Defendants Veritas, Price, and Hernandez intentionally procured a breach of Dr. Craig's Employment Contract by participating in the decision to terminate his employment.

147.    As a direct and proximate result of Defendants Veritas, Price, and Hernandez's actions, Dr. Craig has suffered, and will suffer in the future, significant economic, reputational, and emotional damages.

## REQUESTED RELIEF

WHEREFORE, Plaintiff prays this Court for the following relief:

1.    Enter a judgment in Dr. Craig's favor and against Defendants UMC and Veritas for retaliation in violation of the False Claims Act;

2.    Enter a judgment in Dr. Craig's favor and against Defendants UMC and Veritas for retaliation in violation the DCFCA.

3.    Enter a judgment in Dr. Craig's favor and against Defendants UMC and Veritas for retaliation in violation the DCWPA;

4.    Enter a judgment in Dr. Craig's favor and against Defendants UMC and Veritas for wrongful discharge in violation of public policy;

5.    Enter a judgment in Dr. Craig's favor and against Defendant UMC for breach of contract;

6.    Enter a judgment in Dr. Craig's favor and against Defendants Veritas and Corbett Price for tortious interference with contract and tortious interference with economic advantage;

7.    Award Dr. Craig compensatory damages in an amount to be proven at trial;

8.    Award Dr. Craig an additional amount as liquidated damages of two times the amount owed under the False Claims Act;

9.    Award Dr. Craig an additional amount as liquidated damages of two times the amount owed under the DCFCA;

10.    Award Dr. Craig an additional amount as liquidated damages of three times the amount owed in unpaid wages under the DCWPCL;

11.    Award Dr. Craig punitive damages against Veritas and Price for tortious interference with his Employment Contract;

12.    Enter an order enjoining defendants, or each of them, to do all that is necessary in law or equity to make Dr. Craig whole for the damages and injuries alleged herein;

13.    Award Dr. Craig reasonable attorneys' fees, litigation expenses, and costs; and

14.    Award Dr. Craig all other relief permitted under the above causes of action, or which the court deems just and proper.

Respectfully submitted,

/s/ Debra S. Katz

_____
Debra S. Katz (D.C. Dist. Ct. No. 411861)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C.  20009
Ph:      (202) 299-1140
Fax:     (202) 299-1148
Email:  katz@kmblegal.com


/s/ Lisa J. Banks

_____
Lisa J. Banks (D.C. Dist. Ct. No. 470948)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C.  20009
Ph:      (202) 299-1140
Fax:     (202) 299-1148
Email:  banks@kmblegal.com


/s/ Steven Z. Chertkof

_____
Stephen Z. Chertkof (DC Bar No. 451713)
Heller, Huron, Chertkof & Salzman, PLLC
1730 M Street, N.W., Suite 412
Washington, DC 20036
Ph:      (202) 293-8090
Email:  stephen@hellerhuron.com
            quinn@hellerhuon.com

/s/ Julia T. Quinn
_____

Julia T. Quinn (DC Bar No. 1031695)
Heller, Huron, Chertkof & Salzman, PLLC
1730 M Street, N.W., Suite 412
Washington, DC 20036
Ph:      (202) 293-8090
Email:  quinn@hellerhuon.com


Attorneys for Plaintiff Julian Craig

Date:  February 15, 2018

## JURY DEMAND

Plaintiff requests trial by jury as to all issues in this case.


/s/ Debra S. Katz
_____

Debra S. Katz (D.C. Bar No. 411861)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C.  20009
Ph:      (202) 299-1140
Fax:     (202) 299-1148
Email: katz@kmblegal.com


/s/ Steven Z. Chertkof
_____

Stephen Z. Chertkof (DC Bar No. 451713)
Heller, Huron, Chertkof & Salzman, PLLC
1730 M Street, N.W., Suite 412
Washington, DC 20036
Ph:      (202) 293-8090
Email: szc@hellerhuron.com


Attorneys for Plaintiff Julian Craig

Date:  February 15, 2018