UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
JULIAN CRAIG,                       )
                Plaintiff,          )  Civil Action
vs.                                 )  No. 18-347
                                    )
NOT FOR PROFIT HOSPITAL, et al.,    )  January 22, 2019
                Defendants.         )  10:36 a.m.
                                    )  Washington, D.C.
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE KETANJI B. JACKSON,**
**UNITED STATES DISTRICT COURT JUDGE**

**<u>APPEARANCES</u>:**


**FOR THE PLAINTIFF:**   STEPHEN CHERTKOF
                         JULIA THERESA QUINN
                         Heller, Huron, Chertkof & Salzman, PLLC
                         1730 M Street, NW, Suite 412
                         Washington, DC 20036
                         (202) 293-8090
                         Email: Szc@hellerhuron.com

                         DEBRA S. KATZ
                         JESSICA WESTERMAN
                         Katz, Marshall & Banks, LLP
                         1718 Connecticut Avenue, NW, 6th Floor
                         Washington, DC 20009
                         (202) 299-1140
                         Email: Katz@kmblegal.com


**FOR DEFENDANTS:**      EMIL HIRSCH
(NOT-FOR-PROFIT)         KRISTIN ANN SHEPARD
(UMC)                    Carlton Fields Jorden Burt, P.A.
                         1025 Thomas Jefferson Street, NW
                         Suite 400 West
                         Washington, DC 20007-5208
                         (202)965-8184
                         Email: Ehirsch@carltonfields.com


**(<u>APPEARANCES CONTINUED</u>)**

**<u>APPEARANCES</u>:   (Continued)**


**FOR DEFENDANTS:**        GEOFFREY H. COLL
(VERITAS/C. PRICE)    EDWARD W. GRAY, JR.
(and C. BOUCREE)      Thompson Coburn, LLP
                      1909 K Street, NW, Suite 600
                      Washington, DC 20006-1167
                      (202) 585-6900
                      Email: Egray@thompsoncoburn.com


**FOR DEFENDANT:**         PAUL L. KNIGHT
(L. HERNANDEZ)        Nossaman LLP
                      1666 K Street, NW, Suite 500
                      Washington, DC 20006
                      (202) 887-1400
                      Email: Pknight@nossaman.com



**ALSO PRESENT:**          MICHAEL TILGHMAN,
                      Office of Attorney General (D.C.)



Court Reporter:       Elizabeth Saint-Loth, RPR, FCRR
                      Official Court Reporter
                      U.S. Courthouse
                      Washington, D.C.  20001


            Proceedings reported by machine shorthand,
          transcript produced by computer-aided transcription.

```
1                          P R O C E E D I N G S

2                 THE DEPUTY:  Your Honor, this is Civil Action

3      18-347, Julian Craig versus Not-for-Profit Hospital

4      Corporation, et al.

5                 I am going to ask counsel to please approach the

6      podium, state your appearance for the record, and introduce

7      all of the parties at your table.

8                 MR. CHERTKOF:  Good morning, Your Honor.

9      Steve Chertkof for plaintiff Julian Craig.  With me is

10     Debra Katz, Julia Quinn, and Jessica Westerman.

11                THE COURT:  Good morning to all of you.

12                MS. KATZ:  Good morning.

13                MS. QUINN:  Good morning.

14                MS. WESTERMAN:  Good morning.

15                MR. HIRSCH:  Good morning, Your Honor.

16     Emil Hirsch for the Not-For-Profit Hospital Corporation.

17     And with me at counsel table is my partner Christian

18     Shepard, also for the Not-For-Profit Hospital Corporation.

19                THE COURT:  Good morning.

20                MR. COLL:  Good morning, Your Honor.

21     Geoffrey Coll with Thompson Coburn, on behalf of Veritas of

22     Washington, and Mr. Price and Ms. Boucree.  And with me at

23     counsel table is Edward Gray, also with Thompson Coburn.

24                THE COURT:  Good morning to you.

25                MR. KNIGHT:  Good morning, Your Honor.
```

1    Paul Knight from Nossaman representing Luis Hernandez.

2         THE COURT:  Good morning to you as well.

3         This is a motions hearing with respect to the

4    pending dispositive motions in this action, which are the

5    three motions to dismiss the plaintiff's complaint that the

6    defendants in this action have filed.

7         As you know, because there are so many parties and

8    so many arguments, there are a lot of moving parts in this

9    case.  I am going to need your help sorting through the

10   claims and the various contentions with respect to these

11   pending motions.

12        You should know that I am familiar with your

13   arguments and allegations.  But you should certainly feel

14   free to restate them as necessary, during our discussion

15   this morning, and to provide me with any background detail

16   that you feel may be necessary in order to illuminate the

17   issues.  And because the purpose of this hearing is for the

18   Court to get the information that it needs in order to rule

19   on pending motions, I will be asking you questions;

20   although, I will try not to ask too many or interrupt you

21   too much.

22        In accordance with my ordinary procedure, I don't

23   really like to have time limits with respect to hearings; I

24   find them distracting.  But I also do something fairly

25   unconventional which is, even though this case involves the

1    defendants' motions to dismiss at this stage, I would like

2    the plaintiffs to actually begin by explaining the facts of

3    the case, laying out the claims that have been brought, and

4    then the defendants can respond by explaining why those

5    claims should be dismissed.

6              I think -- let me start by asking defense counsel

7    whether you-all have coordinated your presentations, whether

8    there is going to be lead counsel in this regard, or -- what

9    have you thought about?

10             MR. HIRSCH:  Your Honor, Emil Hirsch.

11             We, obviously, have met.  And we have coordinated

12   what we would like to do here so as not to be redundant,

13   repetitive --

14             THE COURT:  Yes.

15             MR. HIRSCH:  -- and, God forbid, we should

16   contradict one another, also.  So we took all of that in

17   account.

18             Basically, what we have agreed on is that I would

19   argue the sovereign immunity issue.  Both the --

20             THE COURT:  Okay.

21             MR. HIRSCH:  And also the diversity -- lack of

22   diversity jurisdiction issue.

23             With regard to the FCA claims, both the D.C. and

24   the federal, I would basically present the factual narrative

25   or how we see the facts, what has been alleged, what should

1    have been alleged and wasn't alleged.

2              Mr. Coll, on behalf of his clients, is going to

3    argue the applicable legal principles that should drive your

4    ultimate decision on the question of whether this suffices

5    or not under 12(b)(6).

6              And Mr. Knight, who is here only because of two

7    claims, is going to take, essentially, the existence versus

8    nonexistence of a contract, because that's a core issue with

9    regard to the tortious interference claim; so that's our

10   coordination.

11             THE COURT:  All right.

12             MR. HIRSCH:  I would also like to mention that

13   Mr. Michael Tilghman of the D.C. Attorney General's office

14   is seated in the courtroom.  He is here on behalf of the

15   District that has filed the amicus brief.  He has not

16   entered an appearance in the case, so he is seated in the

17   audience.  If the Court wishes to call upon him, he is

18   present.

19             THE COURT:  Understood.  Thank you.

20             MR. HIRSCH:  Thank you.

21             THE COURT:  I think -- in light of that

22   description of what the defendants have prepared, which is

23   consistent with, sort of, how I have thought about the case,

24   we might have the plaintiffs come first, as I have

25   discussed, with regard to all of the claims; then have

1    sovereign immunity, and a plaintiff response to that; then

2    have an FCA -- we'll see about the timing.

3            I am always mindful of the time.  Maybe we'll do

4    FCA and breach of contract together and have a plaintiff's

5    response; but we'll see how it goes.

6            All right.  With that, Mr. Chertkof, are you

7    arguing on behalf of the plaintiff?

8            You may come forward.

9            MR. CHERTKOF:  Good morning.

10           THE COURT:  Good morning.

11           MR. CHERTKOF:  Dr. Julian Craig was the Chief

12   Medical Officer at a hospital known as UMC.  I think the

13   papers refer to it mainly as "UMC," but the technical name

14   is "Not-for-Profit Hospital Corporation" or "NFP."

15           After D.C. took over from the Specialty Hospitals

16   of America, they assumed all personnel contracts.  And the

17   organic statute said they could sue and be sued in their own

18   name, and that the rights of employees were unchanged.

19   That's what the organic statute says.

20           Dr. Craig was in charge of the medical staff as

21   the Chief Medical Officer.  And he became aware of lots of

22   problems when the operator brought in by the UMC board,

23   Veritas, decided to prioritize funding over patient care and

24   other issues.  And the claims in this case really boil down

25   to three sets.

1          The last claim, defamation, isn't an issue; nobody

2     has challenged that.

3          THE COURT:  So, I'm sorry, that continues

4     regardless, right?

5          MR. CHERTKOF:  Exactly.

6          THE COURT:  All right.

7          MR. CHERTKOF:  The first four claims deal with the

8     firing in November.  And it followed just two weeks after

9     Dr. Craig submitted a letter and oral testimony to the D.C.

10    counsel about Veritas' performance at UMC including, among

11    other allegations, that they have made unjustifiable charges

12    to the Government in Medicare and Medicaid.

13          "Unjustifiable charges" means false claims.

14          THE COURT:  I'm sorry.  That came in the context

15    of the letter to the --

16          MR. CHERTKOF:  D.C. Council.

17          THE COURT:  -- the council.

18          MR. CHERTKOF:  And he, basically, bumped into

19    somebody at the hearing and -- I think Councilman Gray, and

20    was invited to testify.  He, basically, read his letter,

21    summarized his letter, and then answered questions about the

22    letter.

23          UMC has put a transcript -- an official transcript

24    of that testimony in as part of their exhibits.

25          THE COURT:  Hold on.  Just give me one second.

1          My computer is not rendering the transcript.

2          Give me one minute.

3          (Proceeding pauses.)

4          THE COURT:  Thank you.  Continue.

5          MR. CHERTKOF:  I think I was summarizing the

6    Councilman --

7          THE COURT:  Yes.  The first four.

8          MR. CHERTKOF:  The first four deal with the

9    firing; that, in November of 2017, Dr. Craig was fired in

10   retaliation for protected activity.  His testimony at D.C.

11   Council was probably the last important act of protected

12   activity.

13         He gave a letter.  He testified orally.

14         The UMC board was angry.  They met and talked

15   about it.  They submitted a letter trying to discredit him.

16   A few days after that, Dr. Craig submitted a second letter

17   correcting the record showing that his testimony was

18   accurate.  He submitted an affidavit and documentation.

19   And, right after that, he got his letter from UMC board

20   saying his employment would be terminated in 30 days.

21         So the first four counts, False Claims Act --

22   federal False Claims Act, the D.C. False Claims Act, the

23   D.C. Whistleblower Protection Act, and the common law

24   wrongful discharge all deal with the wrongful firing.

25         The next three claims deal with the pay issue.

1          From the time that Veritas came on board as the

2    hospital management company, they started running things,

3    including setting things like pay decisions.  And one of the

4    first acts that affected Dr. Craig is they unilaterally cut

5    his pay.

6          THE COURT:  Was he still under contract at this

7    point?

8          MR. CHERTKOF:  Yes.

9          THE COURT:  The written contract?

10          MR. CHERTKOF:  Yes.

11          THE COURT:  All right.

12          MR. CHERTKOF:  He had a written contract.  It was

13    renewable for up to five years; but the initial term was one

14    year, and this was before the initial one-year term was up.

15          THE COURT:  All right.

16          MR. CHERTKOF:  He talked to the person who was the

17    outgoing CEO, and the person texted him:  It's not

18    negotiable, and it's not my decision; it's from Veritas.

19          So Veritas exercised the power of an employer by

20    changing his pay.  They violated the contract that had been

21    approved by both parties, including the full board of UMC.

22    And for the next year and a half or so, Dr. Craig continued

23    to do the work that his original contract said; that is, he

24    continued to work at least 32 hours a week, often more,

25    which is what his contract called for, but he never got paid

 1    the contract rates for that.

 2          He had multiple conversations detailed throughout

 3    our complaint where the COO or the CFO, Ms. Washington in

 4    particular, acknowledged that he was owed back pay; and he

 5    kept working with the hope that the backpay would come.

 6    There were discussions about different arrangements, about

 7    different numbers of hours, and different levels of pay.

 8    Most of those had the same hourly rate, different hours per

 9    week, but none of them were ultimately approved by UMC's

10    board, none.

11          Significantly, for our cases, in the early part of

12    2017, a lawyer for UMC, Steven Pozefsky, met with Julian

13    Craig to resolve the pay issues which had been hanging out

14    there for a very long time; there had been multiple

15    overtures.  And he ultimately said:  You are right, we owe

16    you the money.  Here is how we're going to do it:  We are

17    going to do these two contract extensions of the only

18    contract that was ever approved by the board, the original

19    contract.

20          So one was, essentially, a retroactive extension;

21    it was acknowledging a one-year extension for the year that

22    had already passed.  The next was a prospective extension

23    for the year that was coming.  The second one would have

24    ended, I believe, in the end of May, 2018.

25          There was discussion.  Dr. Craig agreed to that.

1          Dr. Craig, I believe, signed both of those

2     letters -- those extension agreements, and returned them.

3     But at the meeting that he was told the board was going to

4     vote on approving those extensions which he had thought was

5     a formality -- that was the same meeting that his internal

6     complaint regarding patient admissions and improper billings

7     to Medicaid and Medicare got discussed at the board.

8          What was reported to him out of the board was that

9     CEO Hernandez argued not only should they not adopt --

10    finally approve these extensions, the retroactive and

11    prospective, but they should go ahead and fire Dr. Craig

12    immediately.

13          THE COURT:  All right.

14          MR. CHERTKOF:  That was the reaction to his

15    internal complaint saying that patients are being admitted

16    that don't meet criteria for reimbursement for Medicare and

17    Medicaid, which is a large chunk of the population at UMC.

18          THE COURT:  And that was the -- was that the HR

19    complaint that he had made in --

20          MR. CHERTKOF:  Yes.  So what happened was, as

21    detailed in the complaint, in mid-February Dr. Craig gets a

22    copy of the KEPRO audit report.

23          KEPRO did an audit on behalf of only Medicare.  So

24    they only looked at Medicare patients.  They did a sampling

25    of, I believe, ten patient charts and found that none of

them met criteria for hospital admission and, therefore, for recovery of Medicare money for those patients.

When Dr. Craig saw that -- and he also had heard from doctors that they were being pressured to increase admissions -- to increase the revenues for UMC by Veritas. The pressure was from Veritas and CEO Hernandez.

He filed a written complaint that was short; it had four bullet points. But two of those bullet points were that: You are jeopardizing the license of me and you are jeopardizing the licenses of doctors by asking us to do, essentially, fraudulent things. And that prompted a meeting, about two or three days later with a bunch of people, including the head of HR; the lawyer, Mr. Pozefsky; the CEO; and the complaint officer for UMC. And -- actually, I am not sure the CEO was there. I may have misspoken there. There were five people there, as alleged in the complaint.

And they promised they would have outside counsel investigate this. What Dr. Craig said at that meeting was: This isn't a documentation issue. There are patients being admitted who should not be admitted, and you can't fix that.

You can't make documentation if they don't meet criteria. I'm worried that doctors are being pressured to admit people improperly and that we're being reimbursed improperly.

1          As it eventually came out, the auditor for UMC

2     decided to set aside $5 million to reimburse Medicare and

3     Medicaid for improper collections; so that's sort of the

4     framework of what happened here.

5          So the two time periods are the time period when

6     Dr. Craig had worked out this long-standing pay issue; he

7     had signed these two one-year extensions of the only

8     operative contract.  And then the board, instead of

9     approving them at their April meeting, reneged, and there

10    was talk about firing him in retaliation for this internal

11    complaint.  There continues to be issues where they

12    marginalize him.

13         One of the things Hernandez does, instead of

14    firing him, is tried to demote him.  He tried to demote him.

15    So the CMO is reporting to a nurse who had no qualifications

16    as supervisor or knew what he was doing.  Ultimately, that

17    was not fully implemented, but that was one of the things

18    Hernandez issued, was a demotion.  So I think that sets up

19    where we are.

20         And then on the issue of sovereign immunity -- all

21    of the cases come back to your starting point --

22         THE COURT:  I will let you respond.  Let me let

23    them --

24         MR. CHERTKOF:  Okay.  Do you have any questions,

25    then?

1          THE COURT:  Let me make sure that I have -- yes.

2          Let me understand exactly what you are alleging is

3     the protected activity in your complaint.

4          MR. CHERTKOF:  Well, the different statutes cover

5     different things.

6          THE COURT:  All right.

7          MR. CHERTKOF:  So for the False Claims Act -- for

8     D.C. and federal False Claims Act -- they are essentially

9     similar for our purposes; and that has to be a false claim

10    for payment to the Government.  But to be protected from

11    retaliation you don't have to prove there actually was, you

12    just have to have a reasonable suspicion.  You have to

13    complain about it, or you have to make an effort to stop

14    false claims to the Government.

15         THE COURT:  Right.  So what do you say, in terms

16    of your allegations of fact, counts as the complaint or

17    whatever?

18         MR. CHERTKOF:  Okay.  Multiple instances.

19         So starting with the internal complaint in

20    February of 2017 and the meeting a few days later where

21    Dr. Craig put a lot of meat on those bare bones and saying,

22    basically, you are -- Veritas is encouraging doctors to

23    admit patients who don't meet criteria and then billing

24    Medicare and Medicaid for those patients.

25         Those billings are what he called the

1     "unjustifiable charges"; that's a false claim if true.  When

2     he said that, that's protected activity.

3                THE COURT:  Right.

4                MR. CHERTKOF:  And his effort to meet with doctors

5     and to try to stop is also protected activity because the

6     False Claims Acts were amended -- the federal one in 2009,

7     the D.C. one a little after -- to expand coverage to any

8     effort to stop it.  So the argument that you have to be the

9     first reporter is out the window.

10               Any effort by somebody to stop false claims to

11    Medicare and Medicaid is protected by the federal --

12               THE COURT:  And his effort to stop it was these

13    meetings.  What else?

14               MR. CHERTKOF:  Asking for the investigation,

15    talking to doctors.  He overruled, as alleged in the

16    complaint, that he was telling the hospitalists not to admit

17    patients in certain cases.  He would overrule their

18    admission decisions because they didn't meet criteria.

19               And then he continues to try and push this.  The

20    so-called investigation, as far as he knows, never happened.

21    Nobody ever followed up with him or anybody that he talked

22    to.  And then it continues into the summer when he ends up

23    writing the letter -- into November -- when he writes a

24    letter and testifies to the D.C. Council about these

25    problems, where they are increasing admissions for patients

1    who don't meet criteria; they have to return all this money

2    to Medicare and Medicaid.  And they're also doing other

3    things that neglect patients and harm patient care.  So that

4    goes to the D.C. Whistleblower Protection Act which includes

5    a much broader array of activity.  Any allegation of

6    mismanagement, abuse, waste, harm to the public is covered

7    by that.  So pretty much all of his testimony is covered by

8    that.

9            But, under the False Claims Act, his effort to

10   stop improper charges and improper collections from Medicare

11   and Medicaid are protected activity.

12           THE COURT:  All right.  One final question before

13   I turn to the defense.

14           With respect to your wrongful discharge claim,

15   what is the public policy that you say that plaintiff's

16   discharge violates?

17           MR. CHERTKOF:  Well, we have looked at three

18   different ones.  So the first -- the one we submitted most

19   recently to the Court last week is the same policy that was

20   at issue in *Carl*, which we had not previously submitted.

21           THE COURT:  I understand, but it's not at issue in

22   your complaint, right?  I mean, you can't amend your

23   complaint by supplemental filings.

24           Do you reference whatever the *Carl* policy is in

25   the complaint?  And, if so, where?

1          MR. CHERTKOF:  We do not reference the legal

2     statute.  I am not -- I don't believe you generally have to

3     plead statute, you plead facts.

4          We have certainly pled facts that support a

5     finding that Veritas fired -- Veritas/UMC fired Dr. Craig

6     because of his council testimony.  We allege the timing, the

7     14 days.  We allege the D.C. Council members thought he was

8     fired in retaliation.  We allege that another UMC member

9     testified that she thought she was retaliated against at

10    Veritas.  So the facts --

11         THE COURT:  Right.  So the question is, is

12    retal- -- for wrongful discharge in violation of public

13    policy, as I understand the law, we look carefully at what

14    the public policy is that the plaintiff is alleging was at

15    the root of their firing.

16         So the Craig -- you are saying that there are

17    allegations in the complaint to suggest that he was fired

18    because of his testimony to the D.C. Council?

19         MR. CHERTKOF:  Yes.  I think that's -- yes.

20         Our complaint alleges that was really the last

21    straw; that's what got him fired.

22         THE COURT:  All right.

23         MR. CHERTKOF:  He was at odds with them from the

24    time in February when he made his internal complaint.  But

25    when he testified at the D.C. Council, that's when they

1    really got going and decided to end his employment.  And

2    that is consistent with *Carl*, which had the -- I call your

3    attention to paragraph 135 and 136 of the complaint.

4          We also allege, though, in the complaint two

5    regulations about patient care and patient recordkeeping

6    because these were also things that Dr. Craig raised

7    internally.

8          THE COURT:  Understood.  But the whistleblower

9    nature of his having raised it ordinarily cannot be a basis

10   for a wrongful discharge claim.

11         In other words, you are not suggesting, I think,

12   that Dr. Craig himself was completing the paperwork or doing

13   something that he believed to be consistent with public

14   policy insofar as recordkeeping is concerned, and that he

15   was fired because he was acting consistent with public

16   policy in his recordkeeping?

17         MR. CHERTKOF:  We're not --

18         THE COURT:  In other words, there is a distinction

19   in the law with respect to wrongful discharge between a

20   person claiming:  I complained about something that I

21   believed to be illegal or improper, or whatever, and I was

22   fired; that's a whistleblower claim.

23         It is not a wrongful discharge claim, as I

24   understand the law in the District of Columbia, which would

25   be:  I am the record keeper for this hospital, and the

1    hospital wanted me to improperly record things.  And I said

2    no, I am going to do what I believe is consistent with the

3    law, and I was fired; that's a wrongful discharge claim.

4              MR. CHERTKOF:  There is -- the second part is

5    there.  That is -- when he is going to the hospitalists and

6    the emergency room physicians and telling them to stop

7    admitting patients that don't meet criteria, he is basically

8    countermanding the direction that he understood Veritas had

9    given them; and that was part of what put him at odds with

10   them.

11             Veritas had gone down -- he understood -- from

12   doctors telling him so, as alleged in the complaint -- that

13   Veritas had pressured them to increase admissions.

14             THE COURT:  All right.

15             MR. CHERTKOF:  And so they -- and he went back and

16   he said, no, do not do that.  You can only admit patients if

17   they meet medical criteria and you can document it.

18             So he was personally involved in that, in some

19   instances, and he was also advocating for that at his level

20   in meetings that are described in the complaint.

21             THE COURT:  All right.  Thank you.

22             Mr. Hirsch.

23             MR. HIRSCH:  Your Honor, when I mentioned the

24   division of labor, I neglected -- my apologies -- to say

25   that I am also the designated spokesman for this table on

1    the wrongful termination, the violation of public policy,

2    the wage statute, and the D.C. Whistleblower Protection Act.

3              THE COURT:  All right.  Well, we'll get to that.

4              Let me begin at the beginning, which is your claim

5    regarding sovereign immunity and otherwise lack of

6    jurisdiction.

7              MR. HIRSCH:  Your Honor, may it please the Court,

8    there is no dispute between the parties.  I think everyone

9    agrees that the District of Columbia is -- whether you call

10   it a "state" entity, whether you call it a municipal body,

11   or some hybrid or combination of all, that the District is

12   entitled as its own sovereign immunity.

13             It is a sovereign immunity which the D.C. Court of

14   Appeals, in a very scholarly, very exhaustive opinion,

15   written by Judge Julia Mack in D.C. versus *Owens-Corning*

16   says -- it goes -- it's by derivation.  It's historically

17   derived well before the Home Rule Act from the fact that the

18   District, at one time, was a federal enclave, so that -- its

19   immunity has passed on through time to this day.  There is

20   serious case law.

21             As Your Honor knows, there is a plethora of cases,

22   WMATA cases, before this court.  WMATA often gets sued.  It

23   gets sued in this particular court, typically gets sued in

24   diversity cases or accidents, things that are not accidents,

25   firings, terminations or whatnot, but that arises here.

1        The WMATA Compact, Your Honor, says WMATA is an

2   instrumentality of all three jurisdictions, okay, and an

3   agency of each; in other words, a regional instrumentality

4   and an agency of each.

5        THE COURT:  Right.  But the question is:  Are you

6   WMATA for purposes of the instant lawsuit?

7        MR. HIRSCH:  I submit -- I submit that we are a

8   WMATA for a number of reasons.

9        *Owens-Corning,* which is a decision that is relied

10  on very heavily by Judge Walton in the *Fort Totten* case.

11  This is actually, also, a very exhaustive opinion in the

12  Fort Totten metro tragedy, where he tried -- is trying to

13  determine, and decides, whether WMATA partakes of the

14  District's immunity; same issue that we have.  Does

15  Not-For-Profit partake of the District's immunity?

16       The answer is yes.

17       Why is the answer yes, Your Honor?

18       Because our organic statute says that we are part

19  of the District government.  In other words, we are sui

20  juris, separate legal instrumentality within the District

21  government.  And that's -- that needs to be italicized,

22  "within the District government."

23       There are other governmental indicia which we lay

24  out, both the jury and de facto.  We are -- our financial

25  operations are handled very exclusively by the chief

1    financial officer of the District of Columbia; that is also

2    in our organic statute.

3          And if we were to -- just to draw a comparison

4    with WMATA, we actually have a stronger case than Judge

5    Walton had, than WMATA, to qualify for sovereign immunity of

6    the District by derivation because WMATA is not subject

7    to -- its financial operations are not controlled by the

8    OCFO.  There is not -- WMATA operates in the District.  Its

9    headquarters, I think, are not far from this courthouse.  It

10   is not subject to --

11         THE COURT:  I understand.

12         But here is my concern, that you seem to be

13   reasoning from various things that you say are analogous

14   with regard to what Judge Walton was looking at, et cetera.

15         But I would like to drill down on your actual

16   enabling statute, because what I don't understand -- because

17   I haven't looked at WMATA's statute.  But do they have

18   language that says that they are an instrumentality of the

19   District government which shall have a separate legal

20   existence within the District government?

21         MR. HIRSCH:  No.  The WMATA Compact, which is also

22   part of the D.C. Code and part of the Virginia and Maryland

23   codes, doesn't say it exactly like that.

24         What it says is that WMATA is a regional

25   instrumentality, an agency of each of the constituent

1      governments.

2              THE COURT:  All right.  Does your statute say

3      anything about Not-For-Profit Hospital being an agency of

4      the District of Columbia?

5              MR. HIRSCH:  It says that it's a separate legal

6      instrumentality.  The word that is being used is

7      "instrumentality" within the District government, Your

8      Honor.

9              THE COURT:  No, I understand.

10             But then the statute seems to take careful pains

11     to separate the hospital from the District in many, many,

12     many different ways.

13             So, for example, it specifically states that the

14     officers and employees of the corporation shall not be

15     considered District government employees.

16             The District of Columbia shall not be liable for

17     any acts or occurrences of the corporation, regardless of

18     whether or not the corporation purchases insurance.

19             I'm reading from 44-951.14.

20             It goes on to suggest that the drafters of this

21     statute even contemplated that the corporation could be sued

22     under certain circumstances without any suggestion that they

23     would have any sort of sovereign immunity defense.

24             I'm reading 44-951.14(d).  An action or other --

25     an action other than an action for medical negligence or

1   malpractice may not be maintained against the corporation

2   for unliquidated damages to persons or property unless --

3   blah-blah-blah.  The suggestion being:  There are certain

4   circumstances in which an action for medical negligence or

5   malpractice can be maintained against the corporation.

6           So I guess my question is -- before we even think

7   about waiver is the suggestion -- the threshold suggestion

8   that the drafters of the Code intended for this entity, this

9   instrumentality, to be conferred with the sovereign immunity

10  of the District.

11          MR. HIRSCH:  Your Honor, I understand the

12  threshold question.  Before we get into what is a waiver and

13  the sue-and-be-sued clause or waiver -- I understand the

14  threshold.

15          I think, with all due respect, there are many more

16  indicia that this was an entity that was supposed to partake

17  of sovereign immunity for the following reasons:  Very

18  extensive government control.  There are many, many

19  counter-indicia, with all due respect, to the ones that you

20  suggest.  I would like to go over that.

21          We are not only subject to OCFO fiscal management

22  and control, the mayor appoints 6 out of 11 voting members.

23  The mayor, and only the mayor, retains the power to remove

24  for cause.  The entity also, by its organic statute, is

25  exempt from any D.C. taxation.

1          There are more, Your Honor, indicia that cut

2    against the notion that it is so separate from the District

3    of Columbia that it ought not to have pretentions of

4    partaking of the District's immunity.

5          THE COURT:  But there is nothing in the statute

6    that says either way, right?  I mean, there is nothing in

7    the statute that says this separate instrumentality -- which

8    we have carefully inserted the words, shall have a separate

9    legal existence within the District of Columbia -- there is

10   nothing in the statute that says:  Should be, nevertheless,

11   granted sovereign immunity or enjoys the District's

12   sovereign immunity, or anything like that.

13         MR. HIRSCH:  There is no expressed indication of

14   that.  However, if we apply the test that the D.C. Court of

15   Appeals uses, the *Owens-Corning* test, what the *Owens-Corning*

16   test says is you look at whether the entity in question is

17   tasked or delegated to perform public functions.

18         THE COURT:  But is that in the absence of

19   statutory indicia, that the actual intent of the drafters

20   was to have this operate as a separate entity?

21         MR. HIRSCH:  Yes, Your Honor.  Yes, because --

22   that is correct.

23         The *Owens-Corning* test is very, very specific.  It

24   is not dependent on expressed waiver of sovereign immunity

25   or an expressed grant of sovereign immunity.  It's not

1     dependent on that.

2          In many cases where the courts -- both in this

3     courthouse and the D.C. Circuit, as well as the DCCA have

4     had to consider and struggle with these questions are

5     instances where it is not so specifically worded in the

6     legislature that this entity is created with a grant of

7     sovereign immunity; and that is also the structure of the

8     D.C. Code, Your Honor.

9          The structure of the D.C. Code is that -- let's

10    look at the District's organic statute 1-102 says that the

11    District is formed as a corporate entity for municipal

12    purposes, it has the power to be sued and be sued; and it

13    has all other necessary powers to carry out its functions.

14         It doesn't say anything about sovereign immunity.

15         But yet, in another section of the code, also in

16    Title I, 1109(d) that counsel says, notwithstanding anything

17    in this section -- including what they have said in 102,

18    there shall be -- nothing in the statute should be construed

19    to be a waiver of sovereign immunity.  And that's my point,

20    Your Honor.

21         The sovereign immunity -- the derivative sovereign

22    immunity that comes from the Congress through the Home Rule

23    Act of the D.C. government, and from D.C. to its delegatee

24    instrumentalities or agencies like WMATA, like our

25    situation -- we're not-for-profit -- can exist.  It's there,

1    Your Honor, unless there are indications of waiver.

2         In other words, counsel does not have to

3    affirmatively state that we confer hereby sovereign

4    immunity.  It's a derivative form of sovereign immunity.

5         THE COURT:  I understand, but it has --

6         MR. HIRSCH:  It's not a sovereign immunity by

7    grant, if you will.

8         THE COURT:  I appreciate that.

9         MR. HIRSCH:  Thank you.

10        THE COURT:  And the question is the language of

11   the statute and whether they intended the derivative form of

12   sovereign immunity to carry to this entity; and I will have

13   to look at it.

14        MR. HIRSCH:  Of course.

15        THE COURT:  I understand your analogy to WMATA.

16   And I will take a look at WMATA's originating statute as

17   well.

18        MR. HIRSCH:  There are indications outside of the

19   statute also.  Because this is 12(b)(1) motion, I'm allowed

20   to bring materials from outside the four corners of the

21   complaint to try to persuade you.

22        For instance, Exhibit B to our motion is the

23   Comprehensive Annual Financial Report that the District

24   files with Congress, the CAFR report, okay.  It has -- I

25   think, on page 61, I directed you; and we quoted from some

1      very important provisions.

2              The District has assumed, basically, financial

3      responsibility for this entity, which is a struggling, often

4      troubled, financial entity.  It basically says that this

5      assumption is also justified by the fact that D.C. has

6      budgetary control over this particular instrumentality; that

7      is in the CAFR report.

8              On another page of the CAFR report, Your Honor,

9      there is an organizational chart on the entire District of

10     Columbia government, and we are on the organizational chart.

11     So, basically, we are not just within the D.C. government,

12     the jury, but we also are their de facto.

13             Now, one other outside of the statute indicia,

14     which I think is very, very compelling about why we're

15     entitled to sovereign immunity, when former Mayor Fenty

16     transferred -- on July, I think 10 or 12, 2010 -- the assets

17     that the District had acquired by foreclosing on the former

18     private sector owner, he issued a duly promulgated executive

19     order.

20             Now, the executive order doesn't say:  I hereby

21     transfer by deed or by bill of sale assets; it doesn't say

22     that.  Could have done it that way.

23             It says:  I hereby transfer the assets to the

24     jurisdiction and control of the Not-For-Profit Hospital

25     Corporation.

1    "Jurisdiction and control," and this has not been

2 rebutted or challenged at all, is a term of art.  It is a

3 term of art that's been interpreted by the old predecessor

4 to the current DCCA, prior to the Court Reorganization Act

5 by the D.C. Circuit, and by a number of your colleagues on

6 this bench in a number of Guantanamo cases.  And its fixed

7 meaning is that it is a grant or a conferral of sovereign

8 governmental authority.

9    So when Mayor Fenty acted to transfer jurisdiction

10 and control, that, Your Honor, is an ipso facto indication

11 that a public function is being delegated; that sovereign

12 authority is being delegated, and sovereign power --

13    THE COURT:  All right.  So I have two questions in

14 response to that.

15    One is, even assuming that this instrumentality of

16 the District gets derivative sovereign immunity from the

17 District itself as being within the District of Columbia --

18 two questions.  One is:  What do I do with my colleague

19 Judge Moss' opinion in *Ogugua* --

20    However you pronounce that.

21    MR. HIRSCH:  *Ogugua*.

22    THE COURT:  -- not Moss, Mehta --

23    MR. HIRSCH:  Mehta, yes.

24    THE COURT:  -- Judge Mehta, pertaining to waiver?

25    And do you not concede that the District itself

1    only has limited sovereign immunity in the context of torts?

2              In other words, there are certain conditions that

3    apply when a tort claim is being brought; it's not a

4    blanket:  You can't raise any tort against the District.

5              MR. HIRSCH:  May I answer the second question

6    first?

7              THE COURT:  You may.

8              MR. HIRSCH:  Here is our position with regard to

9    the extent or the scope of sovereign immunity if you find

10   that it exists.

11             THE COURT:  Yes.

12             MR. HIRSCH:  In tort, it exists only with regard

13   to discretionary function.

14             With regard to ministerial functions, there is no

15   sovereign immunity that the District has; and, certainly, we

16   can't partake of something that the District doesn't have.

17             With regard to contract, it is our position that

18   under D.C. Code, Section 2-359.04, there is a waiver of

19   sovereign immunity in contract as to the District and as to

20   agencies, and all other units of the D.C. government -- and

21   "units" is the statutory word that they use there -- for

22   procurement contracts that are in writing.

23             So if someone sues on a procurement contract that

24   is in writing and that is executed by the District

25   government or one of its agencies, or one of its other

1    units, the sovereign immunity in contract, under the

2    delegated sovereign immunity theory, is waived.

3              THE COURT:  All right.

4              MR. HIRSCH:  But only to that extent.

5              THE COURT:  Yes.

6              MR. HIRSCH:  That's my position.

7              THE COURT:  But "tort" with respect to

8    discretionary functions --

9              MR. HIRSCH:  Tort.

10             THE COURT:  -- you say is waived with respect to

11   discretionary functions?

12             MR. HIRSCH:  It has been the law since 1969, an

13   en banc decision, *Spencer versus D.C. General Hospital,* that

14   the District's tort immunity only applies to discretionary

15   functions and not to ministerial functions.

16             THE COURT:  That's not broad enough, though, to

17   account for -- or narrow enough to account for the

18   subsection (d) problem, right?

19             Didn't I -- I mean, I just read to you a statutory

20   provision in the enabling statute of your corporation which

21   presupposes the availability of actions for medical

22   negligence and malpractice; it's in the statute.

23             It says you can only bring them unless there is

24   notice given in a certain amount of time, but it suggests

25   that you can bring them.  So how is that squared with your

1   position that there is no tort action to be brought against

2   this corporation on the basis of sovereign immunity?

3          MR. HIRSCH:  Well, the way it is square is this:

4   The courts have -- the D.C. Court of Appeals have

5   interpreted that position -- that statute -- that part of

6   the organic statute, the six-month statute.  I think Judge

7   Mehta also has said that it is not jurisdictional; it is

8   just a notification statute, that's all.

9          In other words, it gives us -- and the District

10  has an analogous statute, I think it's called 12-309, where

11  these municipal -- these governmental bodies are entitled to

12  have some idea of what unliquidated damages claims are so

13  they can budget for them or reserve for them; but that is

14  not a jurisdictional statute.

15         So our position, Your Honor, is that if the

16  hospital were to be faced with a malpractice claim -- most

17  malpractice claims, it's my understanding -- I am not a

18  malpractice defense lawyer, I have never done a case like

19  that, plaintiff or defendant -- involve ministerial acts or

20  omissions, so there would be no immunity there.

21         THE COURT:  So how are you defining "ministerial"

22  as opposed to "discretionary" --

23         MR. HIRSCH:  In other words, nonpolicy,

24  nonchoice -- where there are choices that the Government

25  type of actor has to make.

1          For instance, if a hospital were to be sued for

2     misallocating its resources -- Mr. Chertkof's complaint has

3     some allegations that I don't want to belabor about; that

4     there is a culture of mis- -- of favoring profits and

5     misallocating resources, reducing resources, and so forth.

6     If that was the gravamen, let's say, of a tort plaintiff's

7     claim against the District that, I suppose, could fall

8     under -- because it's a choice between policies and

9     requires --

10          THE COURT:  It would fall under what?  I'm sorry.

11     Discretionary?

12          MR. HIRSCH:  That would be discretionary.

13          THE COURT:  Okay.

14          MR. HIRSCH:  But your typical garden-variety

15     malpractice is not because it's done at the field level; the

16     "field level" being the operating room or the emergency room

17     or the behavior unit.

18          THE COURT:  So that qualifies as "ministerial" in

19     your view, a decision made by a doctor under the direction

20     of the hospital?

21          Let's say the doctor is directed by the hospital

22     to save money and, therefore, not use a certain kind of

23     nylon in the operating room, or whatever it is.  So we're at

24     ministerial then?

25          MR. HIRSCH:  No, no.  That would not be

1   ministerial.  That -- if it's directed based upon a policy

2   choice, then that would not be ministerial.

3         But what I am saying is if it's your typical

4   malpractice where a doctor in the course or in the heat of

5   an operation decides to suture three particular lesions as

6   opposed to suturing four, you know, that, I think, lies in

7   the ministerial field.

8         THE COURT:  All right.  So your point is that this

9   really doesn't go to jurisdiction.

10         MR. HIRSCH:  It really doesn't.

11         THE COURT:  All right.

12         MR. HIRSCH:  Now, Your Honor, with regard to your

13   other question, if you could refresh my memory --

14         THE COURT:  I'm sorry.  It was Judge Mehta's

15   holding that the sue-and-be-sued provision is a waiver.

16         MR. HIRSCH:  Yes.  Judge Mehta, okay.

17         First, that decision is a product of, I think --

18   unfortunate product -- I was not involved in it -- of

19   inadequate briefing.

20         THE COURT:  So it's wrong?  Judge Mehta is wrong?

21         MR. HIRSCH:  But he's wrong not just because --

22   because he was not adequately briefed, you know, and he

23   raised the issue essentially sua sponte.  In other words,

24   the issue of sue-and-be-sued based upon *FDIC v Meyer* case;

25   but he's also wrong because it contravenes Supreme Court

1    precedent as well as D.C. Circuit precedent, as well as DCCA

2    precedent on what the meaning of sue-and-be-sued is.

3              THE COURT:  All right.  Understood.

4              All right.  Let me have plaintiff's counsel

5    respond on sovereign immunity, please.

6              And, by the way, at this rate we might not cover

7    everything, so I might have you focus on the things that I

8    care about most.  Thank you.

9              MR. CHERTKOF:  Thank you, Your Honor.

10             I didn't hear a single mention of the controlling

11   authority in this case, *FDIC versus Meyer.*  In fact, in

12   UMC's brief, it gets barely a passing mention in a footnote.

13   That is the controlling authority here.

14             It's a Supreme Court case.  And it says:  When a

15   government creates a government corporation, which is all

16   that this is -- UMC is a government corporation -- it says

17   it can sue or be sued; that is a waiver of sovereign

18   immunity.  It's a broad waiver.  It must be liberally

19   construed -- these are in quotes -- and cannot be limited by

20   implication.

21             Pretty much the entirety of UMC's argument is

22   trying to limit that by implication; and you can't do it.

23             THE COURT:  So your position is that the *Meyer*

24   case -- I mean, isn't there also Supreme Court authority

25   that suggests sue-and-be-sued, by its terms, is not

1   sufficient to qualify as a waiver?  So what is it about the

2   *Meyer* case that takes it out of the realm of:  If a statute

3   has the words "sue and be sued" in it, such as the

4   District's own enabling statute, it means they don't have

5   sovereign immunity?

6            MR. CHERTKOF:  There are cases, including the

7   1913 case cited by UMC, that when "sue and be sued" appears,

8   essentially, in a government then you look more critically

9   at it.

10           THE COURT:  Then you look more -- I'm sorry?

11           MR. CHERTKOF:  More critically.  That

12  sue-and-be-sued isn't necessarily a waiver of sovereign

13  immunity; you look at the history of that governmental

14  entity.

15           And the cases in the briefs that find that

16  still -- that sovereign immunity exists after

17  sue-and-be-sued fall into two categories:  It's Puerto Rico,

18  it's the District itself, it's the Hawaiian islands -- all

19  of which were territories, conclaves, or full governments.

20           What makes *FDIC versus Meyer* controlling is it

21  says when a government that admittedly has sovereign

22  immunity -- the federal government has sovereign immunity --

23  creates a corporation to exist out in the world -- to take

24  in money, to pay out money, to have contracts -- and it says

25  it can sue and be sued in its own name, that is

1    presumptively a broad waiver of immunity and it can't be

2    overcome by implication.  You have to have a clear showing

3    that the intent of the organic statute shows otherwise.

4              THE COURT:  Is that the case that Judge Mehta

5    relied on?

6              MR. CHERTKOF:  Yes.  He relied on multiple cases,

7    but *FDIC* -- I believe he did rely on *FDIC versus Meyer*.

8              What I would like to do is walk through the

9    organic statute, if I may.

10             May I pass it up?  I have a --

11             THE COURT:  Sure.

12             (Counsel complies.)

13             MR. CHERTKOF:  So I would first like to go -- I

14   used the circled and handwritten numbers at the bottom.

15             THE COURT:  Yes.

16             MR. CHERTKOF:  This is a printout of the organic

17   statute.  All of the highlighting is added by us.

18             On page 7, Section 8, that's 44-951.08,

19   paragraph (c):  Subject to federal and district law, the

20   corporation shall assume and be bound by all personnel

21   contracts and collective bargaining agreements subject to

22   the law.

23             That's in contrast to the WMATA Compact which is

24   noted in the *Burkhart* case; says that WMATA employment is

25   not subject to the law of any of its signatory states or

1    D.C.  Not subject.

2         So this is subject.  They shall assume and be

3    bound by.  So the compact saying:  We are bound by our

4    personnel contract -- that means they can be enforced;

5    otherwise, it is to be bound and be meaningless, and must be

6    enforceable in court.

7         On the next page, on page 8, organic statute

8    Section 10, transfer of employees, paragraph (a).  The

9    employees of United Medical Center -- that's when they were

10   employed by the Specialty Hospitals Corporation's, private

11   sector -- shall be transferred to the corporation with the

12   same rights and obligations as they enjoyed as employees of

13   the United Medical Center -- the same rights and

14   obligations.

15        So before the organic statute was implemented, the

16   employees of United Medical Center can bring a wage claim if

17   they weren't paid.  They can bring a claim under the D.C.

18   Wage Act.  They can bring a claim under the False Claims Act

19   if they thought there were false claims there or they were

20   being retaliated against.  Those were the rights they had

21   when they were employed by the Specialty Hospitals

22   Corporation.  They have the same rights now; that's the only

23   interpretation of that.

24        Going to the next page, this is Section 14 that

25   the Court already focused on.  But I submit that if you look

1    at paragraphs (c), (d), and (e) together, they all deal with

2    the expectation that there will be lawsuits brought against

3    the corporation, and none of them suggests that the answer

4    to most of those lawsuits is to say:  We have sovereign

5    immunity, the lawsuit must be dismissed.

6           In paragraph (c) it says:  The corporation may

7    retain outside counsel, other than the Attorney General, at

8    its own expense, its own money, to provide representation

9    for the corporation and its officers or employees in actual

10   or anticipated litigation or -- I'm skipping ahead -- in any

11   other legal proceeding, lawsuit, grievance, or arbitration

12   filed against the corporation, its officers, and its

13   employees.

14          Does that sound like a legislature that's

15   conferring a broad range of sovereign immunity, or does it

16   sound like they have created a government corporation with

17   the normal meaning, under *FDIC versus Meyer*, that the

18   corporation can sue and be sued because they're out there in

19   commerce?

20          Paragraph (c) we've already talked about.

21          THE COURT:  What do you say in response to

22   Mr. Hirsch's pointing out that, in actuality, the financials

23   of the corporation are actually run by the District; that,

24   apparently, the District places the corporation in its org

25   chart in a way that suggests that it is -- notwithstanding

1    your characterization of it -- as a corporation created to

2    live distinct from the District, at least with respect to

3    liability -- it's still part of the District government?

4         MR. CHERTKOF:  We don't dispute that it's a

5    government corporation and the government has a certain

6    amount of control over it.  That was the argument in

7    *FDIC versus Meyer*.

8         The FDIC is a Government corporation, and the

9    Government had quite a bit of control over the FDIC.  As it

10   ultimately turned out, the Government decided to stand

11   behind FDIC and Fannie Mae and Freddie Mac in a financial

12   crisis.

13        But this organic statute specifically says that

14   the Government of the District of Columbia does not stand

15   behind the debts of UMC, or FMP, whatever you want to call

16   it.  They do not guarantee the debts.  They may choose to

17   put money into it, and they have chosen to put money into it

18   at times, that's why they foreclosed in the first place.

19        But, for example, if you look at page 10 of my

20   packet -- this is Section 16 of the organic statute.  Under

21   paragraph (a), the highlighted part:  Debt of the

22   corporation shall be payable solely from revenues of the

23   corporation.

24        Paragraph (b):  Debt created shall not be

25   considered general obligation debt of the District for any

1   purpose, subsection 3 there.  It shall not involve the full

2   faith and credit of the District of Columbia.

3         What does that mean?  That means there is a big

4   financial wall.  And it also means that the hospital

5   center -- if the corporation wants to go out and borrow

6   money, it's going to pay a higher interest because they are

7   not a Government -- they don't have the full faith of D.C.

8   behind it.  They are a risky -- they are a risky hospital

9   losing money.  But they have chosen to put that financial

10  wall up to say:  The District can hire counsel with its own

11  money, it can borrow money; but D.C. does not stand behind

12  it, we will not pay its debts.  They do not have the full

13  faith and credit of D.C. behind it.

14        Yes, they have a certain amount of control.  They

15  do get to name most of the members of the board, they have

16  budgetary interactions; and they have decided to put money

17  in from time to time.  But they are never obligated to it.

18        There is another provision earlier on, in this

19  section here, that the money from the hospital -- here, it's

20  on page 2 of my packet.  It says that all funds that the

21  hospital corporation gets shall not revert to the general

22  fund of the District of Columbia at the end of the fiscal

23  year or at any other time.

24        THE COURT:  I mean, I see the statute.  I

25  understand --

1          MR. CHERTKOF:  It's quite a wall.

2          THE COURT:  I understand the argument that you are

3    making.  In some ways, it's kind of like -- and I never get

4    this word right -- the Rorschach test, right?  It depends on

5    the way that you look at it, and what is the base line set

6    of considerations.

7          So is it your argument that, based on its

8    instrumentality status, this Not-For-Profit corporation that

9    was created by the District of Columbia would, as a

10   background rule, have received the sovereign immunity of the

11   District but for the sue-and-be-sued language which counts

12   as a waiver under your *Fort Meyer* case -- or *Meyer* case?  Or

13   are you suggesting, as I was probing with Mr. Hirsch, that,

14   when it was created, this never received the sovereign

15   immunity of the District because it wasn't created in that

16   way?

17         MR. CHERTKOF:  I think I'm saying yes to two of

18   those propositions.  It never received sovereign immunity

19   and, if it did, the sue-or-be-sued was a waiver.

20         THE COURT:  Either way.

21         MR. CHERTKOF:  So either way.

22         There is no sovereign immunity to be had.  We

23   don't need to parse where it begins and ends, with

24   discretionary -- any of that stuff.  There is no sovereign

25   immunity conferred on the hospital corporation.

1          THE COURT:  All right.  I understand.

2          MR. CHERTKOF:  No other court has found it.  No

3     other court has dismissed on that ground.

4          THE COURT:  All right.

5          MR. CHERTKOF:  There are now, I think, six cases

6     against NFP.

7          THE COURT:  Six cases against NFP --

8          MR. CHERTKOF:  Yes.

9          THE COURT:  -- all of which dealt with sovereign

10    immunity or only Judge Mehta's case?

11         MR. CHERTKOF:  I think it's been raised in three

12    of them.  But it's implicit in all because if sovereign

13    immunity means there is no jurisdiction then the Court can't

14    issue any other ruling.

15         THE COURT:  All right.

16         MR. CHERTKOF:  So if I can foreshadow the next

17    argument -- because I think it goes to both issues of

18    sovereign immunity and diversity --

19         THE COURT:  Okay.

20         MR. CHERTKOF:  -- NFP has not challenged diversity

21    jurisdiction in other cases.  And in one case, the Adkins

22    Cindy [sic] case, NFP removed from Superior Court --

23         THE COURT:  Yes.  Can I just cut you off on that

24    one because I'm actually less interested in it.

25         Let me ask you this one question, and this will

1    highlight why I think I am.  Do we need diversity

2    jurisdiction in this case?

3            In other words -- but I mean, if you have federal

4    question jurisdiction with respect to your FCA claim and if

5    that claim survives, can't the court exercise supplemental

6    jurisdiction over everything else without regard to the lack

7    of diversity?

8            MR. CHERTKOF:  Absolutely, they can, Your Honor.

9            THE COURT:  All right.

10           MR. CHERTKOF:  The reason it's relevant is this:

11   A state cannot -- a state entity cannot be sued in

12   diversity.  D.C. as a government cannot be sued in

13   diversity.  It has to be a lesser entity.

14           It has to be an instrumentality, a subdivision, a

15   municipal corporation to have diversity.  When NFP comes in

16   and removes on the basis of diversity, as they did in Adkins

17   Cindy, and not challenge it as they did in the *Direct Supply*

18   case and *Sodexo* case --

19           THE COURT:  Well, I am not sure they can be held

20   to that representation in this context, but --

21           MR. CHERTKOF:  I think judicial softball applies

22   against the government as well as the private sector.  They

23   say we are a person for purposes -- as a citizen of D.C. --

24           THE COURT:  For the purpose of one case, they

25   can't refuse it elsewhere.

1           MR. CHERTKOF:  Can't have it both ways.

2           THE COURT:  All right.

3           Mr. Hirsch.

4           MR. HIRSCH:  Your Honor, with the Court's

5    permission, may I rebut the point that was made about the

6    absolute wall separation in the *FDIC v Meyer*?

7           THE COURT:  Sure.

8           MR. HIRSCH:  The George Hyman case, which is a

9    WMATA case involving an accident -- tunnel accident I think

10   in Virginia, but it was brought in the U.S. District Court

11   for D.C., absolutely -- the Circuit absolutely refutes the

12   whole premise of what you just heard counsel say.

13          It says:  We will not adopt *FDIC v Meyer* as a rule

14   of immunity because it is only a rule for federal

15   instrumentalities.  With regard to nonfederal

16   instrumentalities, we look to the law of the Commonwealth of

17   Virginia.  And under the Supreme Court of Virginia, quoting

18   the D.C. Circuit, holds very clearly and unambiguously that

19   sue-and-be-sued is just a power -- just a grant of powers or

20   capacity to use powers to sue and ability -- capacity to be

21   sui juris.

22          So, therefore, we totally reject the base.

23          Other courts have rejected it also.  A majority

24   of -- the vast majority -- in fact, an overwhelming

25   majority, Judge Jackson, state supreme courts reject the

1       notion that sue and be -- the *FDIC v Meyer* rationale that

2       sue and be sued, when found in an organic statute or

3       elsewhere, means that there is no sovereign immunity.

4                THE COURT:  All right.  I understand the dispute.

5       And I am going to have to drill down on the cases to sort of

6       sort this out.

7                MR. HIRSCH:  Now, the wall, with all due respect,

8       it is a categorical gross exaggeration to say that there is

9       a wall when we've come forward with evidence de facto;

10      Exhibit D, the report to Congress.

11               It's even more compelling than I said earlier.  It

12      says that the reason we are in the chain and the reason that

13      we -- that there is even a footnote about the Not-For-Profit

14      Hospital Corporation in the District's budgetary submission

15      is because the District of Columbia is the sole owner -- has

16      assumed the obligation to provide financial support to the

17      corporation to sustain the hospital's operations, creating a

18      financial benefit/burden relationship.  In addition, the

19      District is able to impose its will on the corporation.

20               So in the face of this kind of de facto official

21      document -- this is a solemn document that goes up to

22      Congress --

23               THE COURT:  Understood.  But it can't be more

24      solemn than the statute.  He's pointed out the statutory

25      provisions that indicate that the District doesn't

1     necessarily or have to assume the obligations of

2     the corporation, right?

3              MR. HIRSCH:  The last point that I am going to

4     make on this particular issue --

5              THE COURT:  Yes.

6              MR. HIRSCH:  -- is that -- you asked two questions

7     of Mr. Chertkof.  Which is it?  Did the entity not have

8     sovereign immunity have an issue to begin?  Or was it waived

9     because of the sovereign immunity?

10             He goes to great lengths to argue in his brief

11    that the sovereign immunity is waived because of the

12    sue-and-be-sued clause.  His positions are not reconcilable.

13    The sue-and-be-sued clause makes no sense as a waiver if

14    there was no sovereign immunity to begin with.

15             THE COURT:  Understood.  Understood.  That's why I

16    asked him the question.

17             MR. HIRSCH:  So his positions are contradictory.

18    They are not alternative positions.  They are internally

19    inconsistent.  One is counterintuitive with the other one.

20             THE COURT:  I understand; that's why I asked him

21    the question.  Let me have you pivot, quickly, in a couple

22    of ways.  One is just this notion -- if I accept the

23    plaintiff's argument that the FCA claim is valid, then

24    wouldn't there be supplemental jurisdiction and I wouldn't

25    have to worry about diversity?

1          It's only if they lose -- or you win on FCA, in

2     terms of its sufficiency at this point in the litigation,

3     that I would get to diversity jurisdiction as a potential

4     alternative hook for the remainder of the claims, right?

5          MR. HIRSCH:  That's exactly right.  That's the way

6     I understand it.

7          THE COURT:  And you say no diversity.  But isn't

8     that also contingent on the same argument, that we are the

9     District and the District can't be sued in diversity?

10          MR. HIRSCH:  Yes.  The argument is that we are an

11     arm in the District.

12          There is a D.C. Circuit test for determining arm

13     status under the 11th Amendment; that test applies even to

14     non -- has been adopted by courts, including Judge

15     Oberdorfer to non-11th Amendment entities, like the

16     District.  And under that test, whether you use Judge

17     Oberdorfer's test or whether you use Judge Kavanaugh's test,

18     in the Puerto Rico Ports Authority case, we would -- based

19     on the criteria of that test, we would prevail; we would be

20     deemed to be an arm of the District.

21          THE COURT:  Is there a different test for this --

22     for diversity jurisdiction, in terms of determining whether

23     you are an arm of the District and there is the test that

24     you asked me to use in the sovereign immunity context?

25          MR. HIRSCH:  Somewhat different.  There is a

1    difference.  I would like to address it.

2              In the D.C. -- the most recent announcement from

3    the D.C. Circuit is Judge Kavanaugh's decision in the Puerto

4    Rico port terminal case.  What the Circuit says is -- its a

5    three-part test.

6              Part one:  What is the intent of the sovereign?

7    Meaning the District, in this case, that created the entity.

8              Number two, the function that the entity performs

9    and the control that is being exercised by the sovereign in

10   this case, the District.

11             If those two are inconclusive, the Circuit says

12   then you go to the third one.  You don't go to the third one

13   if the two are conclusive.  And the third one is:  What

14   impact, if any, does the judgment in the case have upon the

15   District's fisc [sic]?

16             Now, if we take that test, Your Honor, I think the

17   District, through its amicus brief, has spoken about how it

18   views the situation.

19             The submission to Congress is also highly

20   compelling, in terms of us being part of the District and

21   being viewed as part of the District.  Judge Fenty's

22   conferral or delegation of jurisdiction --

23             THE COURT:  I understand.  I understand how it

24   applies.  I just wanted to know if there was a different

25   test.

1          MR. HIRSCH:  So we meet all three.

2          Even if we have to go to the third one that Judge

3     Kavanaugh says you don't have to go to if number one and

4     two -- the CAFR report to Congress says that we have -- that

5     the District has assumed liability.  So a judgment in this

6     case is going to have an impact because the District is

7     going to have to pick up the tab.  There is no other tab to

8     be picked up --

9          THE COURT:  All right.  Assuming you lose on

10    sovereign immunity, going to the merits of your argument

11    with respect to the complaint itself, you are prepared to

12    address the FCA claim.

13         Why do you maintain that the complaint is

14    insufficient with regard to its allegations pertaining to

15    the FCA?

16         MR. HIRSCH:  May I have the Court's indulgence?

17         THE COURT:  Yes.

18         MR. HIRSCH:  Your Honor, the only characterization

19    I am going to offer -- and they are all legal

20    characterizations that are going to be offered -- argued by

21    Mr. Coll, that this is basically -- when you analyze it in

22    its totality, all of the pieces of what they like to call

23    the "mosaic," it really is a -- what they have alleged is an

24    employment dispute over wages, hours, FTEs, duration of

25    contracts -- it's an employment dispute dressed up in the

1   federal garb so they can benefit from the enhanced remedial

2   provisions of the federal FCA.

3           Your Honor, we start off with the proposition that

4   there are no insufficient protected disclosure or, slash,

5   protected activity in this case.  Let's walk through,

6   chronologically, what they have alleged -- what the first

7   amended complaint alleges.

8           The first amended complaint begins with an

9   allegation that -- key allegations, that on February 23rd,

10  2017, Ms. Lilian Chukwuma -- who is the then and still is

11  chief financial officer of UMC -- called Dr. Craig in a

12  meeting with other UMC officials -- there were others, this

13  is not just the one -- and said that she had received a

14  letter from KEPRO.  KEPRO is a federally retained

15  intermediary that conducts periodic audits on reviews of

16  different admission criteria, and other things that drive

17  compensability or reimbursability, if you will, under

18  Medicare.

19          The letter was sent to the hospital in 2016.

20  KEPRO described the findings and, actually, it cited the

21  hospital for 100 percent flunk rate.  And the allegation is

22  that the -- it is alleged that this is an indication that

23  the hospital should not have billed Medicare for their

24  admissions.  So all they're alleging -- even though they

25  have this -- they're alleging it's a mere -- they're

1      alleging merely an indication.

2              THE COURT:  I don't understand your

3      representation.  I mean, you heard plaintiff's counsel

4      describe -- and you can show me where in the complaint he

5      has misstated here today what he was alleging.

6              But the intention, according to plaintiff's

7      counsel, is to assert that Dr. Craig understood -- whether

8      it be from this audit report or from his own personal

9      knowledge, or whatever -- that there was improper, false

10     admissions of plaintiffs [sic] and billing of Medicare as a

11     result.  That is a classic FCA kind of allegation, a false

12     claim.  So what about that is insufficient from your

13     perspective?

14              MR. HIRSCH:  Three things, Your Honor --

15              THE COURT:  Okay.

16              MR. HIRSCH:  -- are insufficient.

17              One thing that is insufficient -- it's alleged

18     very cryptically.  Counsel has embellished significantly

19     beyond what the allegations are.

20              Now, what he was told by Lilian Chukwuma is

21     something that the hospital already knew.

22              THE COURT:  It doesn't matter.

23              The question is:  Did he either report or attempt

24     to thwart some activity pertaining to the alleged

25     falsification of the records or the Medicare billing, or

1  whatever -- did he act in a way as to try to respond to

2  that?

3         MR. HIRSCH:  Well, he did two things after the

4  23rd.  The next day he files the HR complaint, on the 24th

5  of February.

6         THE COURT:  Okay.

7         MR. HIRSCH:  The HR complaint, Your Honor, you

8  have as an exhibit.  It is as about as cryptic of a

9  complaint as -- I am not saying that you can't file an HR

10  complaint cryptically; but it talks about patient safety, it

11  talks about regulatory jeopardy without mentioning what it

12  is, it talks about fear of himself or other physicians

13  losing their licenses without saying what it is.  Your

14  Honor, that is a problem because it is very, very cryptic.

15         THE COURT:  But isn't it a problem for the jury?

16         In other words, you are asking me to rule that as

17  a matter of law the letter that he sent to HR and the

18  statements that he made to the council were legally

19  insufficient bases upon which to rest a retaliation claim.

20         You can always argue to the jury that, you know,

21  he didn't say enough to make the hospital angry enough to

22  fire him, what he said was so confusing that they didn't

23  even know he was complaining.  That seems to me the kind of

24  thing that a jury would sort out.

25         But it's not -- you know, from just first blush --

1   unless you were saying writing a letter to HR is not a

2   legally sufficient vehicle by which to raise some kind of a

3   retaliation claim, I don't know that you go to the content

4   of the letter and suggest that he didn't say enough.

5          MR. HIRSCH:  The content of the letter is

6   important, Your Honor.  I am not going to say that it is

7   ipso facto improper to initiate an FCA type of process by

8   letter.

9          What I am saying is that this particular letter,

10  Your Honor, does not say anything about overbilling; it

11  doesn't say anything about fraudulent billing; it doesn't

12  say about false submission.  It doesn't say anything.  It is

13  the most cryptic letter.  And it goes to my point that all

14  he is complaining about -- all he is complaining about is

15  himself, plus -- and how he's been treated, plus a very

16  generalized reference to regulatory jeopardy and potential

17  loss of license without saying anything.

18         THE COURT:  Unjustifiable charges, that's not in

19  there?

20         MR. HIRSCH:  It's not in there.

21         Then he says -- this is very important.  Two days

22  later a meeting was convened.

23         Now, Mr. Chertkof caught himself.  Mr. Hernandez

24  wasn't at the meeting, and it's very important for the Court

25  to understand why he wasn't there.

1              The chief -- one of my former colleagues,

2     Mr. Pozefsky, was there.  The hospital's compliance officer,

3     Dr. Erica Alexander, was there; the chief of HR or the HR

4     director, who is the addressee of the letter that he sent,

5     Mr. Eric Johnson was there; and Dr. Craig.  There, Your

6     Honor -- he's just -- there the allegation goes a little bit

7     further.  There Dr. Craig alleges that he thought that there

8     was improper billing and that patients were admitted because

9     of this culture of -- drive up of admissions and to admit

10    patients --

11             THE COURT:  All right.  So are you suggesting that

12    this kind of statement in the context of the meeting that

13    you described is not a protected activity?

14             MR. HIRSCH:  I am suggesting that it is not a

15    protected activity because what he's reporting is not a

16    result of an investigation that he conducted.

17             Mr. Chertkof was very precise to tell you that the

18    retaliation section of the FCA, 3730.H, is a two-prong

19    thing.  One is an investigation that could lead to FCA

20    action; and the other one is the 2009 amendment which says

21    one or more acts to stop it.

22             Now, we're still at February of 2017.  What I am

23    saying is this is not a product of an investigation.  He was

24    handed this information on a platter by Lilian Chukwuma two

25    days earlier.  She told him and others it was well-known

1          within the hospital that they had a problem with this two --

2                    THE COURT:  I am not sure that the hospital's

3          knowledge is relevant in this way.  You keep conflating, I

4          think, various legal standards.

5                    When we are talking about retaliation, a hospital

6          or an entity can know full well the problems that are being

7          reported by its employees and yet still retaliate against

8          them for raising those same concerns.  So there is nothing

9          in the law, as far as I know, that says if a complaint is

10         made about a problem that the institution is already aware

11         of, there is no retaliation claim.

12                   MR. HIRSCH:  Your Honor, there is something --

13         with all due respect to Mr. Chertkof, he has gone way in

14         excess of what the scope -- even if you give the largest

15         berth or benefit of the doubt to what he's alleged.

16                   He said as a fact, when he first got up here, that

17         the hospital was so angry in February of 2017 because of the

18         HR complaint against Mr. Hernandez that they already started

19         discussing firing and they formed the intent to want to fire

20         him and the retaliation starts then and there; absolutely

21         false.  There is --

22                   THE COURT:  Yes.  But you have to accept, at this

23         stage of the litigation, the allegations as true.  We are at

24         motion to dismiss stage.

25                   This is why I keep saying:  I see your defense,

1       what you are going to say to a jury or what you, perhaps,

2       are going to say to me after summary judgment.  Right.

3              The evidence shows that the hospital couldn't

4       possibly be angry because they already knew about all of

5       this.  This is not a new thing that Mr. Craig was suddenly

6       bringing to their attention.

7              But for the purpose of a motion to dismiss, we

8       have to accept the facts as the plaintiff alleges them.

9              MR. HIRSCH:  Well, it is my position -- I am going

10      to move off of this argument, Your Honor, and on to my next

11      point -- that when they allege knowledge, okay, all they

12      meet -- they don't even meet the minimum threshold under

13      Tunley.  I am going to let Mr. Coll explain this to you in

14      greater detail.  All they say is that they knew.  Well, we

15      know that they didn't know.  Hernandez had no --

16              THE COURT:  Didn't know what?  I'm sorry.

17              MR. HIRSCH:  Mr. Hernandez had no clue that an HR

18      complaint was filed against him.

19              THE COURT:  All right.

20              MR. HIRSCH:  He was deliberately kept away from

21      it.

22              THE COURT:  All right.

23              MR. HIRSCH:  There was another thing that counsel

24      said, well, we have no reason to believe that an

25      investigation was conducted; absolutely totally false.  A

1    massive internal investigation was conducted as a result of

2    the HR complaint.

3            So what I am saying is that the allegations of

4    knowledge, key allegations -- that you cannot have a

5    retaliation by Hernandez without crossing the bridge.  The

6    most boilerplate, unadorned allegation has absolutely no

7    factual enhancement.

8            THE COURT:  All right.

9            MR. HIRSCH:  That's that.

10           Now, the complaint has also -- in paragraph 49,

11   Your Honor -- this goes to the protected activity.  It has a

12   very, very critical allegation that during this period,

13   meaning -- we're still in February of 2006 [sic] --

14   Dr. Craig learned that Ms. Chukwuma, the chief financial

15   officer, had conducted an audit of patient admission records

16   and had determined that UMC would likely have to return

17   $5 million to Medicare and Medicaid for improperly billed

18   patient stays.

19           So before the end of February he knows that the

20   hospital has already taken remedial action.  So he is not --

21   what he does after that -- he is not the whistleblower.

22   It's not because of his agency that -- because of his agency

23   that anything is done by the hospital.  The hospital is

24   aware of the problem from KEPRO.

25           As early as February 2017, according to allegation

1    No. 49, per his description, Ms. Chukwuma had determined

2    that there is a need to pay back.

3             As of May 1st, when the Washington Post article is

4    published, Mr. DeWitt, the chief financial officer of the

5    District, is interviewed and says that they have already

6    reserved funds for this -- this is not because of

7    Dr. Craig's agency.

8             THE COURT:  No.  I understand the point that you

9    are making.  But let me just clarify.  You are in

10   whistleblower territory, right, not the FCA anymore?

11            MR. HIRSCH:  Well, but the way the FCA --

12            THE COURT:  Because the FCA does not say anything

13   about you tampering in a retaliation claim for conduct that

14   alleged fraudulent billing, conduct, whatever, about which

15   the entity is already aware.

16            MR. HIRSCH:  But, Your Honor, the statute has been

17   massively interpreted, as you know, by numerous courts of

18   appeals and numerous district courts.  There is basically a

19   couple strands of authority.  A, before the 2009 amendment,

20   you had to be someone who -- you had to be someone who

21   investigated.

22            THE COURT:  No.  I am talking about protected --

23   so today -- because we're applying the statute today, it is

24   my understanding that an employee must demonstrate that he,

25   one, engaged in protected activity and, two, was

1    discriminated against or retaliated against because of that

2    activity.

3         So what I am trying to figure out is what the

4    authority is for your suggestion that he cannot be

5    considered, as a matter of law, to have engaged in protected

6    activity if his complaints concern information that the

7    entity is already aware of.

8         MR. HIRSCH:  Well, I think I stand on the argument

9    and the cases that we have cited in briefs, Your Honor --

10        THE COURT:  All right.

11        MR. HIRSCH:  -- in our briefs that -- in order to

12   engage in protected activity/protected disclosure, you have

13   to either be the one who is investigating it, you have to --

14   or after the 2009 amendments you have to be the one who

15   actually takes affirmative action to stop it.

16        In other words, that you are somehow an agent to

17   bring about the change or remediation -- that is totally not

18   this case.

19        THE COURT:  All right.

20        MR. HIRSCH:  The impetus for the change came from

21   KEPRO.  It was followed up as early as February 2017 by the

22   chief financial officer who is talking about having to

23   reserve.  The chief -- the chief financial officer,

24   Mr. DeWitt, telling the Washington Post as early as May that

25   they were going to do that.

1        And lastly, Your Honor, comes the testimony -- the

2   letter and the testimony before the council.

3        Now, here, Your Honor, there is also a huge

4   problem because, if you look at page 13 and 14 of the

5   transcript, Chairman Vincent Gray of the health oversight

6   committee asks Dr. Craig, after he gives his testimony, asks

7   him two very important questions.  You have made, sir --

8   Doctor, some very serious charges that you have lodged at

9   UMC.  Tell us what the detail is, or the specifics.

10        With regard to the overbilling he gives two

11   answers.  He says, well, KEPRO.  I base my -- I base,

12   Chairman Gray, what I say based on KEPRO.  And, also, on the

13   fact that since -- the KEPRO report and this activity in

14   February things have improved, they have stopped.  In other

15   words, there has been a change in the admission criteria and

16   the problem is, essentially, resolved.

17        With regard to the patient and quality issues --

18   when he's asked about the details, he says we keep reading

19   these articles.  You know, I direct -- basically he --

20        THE COURT:  So is your point that he had no

21   independent or direct knowledge -- he was reciting things

22   that he had read in the Washington Post?

23        MR. HIRSCH:  He was reciting things about what he

24   was told about the KEPRO report.  He was reciting what he

25   was told by Ms. Chukwuma, and then what he read in the

1    paper.

2              So what I am saying is he is not engaging --

3              THE COURT:  A whistleblower.  But what about the

4    FCA claim?

5              MR. HIRSCH:  But, Your Honor, all he's doing there

6    is relaying information that is not derived by him, not as a

7    result of an investigation by him, not a result of any

8    action by him because all of the action to remediate and to

9    pay back the Government was taken by others.

10             THE COURT:  So your reading of the FCA retaliation

11   statute is that you can only engage in a protected activity,

12   that is, complain or testify about conduct that you yourself

13   have investigated, discovered, et cetera; that it can't be

14   something that you learn about and then you complain about

15   or testify, if other people also know and are really the

16   agents of change?

17             MR. HIRSCH:  That is correct, I would say.

18             THE COURT:  All right.

19             MR. HIRSCH:  All you are doing is relaying or

20   purveying publicly known information, and you are taking it

21   from A to B, and others do this -- especially in a case like

22   this where he admits in his sworn council testimony that

23   the --

24             THE COURT:  No, I understand the facts.  I am

25   just --

1          MR. HIRSCH:  -- I don't think he's engaging in

2      protected activity; that's my point.

3          THE COURT:  All right.  Let me have plaintiff's

4      counsel respond.  And, in the interest of time, we're going

5      to go super quickly.

6          I guess my question, in response to what defense

7      counsel has just offered, is whether you read the law in the

8      same way.  Is there some protected activity discount that

9      arises out of your relaying, testifying, writing about,

10     complaining of information that you yourself have not

11     discovered?

12         MR. HIRSCH:  Absolutely not.

13         The 2009 amendments were designed to broaden,

14     which is why they added the effort to stop, because the

15     effort to stop violations can be done by somebody who is not

16     the original discoverer.  Dr. Craig was in a perfect

17     position to stop it; he was the chief medical officer.  I

18     like to call it factually -- it's moot anyway because we

19     have alleged both.

20         In paragraph 41 of the first amended complaint --

21     it's a long one, so I am going to start on the top of

22     page 14; it's about four lines down.  Beginning in the fall

23     of 2016 and continuing through early 2017, Dr. Craig became

24     concerned that the hospital was engaged in some practices

25     that compromised patient care and safety, and other

1    practices that he reasonably believed violated federal and

2    District of Columbia law.

3            Dr. Craig was informed by a member of the

4    hospitalist group that Mr. Hernandez and Veritas were

5    pressuring UMC employees to increase hospital admission

6    numbers in order to improve the hospital's financial

7    outlook.  Dr. Craig saw a number of examples of patients

8    admitted to UMC for issues that did not meet admissions

9    criteria, or for whom there lacked appropriate documentation

10   to support an admission decision.

11           On a number of occasions, Dr. Craig directed UMC

12   hospitalists not to admit patients who did not meet

13   admissions criteria.  Doctors told him that the emergency

14   room had been instructed by Mr. Hernandez and other Veritas

15   executives to admit those patients in order to keep

16   admissions numbers high.

17           So even if individual action is required, it's

18   alleged.  It's not required.  It's not required at all, but

19   it's alleged anyway; and they have to accept it at this

20   stage.

21           THE COURT:  Okay.

22           MR. CHERTKOF:  Paragraph 45 and 46 go through --

23   I don't want to belabor the point.

24           The meeting where Hernandez wanted to fire

25   Dr. Craig is alleged in paragraph 55 of the complaint, and

1    that's an April 29th meeting.  So Dr. Craig had signed these

2    contract extensions a week or two before the April 29th

3    meeting.  But it's the April 29th board meeting where the

4    board is discussing Dr. Craig's complaint.  And it's relayed

5    to Dr. Craig that Hernandez got angry at him at that

6    meeting, on April 29th, and proposed his firing.

7          THE COURT:  All right.  Let me hear from

8    Mr. Hernandez's counsel regarding why you think that there

9    is insufficient -- an insufficient factual basis accepting

10   the facts as true, as we must do at this stage of the

11   litigation, to raise a claim -- an FCA claim against your

12   client.

13         MR. KNIGHT:  Paul Knight for Luis Hernandez.

14         Primarily, Your Honor, because there is no

15   specific allegations of -- it's all so conclusory and vague.

16   There is no reference to any doctor, no reference to any

17   patient.  There are no factual allegations that you can rely

18   on.

19         THE COURT:  Why do you think I have to -- are you

20   suggesting that Rule 9(b) particularity applies to this kind

21   of claim?

22         MR. KNIGHT:  No.  Even under an AA standard, it

23   still requires allegations of fact that show that there has

24   been -- these acts have occurred; that there has been

25   some -- patient has been admitted, or anything else.  So

1   it's just totally conclusory at this point, even in the

2   claim -- the amended complaint, that there is not one shred

3   of specificity as to anything that was done to admit even a

4   single patient improperly.

5           THE COURT:  So you think the statement, as was

6   read from paragraph 41:  Dr. Craig saw a number of examples

7   of patients admitted to UMC for issues that did not meet

8   admissions criteria, or for whom there lacked appropriate

9   documentation to support an admission decision, is

10  insufficiently specific to give you an idea of what he was

11  concerned about?

12          MR. KNIGHT:  Yes.  There is nothing alleged, other

13  than a very vague conclusion at that point.  There has got

14  to be some specific facts to show that a patient was brought

15  in and admitted --

16          THE COURT:  Like the patient's name?  It's not

17  enough that he says:  I have seen a number of examples of

18  this happening?

19          MR. KNIGHT:  Again, so vague, Your Honor, that --

20  what do we -- we can't even respond to that.  What are you

21  talking about specifically that was said to the doctors?

22          THE COURT:  Apparently he then went to a meeting

23  and told everybody.  And then he --

24          MR. KNIGHT:  I'm sorry?

25          THE COURT:  Apparently he then went to a meeting

1    and he raised those same concerns.  So perhaps in the

2    context of the meeting there were some more particulars.

3              I guess I don't understand your suggestion that

4    Mr. Hernandez or others in positions of authority were

5    confused somehow about Dr. Craig's representations.

6              MR. KNIGHT:  What we're looking at is the

7    allegations in the complaint are insufficient to describe

8    any type of patient that was admitted improperly.  It is --

9              THE COURT:  But why does that matter?

10             We are in a retaliation world.  Even if no patient

11   was ever admitted improperly, that's not the plaintiff's

12   burden in a retaliation claim, right?

13             His burden is just to demonstrate that he was

14   concerned about the possibility that patients were being

15   admitted improperly.  And even if he was wrong about that,

16   to the extent that he raised those claims with your client

17   and others, he says he was retaliated against.

18             MR. KNIGHT:  I think you have to show that there

19   was a -- that he did -- he engaged in protected activity of

20   investigating.  There is a vague conclusion that he is

21   making in the complaint that this was done.

22             THE COURT:  All right.  Thank you.

23             Let me make sure -- I am worried about time, so

24   let me just make sure I have -- you can be seated.

25             MR. KNIGHT:  Thank you.

1              THE COURT:  All right.  Does any other defense

2      counsel have something to say that hasn't already been

3      raised with respect to this retaliation whistleblower kind

4      of claim?

5              (No audible response.)

6              THE COURT:  All right.  Let me ask plaintiff's

7      counsel about wrongful discharge.

8              I just want to be clear in the complaint because

9      my understanding, from your complaint, was that Dr. Craig

10     was alleging violation of the recordkeeping and that that

11     was a violation of a municipal policy.

12             This new thing that came in the supplemental

13     briefing just a day ago, or today, was not in the complaint.

14     So help me to understand what you suggest is the violation

15     of public policy or what public policy is being violated by

16     his discharge, allegedly.

17             MR. CHERTKOF:  So Dr. Craig raised a number of

18     issues.  So some are in one basket, like false claims; some

19     are in whistleblower; some are in wrongful discharge.

20             For wrongful discharge, it has to show that he was

21     fired for opposing a violation of D.C. public policy or

22     punishment for that.

23             So we have three things.  In the complaint we

24     mentioned two regulations about patient care and patient

25     recordkeeping which were at the heart of what he was

1    raising.

2          He was raising that patients are being admitted

3    that don't meet criteria.  And the hospital's response was:

4    It's a recordkeeping issue.  His response was, no, they

5    don't meet criteria; that was the issue.  If you fire

6    somebody for trying to enforce those kind of regulations,

7    that's a wrongful discharge under *Carl,* or at least it could

8    be for the motion to dismiss stage.

9          Similarly, while we didn't plead the actual

10   statute, there is a statute referenced in the *Carl* case that

11   you can't use your economic power as an employer to punish

12   people for testifying before the D.C. Council.

13          THE COURT:  I understand.  But that has to be

14   pled.

15          MR. CHERTKOF:  The statute to be pled?

16          THE COURT:  I think so, yes; to the extent that

17   the allegation, the count, relates to discharge of an

18   employee for his refusal to violate the law in furtherance

19   of a public policy of the District as manifested in a

20   statute or regulation.  Right.  It can't just be a public

21   policy generally.  It has to be something that's manifested

22   in a statute or regulation.

23          So doesn't the defense, with respect to this

24   claim, have a legitimate argument that you have got to tell

25   us which regulations or statutes you are referring to?

1          MR. CHERTKOF:  In paragraph 136 of the complaint,

2     we allege -- which is the wrongful discharge -- we allege,

3     in the second-to-last full sentence:  Dr. Craig again

4     furthered these public policies when he submitted two

5     letters and testified before the city council about Veritas'

6     mismanagement and malfeasance at UMC.

7          So if the only lacking is a citation to the

8     statute --

9          THE COURT:  No, no, no.  No.  The suggestion being

10    made by that part of this complaint is that the public

11    policy is in the -- you know, hospital's malfeasance, the

12    things that they were doing wrong -- which you say is

13    violation of the recordkeeping and whatever, ensuring

14    patient care -- the two policies that you set forth in

15    section -- or in paragraph 135 have to do with proper

16    recordkeeping and patient care.

17         Then, in 136, you indicate that he furthered those

18    public policies when he complained that the hospital was not

19    doing those things.

20         MR. CHERTKOF:  Right.

21         THE COURT:  What you don't say is that there is an

22    independent public policy that says that people who testify

23    before the council about anything, people who make

24    testimony -- which is what you now say in your supplemental

25    filing -- that based on that municipal regulation Dr. Craig

1        was fired in violation of that regulation.

2                So his testimony, as it is I think fairly read in

3        the complaint, is to further the public policy of

4        recordkeeping and patient care because he talked about that

5        in the council.  And so to the extent that he was then

6        fired, you say, in the complaint, there is a violation of

7        the public recordkeeping and patient care regulations.  But

8        that's really not how discharge -- wrongful discharge works;

9        that's a whistleblower complaint.

10               He complained about things that the District cares

11       about:  See, e.g., these regulations.

12               To the extent there is another regulation that

13       says what the District cares about is people who complain

14       being fired, right, you have to cite that regulation in the

15       complaint as the basis for your wrongful discharge claim, I

16       think.  Why am I wrong about that?

17               MR. CHERTKOF:  You may not be.

18               But my understanding, as general, is you don't

19       have to plead statutes; you plead the facts.

20               Rule 8(a) still says you plead facts showing you

21       are entitled to relief.  We pled the facts that his

22       testimony at the D.C. Council about all of the acts of

23       Veritas, both the unjustifiable charges to the government,

24       the recordkeeping, the patient care issues -- all of that

25       came to a head when he testified at the D.C. Council, and

1   less than two weeks later he's fired.  I think we presented

2   the facts.

3          If what we need to do is amend the complaint to

4   add a citation of that statute, then I would ask to do that.

5   But I think Rule 8(a) is generally interpreted that you have

6   to plead the actual statute.  If we weren't clear enough,

7   that that was a separate issue -- obviously, we didn't

8   mention it in our brief; so it got by us in that sense.

9          But I think that that is clearly presented by

10  these facts.  The D.C. Council testimony was the last straw

11  in this contentious relationship over six months.

12          THE COURT:  All right.  Thank you.

13          Let me have defendants on breach of contract.

14          One of you counsel members are -- I'm sorry.

15          One of you counsel for defendant are prepared to

16  discuss the breach of contract claim, and why you think it

17  needs to be --

18          MR. KNIGHT:  Right.  Your Honor, Paul Knight for

19  Mr. Hernandez.

20          He is charged in Counts 6 and 7 as to the

21  contract -- the amended complaint, and the arguments here

22  today show that there was only one contract, a one-year

23  contract in existence.  There was never any other contract

24  that was agreed to.

25          As they point out, there was a contract signed on

1      June 3rd, 2015, and it was signed by all necessary parties,

2      as they point out in paragraph 19 of the first amended

3      complaint.  So there is a contract, one-year contract, with

4      an option to renew.  11 months into that contract it was not

5      renewed.  He was told -- Dr. Craig was told that it would

6      not be renewed; as a matter of fact, his hours were going to

7      be reduced and his salary reduced.

8               THE COURT:  All right.  Well, what about the

9      allegation, and I tried to clarify this with plaintiff's

10     counsel in his remarks here today, that his salary was

11     reduced even prior to the one-year expiration.

12              MR. KNIGHT:  There could be a one month issue; but

13     that's not going to convey federal jurisdiction in this

14     court, if you are talking about a matter of a few dollars in

15     one month, Judge.  There could be --

16              THE COURT:  What do you mean?  I don't understand.

17              MR. KNIGHT:  April 29th -- it's April 29th when

18     he's informed:  Your salary is going to be reduced.

19              THE COURT:  Effective immediately.

20              MR. KNIGHT:  Effective immediately.

21              THE COURT:  Okay.

22              MR. KNIGHT:  So there is one month involved in

23     that --

24              THE COURT:  I thought it was June that you said

25     his contract went until --

1          MR. KNIGHT:  His contract went to the beginning of

2     June.  So he had the month of May --

3          THE COURT:  April, May --

4          MR. KNIGHT:  No.  It's at the end of April, the

5     29th.

6          THE COURT:  The end of April, okay.  And it went

7     from, you know, $320,000, overall, annually to

8     200-something, so that's a pretty sizeable amount of money

9     in May.

10          MR. KNIGHT:  For one month.

11          THE COURT:  Okay.

12          MR. KNIGHT:  For one month.  So that's not going

13     to convey any federal jurisdiction; that's not what this

14     case is about.

15          This case -- they keep -- they want to argue that

16     the contract continued.  It did not continue, and that's our

17     point.  Once that one-year period ended, he's an employee

18     at-will.

19          THE COURT:  All right.  So is it your suggestion

20     that unless the parties had a written agreement there is no

21     such thing as a breach of contract?

22          MR. KNIGHT:  There could be under certain

23     circumstances; but it's very clear that this contract ended.

24          THE COURT:  No.  I understand the written

25     agreement ended.  But in the written agreement there was at

1    least indicia of intent on the part of the parties that

2    their employment relationship would continue.

3              MR. KNIGHT:  Well, there was an option to renew

4    that contract and that option was not exercised.

5              THE COURT:  I understand.  What I'm trying to

6    suggest to you is -- understand from your argument is

7    whether it is your position that a written contractual

8    agreement is the only basis by which parties can claim

9    breach of contract in the employment arena?

10             MR. KNIGHT:  Under the facts of this case --

11             THE COURT:  No.  Not under the facts of this case,

12   under the law.

13             MR. KNIGHT:  Well, as a general principle, a

14   contract could continue, a written contract, if it continued

15   in the exact same form --

16             THE COURT:  I am not talking about the

17   continuance.  Forget the written contract.

18             Dr. Craig shows up on day 1 and he says:  I would

19   like to work for you-all, I am very experienced.  They say,

20   great, we will pay you $320,000 a year.  Go forward.

21             MR. KNIGHT:  For one year.

22             THE COURT:  No.  Not for one year.

23             In my hypothetical, Dr. Craig starts working for

24   them with an understanding that they're going to pay him at

25   a rate of $320,000 a year -- however that comes out to be

1    month to month, right.  He has no written agreement.  Month

2    one comes and goes, and they pay him substantially less than

3    that.

4            Is it your argument that because they don't have a

5    written agreement Dr. Craig has no breach of contract claim?

6            MR. KNIGHT:  He has no breach of contract claim

7    once that year one ends.  He becomes an employee at-will.

8            THE COURT:  There is no year one in my

9    hypothetical.  He is an employee at will from day 1, so

10   let's put it that way.  Employees at will have no

11   contractual agreement with their employer?

12           MR. KNIGHT:  There can be an implied contract

13   based on an agreement between the parties that they will pay

14   him a set amount, but that --

15           THE COURT:  Okay.

16           MR. KNIGHT:  Okay.

17           THE COURT:  So given that that's the case, that an

18   employee could -- even an at-will employee who never had a

19   contract claim that the employer -- based on the course of

20   conduct and the representations that the employee says were

21   made to him when he started to work -- is violating some

22   agreement, even if it's not written down -- what I don't

23   understand is why you are suggesting that when the one-year

24   written contract was over Dr. Craig did not essentially

25   convert to an at-will employee who was operating under

1    disputed terms, because he says:  I'm supposed to be getting

2    $320,000; and apparently someone else says, no, you are only

3    supposed to be given $220,000.  But how is it that there is

4    not a valid breach of contract claim even in the

5    post-written-contract world?

6              MR. KNIGHT:  Because there is no meeting of the

7    minds of the parties.

8              THE COURT:  Did he come to work every day?

9              MR. KNIGHT:  He chose.  He cannot unilaterally

10   make a contract.

11             THE COURT:  Was he paid for the time -- anything?

12   Was he paid?  Did he have an employee card that was

13   continually valid to allow him access to the hospital after

14   the one year was over?

15             MR. KNIGHT:  Yes.

16             THE COURT:  All right.  So why couldn't a jury,

17   some jury, determine that there was still some valid

18   contractual agreement related to employment -- setting aside

19   the terms, the dispute over what it was -- I don't

20   understand your argument that there was no contract in

21   effect with respect to Dr. Craig after the one year

22   terminated.

23             MR. KNIGHT:  Because the contract at the hospital

24   requires ratification by the board.  They say that in

25   paragraph 19, that they are a necessary party to have a

1     contract.

2          After that one-year contract expired, there was no

3     ratified contract going forward.  So he is an at-will

4     employee at that point at the lesser salary that they were

5     offering to pay him.  He's disputing:  I am not taking that.

6     So there is no meeting of the minds at that point.

7          THE COURT:  Why isn't this an argument for the

8     jury?  You are not suggesting to me that, as a matter of

9     law, when the one year expired there can be no breach of

10    contract claim brought by the employee who continues to come

11    to work and who continues to be paid something in this

12    indeterminate status.

13         MR. KNIGHT:  Our position, Judge, is there is no

14    contract that he is entitled to be paid at the amount that

15    he wishes to be paid.  The hospital offered him a salary to

16    pay him a lesser amount in the April 29th --

17         THE COURT:  Which suggests they intended to extend

18    his employment to some degree.

19         MR. KNIGHT:  But not under the contractual amount

20    set on June 15th.

21         THE COURT:  And it's your position that this

22    dispute over what the terms of his contractual agreement was

23    is not to be resolved by a jury; it's supposed to be

24    resolved by me by dismissing his complaint.

25         MR. KNIGHT:  As a matter of law, there is no

1          contract.  He is an at-will employee.  Now, they're claiming

2          that there was a tortious interference.  And the law is you

3          cannot have a tortious interference when there is no

4          contract.

5                    At this point, they have not agreed on terms.  He

6          is saying one thing; the hospital is saying something else.

7          There is no contract in place.  And he is -- their entire

8          argument today is saying that he's trying to get a contract

9          but he doesn't have one.  He's working with various people.

10         But even Mr. Hernandez cannot give him a contract; that's

11         something only the board -- the hospital can do.

12                   THE COURT:  So, as a matter of law, he worked

13         after the expiration of the written agreement at his own

14         peril?  He was supposed to walk away and just -- that's the

15         end of it?

16                   MR. KNIGHT:  He is an at-will employee.  He can be

17         terminated at any time for any nondiscriminatory reason.

18                   THE COURT:  Right.  He's not -- but the claim is

19         not about termination.  The claim is about contract.

20                   And to the extent -- that's why I asked you at the

21         beginning whether at-will employees can bring breach of

22         contract actions; and your answer was yes.  That's fine.  He

23         is an at-will employee.

24                   MR. KNIGHT:  But there has to be an agreement,

25         even with an at-will employee:  You are going to work for

1   this amount and for this term of time, and there was never

2   any agreement between the two parties.

3           THE COURT:  There was an agreement he would work.

4   It may not be -- there may be a dispute over his

5   compensation and his hours.  But doesn't the course of

6   dealing among the parties suggest that at least for some

7   period of time -- because they didn't terminate him at the

8   end of the one year; so a jury could find that there was a

9   meeting of the minds with respect to his working, being an

10   employee of the hospital.  The question is just at what

11   term, in terms of the compensation and the hours, right?

12           MR. KNIGHT:  What is pled is that he would be paid

13   a lesser amount, $100,000 a year, after April 29th.  So they

14   have not agreed on -- he has -- the two parties would have

15   to agree to have a contract, an at-will contract, that he

16   was agreeing to work for that amount of time; he never did.

17           THE COURT:  All right.  Plaintiff's counsel.

18           MR. CHERTKOF:  This is a factual dispute, is the

19   easy answer.  Let me call the Court's attention to

20   paragraph 92 where we quote the one and only notice of

21   nonrenewal that Dr. Craig received in the relevant time.

22           Paragraph 92 of the indented paragraph; this

23   letter serves as Not-for-Profit Hospital's Corporation a/k/a

24   United Medical Center official 30-day notice of nonrenewal

25   of contract, NFPHC 316.  It goes on to say:  Your last day

1    is December 18th.

2           Now, there is a dispute about what -- that

3    document was a contract that was never fully implemented.

4    But the idea that there is a contract that requires a 30-day

5    notice is supported in the complaint and in the record.

6           And, I mean, we didn't plead all the details, but

7    I think we did plead that, in July of 2016, the CFO signed a

8    document promising to restore Dr. Craig's pay to the

9    $320,000 level, which is a few months after they supposedly

10   cut it.  They cut it in the middle -- not the "middle" --

11   before the end of the very first year.  So we have those

12   factual issues --

13          THE COURT:  Can I understand your position?

14          Can I understand your position as a matter of law,

15   because I am just trying to figure out the status.

16          You don't dispute that there was a written

17   agreement that terminated at some point, June of 2017?

18          MR. CHERTKOF:  I have a written agreement.  I

19   dispute that it terminated.  I believe --

20          THE COURT:  How so?

21          MR. CHERTKOF:  The parties --

22          THE COURT:  It had a year-long start and end date.

23          MR. CHERTKOF:  By its terms, it required renewal

24   by both parties; that is true.

25          THE COURT:  So given that there was no renewal by

1   both parties as of the date of expiration of that agreement,

2   isn't the law such that Dr. Craig essentially became an

3   at-will employee post the termination of that agreement,

4   even though he was still in negotiations for the renewal of

5   his contract?

6           MR. CHERTKOF:  No.  The law is that if parties are

7   under a contract for a definite term and the term expires,

8   and they continue to work -- the terms of that agreement,

9   other than the duration, continue to apply until it's

10  changed --

11          THE COURT:  I am not asking about the terms.  I am

12  asking about --

13          MR. CHERTKOF:  But the terms is the salary.

14          THE COURT:  Right.  So I hear that you-all have a

15  dispute over what amount Dr. Craig was supposed to be

16  paid --

17          MR. CHERTKOF:  Right.

18          THE COURT:  -- during the period following the

19  termination of the agreement; that's very clear.

20          Somebody says $320,000 per the terms of the

21  agreement, written agreement; someone says 200-and-something

22  per my oral representations that were made the month before

23  the agreement ended.

24          All right.  I get that.

25          I'm trying to understand what his legal status is

1   once that written piece of paper is no longer in effect.  It

2   is possible that he is an at-will employee who, based on the

3   intentions and understandings of the parties as interpreted

4   by a jury, would say he was supposed to get $320,000 even in

5   that at-will period.

6          But are you arguing that the actual agreement was

7   itself extended as a legal matter so that he was really a

8   contracted employee during this period of time or not?

9          MR. CHERTKOF:  The status of that contract is one

10  of the key factual disputes.  But let me back up.

11         I work for you and you pay me, is always a

12  contractual arrangement.  If he was entitled to be paid

13  $320,000 a year for which we have substantial evidence

14  throughout the period, even after the first year, then it is

15  a breach of contract for him to do the work and not get paid

16  the agreed-upon rate regardless of --

17         THE COURT:  I understand -- what the agreed-upon

18  rate is is the factual dispute.

19         I am just trying to figure out what instrument

20  governs.  From your perspective, is Dr. Craig a contracted

21  employee who cannot be fired as of July?  Or is he an

22  at-will employee who you say was still entitled to the same

23  $320,000?  But if they decided, in July or August or

24  whenever, to terminate him, could he rely on the contract

25  saying:  We have this physical written piece of paper that

1    indicates that I am still supposed to be working for you, or

2    not?

3          Isn't he -- let me put it to you -- isn't he

4    clearly an at-will employee on the day that document

5    terminates?  And the issue is only whether and to what

6    extent -- because he continued to work and because he

7    continued to draw a salary, he was supposed to be getting

8    $320,000 versus $220,000?

9          MR. CHERTKOF:  It turns on whether the affirmative

10   act of renewing the contract is required for the parties to

11   continue operating under that contract, or whether, by their

12   conduct, they can continue to live under that contract after

13   its stated expiration date.

14         The contract was contemplated to be in effect for

15   five years.  As late as April of 2017, they're purporting to

16   extend it for two more years; one of those retroactively and

17   one prospectively.

18         THE COURT:  But you needed the retroactive in

19   order to cover what I'm saying.  This is my point.

20         My point is precisely because the lawyer says, six

21   months later or eight months later, we're doing a renewal

22   contract.  Oh, by the way, I am going to backdate this.

23   Right?  That period was uncovered absent his backdating.

24         MR. CHERTKOF:  Arguably.  But the question is to

25   what effect?  Because even the original contract which

1    required the board to approve it to be effective -- the

2    board approval lagged months behind his start date.  So he

3    shows up for work I believe in June -- he's getting paid.

4    If they don't pay him, it's a contract claim.  But the board

5    approval lagged months and months --

6              THE COURT:  I understand.  I am not saying you

7    lose because your argument is, fine, he is an at-will

8    employee.

9              But the parties' understanding was that this was

10   effectively an extension of the prior agreement, that there

11   really was no change to it, in terms of how much he thought

12   he was supposed to be getting paid during this at-will

13   period and how much he was actually getting paid.

14             Their argument is, no, he's in a totally different

15   world at this point.  There is no written agreement.  And to

16   the extent he kept on working, he was an at-will employee

17   who was getting $220,000 a year; that's the dispute that a

18   jury is supposed to decide.

19             MR. CHERTKOF:  Yes.  But the law -- we're closer

20   on that, you and I, in that this is a long contract.  I have

21   it here, if you need to see it.  It's 20 pages.

22             All of the other terms govern his employment:  His

23   duties, his responsibilities, his benefits, his rate of pay,

24   his access to charts, the .8 FTE hours -- all of that

25   continued to apply because both parties, by their conduct

1    and their words, continued to live under it.

2              THE COURT:  All right.

3              MR. CHERTKOF:  And that's enough.

4              So the question is:  When he shows up for work,

5    does he get the agreed-upon rate or not?

6              They only gave him one notice ever terminating

7    saying:  We don't want to renew you anymore, and that was

8    after the council testimony.

9              THE COURT:  At the end, right.

10             Any final response to that?

11             MR. KNIGHT:  And that one is referenced, a

12   contract, in writing.

13             THE COURT:  Yes.

14             MR. KNIGHT:  As they plead in the amended

15   complaint, in paragraphs 25 and 27, there was a letter sent

16   to Dr. Craig.  It describes that he will only work 20 hours

17   at $120,000 a year.  So it's in writing.  He's served with

18   that; that is what he continued under at the hospital.  So

19   he has been given written notice.

20             The conduct -- they keep saying that by conduct

21   and policy the contract continues.  No.  It specifically did

22   not continue because they told him in writing:  You are not

23   being renewed at that amount, you are being reduced; your

24   hours are being reduced, and it's in writing.

25             THE COURT:  I understand.

1          All I'm imploring you to understand is that this

2     is a factual dispute about the terms of the agreement based

3     on evidence presented by both sides that suggest either that

4     he continued on in this $320,000 status or he continued on

5     at the reduced salary that you say was presented to him

6     before the termination of the agreement.

7          It does not strike me as a legal argument that he

8     can make no breach of contract claim, which is what your

9     motion to dismiss says.

10          MR. KNIGHT:  And we think under the cases we rely

11     on that it does.

12          THE COURT:  It does.  All right.

13          Any final words?  Yes.

14          MR. HIRSCH:  May I address this point for

15     Not-For-Profit?

16          THE COURT:  Please.

17          MR. HIRSCH:  I have listened to what Mr. Knight

18     has said and I have listened, even more carefully, to what

19     Mr. Chertkof said.  Your Honor, there is no material

20     question of fact that a jury gets to decide, and here is

21     why:  Once it is acknowledged, as Your Honor has aptly

22     observed, that the contract expired on June 2nd of 2016 --

23     we have an admission from counsel and a very candid

24     acknowledgment that it takes two to act to renew -- to

25     trigger the option; that contract is finished.  There is no

1    extant contract.

2         I think the very fact that they have brought the

3    wrongful termination in violation of public policy is an

4    acknowledgment they have hedged their bets.

5         THE COURT:  Here is where the law is against you,

6    Mr. Hirsch -- here is where the law is against you:

7         Even if there was never a written contract,

8    through the course of conduct which says Mr. -- Dr. Craig

9    arrives at the hospital, he shows his badge, he goes into

10   his office, he looks at patient records, he has meetings

11   with people, he receives some salary -- a reasonable jury

12   could interpret those facts as indicating that there was an

13   employment relationship, some agreement -- some agreement

14   between Dr. Craig and the hospital.

15        The question is:  What are its terms?

16        Are you right that at that point, after the

17   written agreement expires, he was now working the same

18   hours, et cetera, for $220,000?  Or are they right, that the

19   terms of the prior written agreement carried over into this

20   period where there was no written agreement in effect?

21        What I don't understand to be the law is that once

22   a prior written employment agreement terminates and the

23   parties continue to act in an employment relationship there

24   is no ability to bring a breach of contract claim.  I have

25   not seen that anywhere in the law, and it's inconsistent

1   with what I understand contract law to teach us.

2        MR. HIRSCH:  But this is what I would like to

3   persuade you, hopefully, on this particular point:  Whatever

4   claim might exist under that particular scenario or

5   hypothetical that you posit, Your Honor, would not be a

6   claim based on an expressed contract.  Here all they have

7   pled is breach of it.  It might conceivably be a quantum

8   meruit type of claim --

9        THE COURT:  No.  You've put the word expressed

10  contract.  They say breach of contract.  You can have a

11  breach of contract claim without a written document, that's

12  Contracts 101.

13       MR. HIRSCH:  But there is a principle of law, Your

14  Honor -- and if necessary we will brief it -- that the D.C.

15  Court of Appeals holds that -- in a stream of major

16  decisions even in -- that neither party, I think, has

17  addressed yet -- that says that for a contract, whether oral

18  or written or implied, to have any force and effect you have

19  a meeting of the minds on essential material terms.

20       Now, he has done his job, Mr. Chertkof says.  He

21  has done his job, he has shown up for however many hours.

22  But, surely, in an employment situation, where the man is

23  seeking compensation -- surely, the terms of his

24  compensation, the FTE, the hourly rate, the 320 versus

25  200 -- those are essential material terms.

1          THE COURT:  Understood.  And in the reality of the

2     circumstances -- and we're going to end it here -- his

3     argument is:  There was a meeting of the minds the day I

4     signed my original written agreement.

5          These parties -- the parties before you -- agreed

6     to these terms.  It's not a world in which there was never,

7     he says -- and I think we have to accept this for purposes

8     of the motion to dismiss.  This is not a world in which

9     there was never an understanding that I was going to be an

10     employee, I was going to do certain duties, I was going to

11     get certain amounts.  Your counter counsel says there is a

12     20-page document that lays out all of these essential terms.

13          So the only question is whether once the date of

14     that document expired it was the parties' intention to have

15     all of those terms essentially nullified such that they

16     don't apply anymore to any at-will period that comes after

17     it or not.

18          You say essentially those terms were amended

19     because a month before it was over he got this letter that

20     says we're changing the terms.  He says:  That letter

21     doesn't mean anything; I continued to work at $320,000.

22          But this is not the kind of scenario that you are

23     talking about where the parties never reach any agreement

24     with respect to the material terms of a contract such that

25     we can say there is no contract.  There was an existing

1    agreement that everybody says was in effect for $320,000 for

2    these particular hours; and the only issue is, on the day

3    that that terminated, what was the parties' intention with

4    respect to his going forward?

5         Now you suggest that -- you-all -- the defendants

6    suggest that, essentially, that agreement evaporated and

7    there was, at that point, no meeting of the minds regarding

8    his employment.  And I don't understand that necessarily to

9    be the case as a matter of law.

10        If anything, the jury has to determine what the

11   parties' intentions were from that moment forward given his

12   continued working, showing up, getting paid something,

13   et cetera.  All right?

14        I mean, this to me is probably the clearest one of

15   all of the claims that seems to me doesn't make a whole lot

16   of sense, in terms of the motion to dismiss, suggesting that

17   there is no breach of contract claim.  Maybe he loses,

18   ultimately, if a jury decides or if you can establish, at

19   summary judgment, that no reasonable jury could find that

20   the $320,000 was still in effect.

21        But to suggest that as a matter of law he had no

22   contract claim on June 3rd doesn't seem to me to be

23   consistent with the law.

24        MR. HIRSCH:  Your Honor, all I can say is that the

25   principle of law that they're relying on for the proposition

1   that even after a contract, an expressed contract, for the

2   term of one year ends, the parties can essentially, by

3   course of conduct or by the way they are conducting

4   themselves, continued in effect --

5          THE COURT:  That has to be the case, that is how

6   medical contracts work.  People are negotiating terms all

7   the time and the doctors and the nurses, and whoever,

8   continue to show up.

9          MR. HIRSCH:  But the principal law that

10  Mr. Chertkof is citing in his brief -- which is primarily

11  Maryland cases that he's relying on -- contains an

12  exception.  There is an exception that -- I think his

13  pleading has triggered the exception the way he has pled his

14  allegations; that is, if the parties do not do anything

15  after the expiration.

16         In other words, once you go to June 3rd, if you

17  say nothing -- if it's silence, and they continue in a

18  silent mode, then that silent mode means that the course of

19  conduct is to continue the same way in terms of

20  compensation, hours, and duties.

21         But his own pleading, Your Honor, says time and

22  again that he was told that -- he was told first by Andrew

23  Davis on the 29th of February that this was not going to

24  continue.  He was told on May 2nd that this was not going to

25  be the case.  He was told repeatedly, when the board refused

1    to approve these retroactive or backdated modifications,

2    that -- so what I am saying is that his pleading --

3               THE COURT:  I understand --

4               MR. HIRSCH:  -- he is injecting prima facie -- I'm

5    sorry, Your Honor -- into his own case the exception to the

6    principle that he's relying on.  So this doesn't meet the

7    plausibility standard on breach of contract under Tunely

8    and -- because he's injected into the case the contrary

9    theory, the exception to the principle that he relies.

10              So because the exception to the principle has been

11   triggered is not a mere matter of defense.  I don't think

12   you can say -- it's an equipoise, the allegations.  You

13   can't say that he's gone beyond mere possibility into

14   plausibility.  At best, that's a mere possibility for him.

15              I think at best for us, you know, I think it's

16   been refuted by UMC's conduct.  UMC's conduct repeatedly,

17   starting on April -- in late April, when Andrew Davis told

18   him that this was not going to continue --

19              THE COURT:  What about the woman who said

20   otherwise and what about the attorney who suggested that he

21   could get a renewal and it was going to be backdated?  Those

22   things happened after, right?

23              MR. HIRSCH:  Those are all statements without

24   authority.

25              THE COURT:  No, no, no.  We are not in authority

1    world.  Those are in the complaint.

2           Those are allegations in the complaint.  So they,

3    taken as true, undermine the suggestion that the fact that

4    he had been notified by UMC that they intended to reduce his

5    salary is sufficient to put the whole thing in equipoise.

6           In other words, also in the complaint -- in

7    addition to the statements that you point out, where a month

8    before the thing was over they say, oh, we're going to take

9    you down to 220 -- after that, on at least two occasions in

10   the complaint, other people represented he is not going to

11   be taken down to 220, including an attorney who apparently

12   drafted documents that suggested that he would get a

13   retroactive payment at the $320,000 level, the complaint

14   alleges that he signed such a document -- I don't know

15   whether any of that is true, but it's in the complaint.

16          MR. HIRSCH:  But those, with all due respect,

17   Judge Jackson, are immaterial allegations because counsel

18   has acknowledged he is -- in the affirmative allegations on

19   the face of the complaint, that you have to have board

20   approval because UMC, Your Honor, has a policy.  And our

21   policy -- which Dr. Craig knows well from being both a

22   former voting member, as well as an ex-official member while

23   he was CMO -- is that any contractual undertaking in excess

24   of $200,000 is not within the purview of the CEO or any

25   official.  It is -- it requires board approval.

1          THE COURT:  While that may be so, tell me why that

2     also doesn't apply to the $220,000 reduction letter?  Was

3     that something that the board had approved at that point?

4     If not, you can't rely on that as some sort of a statement

5     that his salary was going to be reduced.  This is the

6     dispute.

7          You have good arguments; so do they.  That's why a

8     jury is supposed to decide it, and the Court is not supposed

9     to take it out of their hands and say as a matter of law he

10    has no breach of contract claim.  I don't know the answer to

11    this.  But what I am suggesting is that it's not as

12    a-matter-of-law kind of issue precisely because of these

13    different interpretations of the facts.

14         I need to go, so do you.  Thank you very much.  I

15    will take it under advisement.

16         MR. HIRSCH:  Thank you, Your Honor.

17         THE DEPUTY:  All rise.  This court has adjourned.

18         (Whereupon, the proceeding concludes, 12:49 p.m.)

19                         **CERTIFICATE**

20

21         I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
      certify that the foregoing constitutes a true and accurate
      transcript of my stenographic notes, and is a full, true,

22    and complete transcript of the proceedings to the best of my
      ability.

23
           Dated this 31st day of January, 2019.

24

25         /s/ Elizabeth Saint-Loth, RPR, FCRR
           Official Court Reporter

## $

**$100,000** [1] - 81:13
**$120,000** [1] - 87:17
**$200,000** [1] - 95:24
**$220,000** [5] - 78:3,
85:8, 86:17, 89:18,
96:2
**$320,000** [15] - 75:7,
76:20, 76:25, 78:2,
82:9, 83:20, 84:4,
84:13, 84:23, 85:8,
88:4, 91:21, 92:1,
92:20, 95:13

## /

**/s** [1] - 96:25

## 1

**1** [2] - 76:18, 77:9
**1-102** [1] - 27:10
**10** [3] - 29:16, 39:8,
41:19
**100** [1] - 52:21
**101** [1] - 90:12
**102** [1] - 27:17
**1025** [1] - 1:21
**10:36** [1] - 1:5
**11** [2] - 25:22, 74:4
**1109(d** [1] - 27:16
**11th** [1] - 49:13
**12** [1] - 29:16
**12(b)(1** [1] - 28:19
**12(b)(6)** [1] - 6:5
**12-309** [1] - 33:10
**12:49** [1] - 96:18
**13** [1] - 62:4
**135** [2] - 19:3, 71:15
**136** [3] - 19:3, 71:1,
71:17
**14** [4] - 18:7, 39:24,
62:4, 64:22
**15th** [1] - 79:20
**16** [1] - 41:20
**1666** [1] - 2:8
**1718** [1] - 1:17
**1730** [1] - 1:13
**18-347** [2] - 1:4, 3:3
**18th** [1] - 82:1
**19** [2] - 74:2, 78:25
**1909** [1] - 2:4
**1913** [1] - 37:7
**1969** [1] - 32:12
**1st** [1] - 60:3

## 2

**2** [1] - 42:20
**2-359.04** [1] - 31:18
**20** [2] - 86:21, 87:16
**20-page** [1] - 91:12
**200** [1] - 90:25
**200-and-something**
[1] - 83:21
**200-something** [1] -
75:8
**20001** [1] - 2:16
**20006** [1] - 2:9
**20006-1167** [1] - 2:5
**20007-5208** [1] - 1:22
**20009** [1] - 1:17
**20036** [1] - 1:13
**2006** [1] - 59:13
**2009** [5] - 16:6, 56:20,
60:19, 61:14, 64:13
**2010** [1] - 29:16
**2015** [1] - 74:1
**2016** [4] - 52:19,
64:23, 82:7, 88:22
**2017** [11] - 9:9, 11:12,
15:20, 52:10, 56:22,
57:17, 59:25, 61:21,
64:23, 82:17, 85:15
**2018** [1] - 11:24
**2019** [2] - 1:5, 96:23
**202** [4] - 1:14, 1:18,
2:5, 2:9
**202)965-8184** [1] -
1:22
**22** [1] - 1:5
**220** [2] - 95:9, 95:11
**23rd** [2] - 52:9, 54:4
**24th** [1] - 54:4
**25** [1] - 87:15
**27** [1] - 87:15
**293-8090** [1] - 1:14
**299-1140** [1] - 1:18
**29th** [10] - 66:1, 66:2,
66:3, 66:6, 74:17,
75:5, 79:16, 81:13,
93:23
**2nd** [2] - 88:22, 93:24

## 3

**3** [1] - 42:1
**30** [1] - 9:20
**30-day** [2] - 81:24,
82:4
**316** [1] - 81:25
**31st** [1] - 96:23
**32** [1] - 10:24
**320** [1] - 90:24

**3730.H** [1] - 56:18
**3rd** [3] - 74:1, 92:22,
93:16

## 4

**400** [1] - 1:21
**41** [2] - 64:20, 67:6
**412** [1] - 1:13
**44-951.08** [1] - 38:18
**44-951.14** [1] - 24:19
**44-951.14(d)** [1] -
24:24
**45** [1] - 65:22
**46** [1] - 65:22
**49** [2] - 59:10, 60:1

## 5

**5** [2] - 14:2, 59:17
**500** [1] - 2:8
**55** [1] - 65:25
**585-6900** [1] - 2:5

## 6

**6** [2] - 25:22, 73:20
**600** [1] - 2:4
**61** [1] - 28:25
**6th** [1] - 1:17

## 7

**7** [2] - 38:18, 73:20

## 8

**8** [3] - 38:18, 39:7,
86:24
**8(a** [2] - 72:20, 73:5
**887-1400** [1] - 2:9

## 9

**9(b** [1] - 66:20
**92** [2] - 81:20, 81:22

## A

**a)** [1] - 39:8
**a-matter-of-law** [1] -
96:12
**a.m** [1] - 1:5
**a/k/a** [1] - 81:23
**AA** [1] - 66:22

**ability** [3] - 46:20,
89:24, 96:22
**able** [1] - 47:19
**absence** [1] - 26:18
**absent** [1] - 85:23
**absolute** [1] - 46:6
**absolutely** [7] - 45:8,
46:11, 57:20, 58:25,
59:6, 64:12
**abuse** [1] - 17:6
**accept** [5] - 48:22,
57:22, 58:8, 65:19,
91:7
**accepting** [1] - 66:9
**access** [2] - 78:13,
86:24
**accident** [1] - 46:9
**accidents** [2] - 21:24
**accordance** [1] - 4:22
**according** [2] - 53:6,
59:25
**account** [2] - 5:17,
32:17
**accurate** [2] - 9:18,
96:21
**acknowledged** [3] -
11:4, 88:21, 95:18
**acknowledging** [1] -
11:21
**acknowledgment** [2] -
88:24, 89:4
**acquired** [2] - 29:17
**Act** [14] - 9:21, 9:22,
9:23, 15:7, 15:8,
17:4, 17:9, 21:2,
21:17, 27:23, 30:4,
39:18
**act** [5] - 9:11, 54:1,
85:10, 88:24, 89:23
**acted** [1] - 30:9
**acting** [1] - 19:15
**Action** [2] - 1:3, 3:2
**action** [13] - 4:4, 4:6,
24:24, 24:25, 25:4,
33:1, 56:20, 59:20,
61:15, 63:8, 65:17
**actions** [2] - 32:21,
80:22
**activity** [20] - 9:10,
9:12, 15:3, 16:2,
16:5, 17:5, 17:11,
52:5, 53:24, 56:13,
56:15, 59:11, 60:25,
61:2, 61:6, 62:13,
63:11, 64:2, 64:8,
**activity/protected** [1]
- 61:12
**actor** [1] - 33:25
**acts** [6] - 10:4, 24:17,

33:19, 56:21, 66:24,
72:22
**Acts** [1] - 16:6
**actual** [6] - 23:15,
26:19, 40:9, 70:9,
73:6, 84:6
**actuality** [1] - 40:22
**add** [1] - 73:4
**added** [2] - 38:17,
64:14
**addition** [2] - 47:18,
95:7
**address** [3] - 50:1,
51:12, 88:14
**addressed** [1] - 90:17
**addressee** [1] - 56:4
**adequately** [1] - 35:22
**adjourned** [1] - 96:17
**Adkins** [2] - 44:21,
45:16
**admission** [9] - 13:1,
16:18, 52:16, 59:15,
62:15, 65:5, 65:10,
67:9, 88:23
**admissions** [11] -
12:6, 13:5, 16:25,
20:13, 52:24, 53:10,
56:9, 65:8, 65:13,
65:16, 67:8
**admit** [8] - 13:24,
15:23, 16:16, 20:16,
56:9, 65:12, 65:15,
67:3
**admits** [1] - 63:22
**admitted** [12] - 12:15,
13:21, 56:8, 65:8,
66:25, 67:7, 67:15,
68:8, 68:11, 68:15,
70:2
**admittedly** [1] - 37:21
**admitting** [1] - 20:7
**adopt** [2] - 12:9, 46:13
**adopted** [1] - 49:14
**advisement** [1] -
96:15
**advocating** [1] - 20:19
**affected** [1] - 10:4
**affidavit** [1] - 9:18
**affirmatively** [1] - 28:3
**agencies** [3] - 27:24,
31:20, 31:25
**agency** [7] - 22:3,
22:4, 23:25, 24:3,
59:22, 60:7
**agent** [1] - 61:16
**agents** [1] - 63:16
**ago** [1] - 69:13
**agree** [1] - 81:15
**agreed** [9] - 5:18,
11:25, 73:24, 80:5,

81:14, 84:16, 84:17, 87:5, 91:5
**agreed-upon** [3] - 84:16, 84:17, 87:5
**agreeing** [1] - 81:16
**agreement** [39] - 75:20, 75:25, 76:8, 77:1, 77:5, 77:11, 77:13, 77:22, 78:18, 79:22, 80:13, 80:24, 81:2, 81:3, 82:17, 82:18, 83:1, 83:3, 83:8, 83:19, 83:21, 83:23, 84:6, 86:10, 86:15, 88:2, 88:6, 89:13, 89:17, 89:19, 89:20, 89:22, 91:4, 91:23, 92:1, 92:6
**agreements** [2] - 12:2, 38:21
**agrees** [1] - 21:9
**ahead** [2] - 12:11, 40:10
**aided** [1] - 2:18
**al** [2] - 1:5, 3:4
**Alexander** [1] - 56:3
**allegation** [10] - 17:5, 52:9, 52:21, 53:11, 56:6, 59:6, 59:12, 59:25, 70:17, 74:9
**allegations** [20] - 4:13, 8:11, 15:16, 18:17, 34:3, 51:14, 52:9, 53:19, 57:23, 59:3, 59:4, 66:15, 66:17, 66:23, 68:7, 93:14, 94:12, 95:2, 95:17, 95:18
**allege** [7] - 18:6, 18:7, 18:8, 19:4, 58:11, 71:2
**alleged** [18] - 5:25, 6:1, 13:16, 16:15, 20:12, 51:23, 52:6, 52:22, 53:17, 53:24, 57:15, 60:14, 64:19, 65:18, 65:19, 65:25, 67:12
**allegedly** [1] - 69:16
**alleges** [5] - 18:20, 52:7, 56:7, 58:8, 95:14
**alleging** [7] - 15:2, 18:14, 52:24, 52:25, 53:1, 53:5, 69:10
**allow** [1] - 78:13
**allowed** [1] - 28:19
**ALSO** [1] - 2:12
**alternative** [2] - 48:18, 49:4

**amend** [2] - 17:22, 73:3
**amended** [9] - 16:6, 52:7, 52:8, 64:20, 67:2, 73:21, 74:2, 87:14, 91:18
**amendment** [2] - 56:20, 60:19
**Amendment** [2] - 49:13, 49:15
**amendments** [2] - 61:14, 64:13
**America** [1] - 7:16
**amicus** [2] - 6:15, 50:17
**amount** [13] - 32:24, 41:6, 42:14, 75:8, 77:14, 79:14, 79:16, 79:19, 81:1, 81:13, 81:16, 83:15, 87:23
**amounts** [1] - 91:11
**analogous** [2] - 23:13, 33:10
**analogy** [1] - 28:15
**analyze** [1] - 51:21
**Andrew** [2] - 93:22, 94:17
**angry** [5] - 9:14, 54:21, 57:17, 58:4, 66:5
**ANN** [1] - 1:20
**announcement** [1] - 50:2
**Annual** [1] - 28:23
**annually** [1] - 75:7
**answer** [7] - 22:16, 22:17, 31:5, 40:3, 80:22, 81:19, 96:10
**answered** [1] - 8:21
**answers** [1] - 62:11
**anticipated** [1] - 40:10
**anyway** [2] - 64:18, 65:19
**apologies** [1] - 20:24
**appeals** [1] - 60:18
**Appeals** [4] - 21:14, 26:15, 33:4, 90:15
**appearance** [2] - 3:6, 6:16
**APPEARANCES** [3] - 1:10, 1:24, 2:1
**applicable** [1] - 6:3
**applies** [5] - 32:14, 45:21, 49:13, 50:24, 66:20
**apply** [6] - 26:14, 31:3, 83:9, 86:25, 91:16, 96:2
**applying** [1] - 60:23
**appoints** [1] - 25:22

**appreciate** [1] - 28:8
**approach** [1] - 3:5
**appropriate** [2] - 65:9, 67:8
**approval** [4] - 86:2, 86:5, 95:20, 95:25
**approve** [3] - 12:10, 86:1, 94:1
**approved** [4] - 10:21, 11:9, 11:18, 96:3
**approving** [2] - 12:4, 14:9
**April** [15] - 14:9, 66:1, 66:2, 66:3, 66:6, 74:17, 75:3, 75:4, 75:6, 79:16, 81:13, 85:15, 94:17
**aptly** [1] - 88:21
**arbitration** [1] - 40:11
**arena** [1] - 76:9
**arguably** [1] - 85:24
**argue** [5] - 5:19, 6:3, 48:10, 54:20, 75:15
**argued** [2] - 12:9, 51:20
**arguing** [2] - 7:7, 84:6
**argument** [22] - 16:8, 36:21, 41:6, 43:2, 43:7, 44:17, 48:23, 49:8, 49:10, 51:10, 58:10, 61:8, 70:24, 76:6, 77:4, 78:20, 79:7, 80:8, 86:7, 86:14, 88:7, 91:3
**arguments** [4] - 4:8, 4:13, 73:21, 96:7
**arises** [2] - 21:25, 64:9
**arm** [4] - 49:11, 49:12, 49:20, 49:23
**arrangement** [1] - 84:12
**arrangements** [1] - 11:6
**array** [1] - 17:5
**arrives** [1] - 89:9
**art** [2] - 30:2, 30:3
**article** [1] - 60:3
**articles** [1] - 62:19
**aside** [2] - 14:2, 78:18
**assert** [1] - 53:7
**assets** [3] - 29:16, 29:21, 29:23
**assume** [3] - 38:20, 39:2, 48:1
**assumed** [4] - 7:16, 29:2, 47:16, 51:5
**assuming** [2] - 30:15, 51:9
**assumption** [1] - 29:5
**at-will** [20] - 75:18,

77:7, 77:18, 77:25, 79:3, 80:1, 80:16, 80:21, 80:23, 80:25, 81:15, 83:3, 84:2, 84:5, 84:22, 85:4, 86:7, 86:12, 86:16, 91:16
**attempt** [1] - 53:23
**attention** [2] - 19:3, 58:6, 81:19
**attorney** [2] - 94:20, 95:11
**Attorney** [3] - 2:12, 6:13, 40:7
**audible** [1] - 69:5
**audience** [1] - 6:17
**audit** [4] - 12:22, 12:23, 53:8, 59:15
**auditor** [1] - 14:1
**audits** [1] - 52:15
**August** [1] - 84:23
**Authority** [1] - 49:18
**authority** [10] - 30:8, 30:12, 36:11, 36:13, 36:24, 60:19, 61:4, 68:4, 94:24, 94:25
**availability** [1] - 32:21
**Avenue** [1] - 1:17
**aware** [5] - 7:21, 57:10, 59:24, 60:15, 61:7

---

**B**

**backdate** [1] - 85:22
**backdated** [2] - 94:1, 94:21
**backdating** [1] - 85:23
**background** [2] - 4:15, 43:10
**backpay** [1] - 11:5
**badge** [1] - 89:9
**banc** [1] - 32:13
**Banks** [1] - 1:16
**bare** [1] - 15:21
**barely** [1] - 36:12
**bargaining** [1] - 38:21
**base** [4] - 43:5, 46:22, 62:11
**based** [11] - 35:1, 35:24, 43:7, 49:18, 62:12, 71:25, 77:13, 77:19, 84:2, 88:2, 90:6
**bases** [1] - 54:19
**basis** [6] - 19:9, 33:2, 45:16, 66:9, 72:15, 76:8
**basket** [1] - 69:18

**became** [3] - 7:21, 64:23, 83:2
**becomes** [1] - 77:7
**BEFORE** [1] - 1:8
**begin** [4] - 5:2, 21:4, 48:8, 48:14
**beginning** [4] - 21:4, 64:22, 75:1, 80:21
**begins** [2] - 43:23, 52:8
**behalf** [5] - 3:21, 6:2, 6:14, 7:7, 12:23
**behavior** [1] - 34:17
**behind** [6] - 41:11, 41:15, 42:8, 42:11, 42:13, 86:2
**belabor** [2] - 34:3, 65:23
**bench** [1] - 30:6
**benefit** [2] - 52:1, 57:15
**benefit/burden** [1] - 47:18
**benefits** [1] - 86:23
**berth** [1] - 57:15
**best** [3] - 94:14, 94:15, 96:22
**bets** [1] - 89:4
**between** [6] - 19:19, 21:8, 34:8, 77:13, 81:2, 89:14
**beyond** [2] - 53:19, 94:13
**big** [1] - 42:3
**bill** [1] - 29:21
**billed** [2] - 52:23, 59:17
**billing** [6] - 15:23, 53:10, 53:25, 55:11, 56:8, 60:14
**billings** [2] - 12:6, 15:25
**bit** [2] - 41:9, 56:6
**blah** [1] - 25:3
**blah-blah-blah** [1] - 25:3
**blanket** [1] - 31:4
**blush** [1] - 54:25
**board** [23] - 7:22, 9:14, 9:19, 10:1, 10:21, 11:10, 11:18, 12:3, 12:7, 12:8, 14:8, 42:15, 66:3, 66:4, 78:24, 80:11, 86:1, 86:2, 86:4, 93:25, 95:19, 95:25, 96:3
**bodies** [1] - 33:11
**body** [1] - 21:10
**boil** [1] - 7:24
**boilerplate** [1] - 59:6

**bones** [1] - 15:21
**borrow** [2] - 42:5, 42:11
**bottom** [1] - 38:14
**Boucree** [1] - 3:22
**BOUCREE** [1] - 2:4
**bound** [4] - 38:20, 39:3, 39:5
**breach** [19] - 7:4, 73:13, 73:16, 75:21, 76:9, 77:5, 77:6, 78:4, 79:9, 80:21, 84:15, 88:8, 89:24, 90:7, 90:10, 90:11, 92:17, 94:7, 96:10
**bridge** [1] - 59:5
**brief** [7] - 6:15, 36:12, 48:10, 50:17, 73:8, 90:14, 93:10
**briefed** [1] - 35:22
**briefing** [2] - 35:19, 69:13
**briefs** [3] - 37:15, 61:9, 61:11
**bring** [9] - 28:20, 32:23, 32:25, 39:16, 39:17, 39:18, 61:17, 80:21, 89:24
**bringing** [1] - 58:6
**broad** [4] - 32:16, 36:18, 38:1, 40:15
**broaden** [1] - 64:13
**broader** [1] - 17:5
**brought** [9] - 5:3, 7:22, 31:3, 33:1, 40:2, 46:10, 67:14, 79:10, 89:2
**budget** [1] - 33:13
**budgetary** [3] - 29:6, 42:16, 47:14
**bullet** [2] - 13:8
**bumped** [1] - 8:18
**bunch** [1] - 13:12
**burden** [2] - 68:12, 68:13
**Burkhart** [1] - 38:24
**Burt** [1] - 1:20

# C

**CAFR** [4] - 28:24, 29:7, 29:8, 51:4
**candid** [1] - 88:23
**cannot** [11] - 19:9, 36:19, 45:11, 45:12, 59:4, 61:4, 78:9, 80:3, 80:10, 84:21
**capacity** [2] - 46:20
**card** [1] - 78:12

**care** [1] - 7:23, 17:3, 19:5, 36:8, 64:25, 69:24, 71:14, 71:16, 72:4, 72:7, 72:24
**careful** [1] - 24:10
**carefully** [3] - 18:13, 26:8, 88:18
**cares** [2] - 72:10, 72:13
**Carl** [5] - 17:20, 17:24, 19:2, 70:7, 70:10
**Carlton** [1] - 1:20
**carried** [1] - 89:19
**carry** [2] - 27:13, 28:12
**case** [49] - 4:9, 4:25, 5:3, 6:16, 6:23, 7:24, 21:20, 22:10, 23:4, 33:18, 35:24, 36:11, 36:14, 36:24, 37:2, 37:7, 38:4, 38:24, 43:12, 44:10, 44:21, 44:22, 45:2, 45:18, 45:24, 46:8, 46:9, 49:18, 50:4, 50:7, 50:10, 50:14, 51:6, 52:5, 61:18, 63:21, 70:10, 75:14, 75:15, 76:10, 76:11, 77:17, 92:9, 93:5, 93:25, 94:5, 94:8
**cases** [18] - 11:11, 14:21, 16:17, 21:21, 21:22, 21:24, 27:2, 30:6, 37:6, 37:15, 38:6, 44:5, 44:7, 44:21, 47:5, 61:9, 88:10, 93:11
**categorical** [1] - 47:8
**categories** [1] - 37:17
**caught** [1] - 55:23
**center** [1] - 42:5
**Center** [4] - 39:9, 39:13, 39:16, 81:24
**CEO** [6] - 10:17, 12:9, 13:6, 13:14, 13:15, 95:24
**certain** [11] - 16:17, 24:22, 25:3, 31:2, 32:34, 34:22, 41:5, 42:14, 75:22, 91:10, 91:11
**certainly** [3] - 4:13, 18:4, 31:15
**CERTIFICATE** [1] - 96:19
**certify** [1] - 96:21
**cetera** [4] - 23:14, 63:13, 89:18, 92:13
**CFO** [2] - 11:3, 82:7

**chain** [1] - 47:12
**Chairman** [2] - 62:5, 62:12
**challenge** [1] - 45:17
**challenged** [3] - 8:2, 30:2, 44:20
**change** [5] - 61:17, 61:20, 62:15, 63:16, 86:11
**changed** [1] - 83:10
**changing** [2] - 10:20, 91:20
**characterization** [2] - 41:1, 51:18
**characterizations** [1] - 51:20
**charge** [1] - 7:20
**charged** [1] - 73:20
**charges** [7] - 8:11, 8:13, 16:1, 17:10, 55:18, 62:8, 72:23
**chart** [3] - 29:9, 29:10, 40:25
**charts** [2] - 12:25, 86:24
**CHERTKOF** [67] - 1:11, 3:8, 7:9, 7:11, 8:5, 8:7, 8:16, 8:18, 9:5, 9:8, 10:8, 10:10, 10:12, 10:16, 12:14, 12:20, 14:24, 15:4, 15:7, 15:18, 16:4, 16:14, 17:17, 18:1, 18:19, 18:23, 19:17, 20:4, 20:15, 36:9, 37:6, 37:11, 38:6, 38:13, 38:16, 41:4, 43:1, 43:17, 43:21, 44:2, 44:5, 44:8, 44:11, 44:16, 44:20, 45:8, 45:10, 45:21, 46:1, 65:22, 69:17, 70:15, 71:1, 71:20, 72:17, 81:18, 82:18, 82:21, 82:23, 83:6, 83:13, 83:17, 84:9, 85:9, 85:24, 86:19, 87:3
**Chertkof** [10] - 1:12, 3:9, 7:6, 48:7, 55:23, 56:17, 57:13, 88:19, 90:20, 93:10
**Chertkof's** [1] - 34:2
**chief** [10] - 22:25, 52:11, 56:1, 56:3, 59:14, 60:4, 61:22, 61:23, 64:17
**Chief** [2] - 7:11, 7:21
**choice** [2] - 34:8, 35:2
**choices** [1] - 33:24

**choose** [1] - 41:16
**chose** [1] - 78:9
**chosen** [2] - 41:17, 42:9
**Christian** [1] - 3:17
**chronologically** [1] - 52:6
**Chukwuma** [6] - 52:10, 53:20, 56:24, 59:14, 60:1, 62:25
**chunk** [1] - 12:17
**Cindy** [2] - 44:22, 45:17
**circled** [1] - 38:14
**Circuit** [9] - 27:3, 30:5, 36:1, 46:11, 46:18, 49:12, 50:3, 50:4, 50:11
**circumstances** [4] - 24:22, 25:4, 75:23, 91:2
**citation** [2] - 71:7, 73:4
**cite** [1] - 72:14
**cited** [3] - 37:7, 52:20, 61:9
**citing** [1] - 93:10
**citizen** [1] - 45:23
**city** [1] - 71:5
**Civil** [2] - 1:3, 3:2
**claim** [53] - 6:9, 8:1, 15:9, 16:1, 17:14, 19:10, 19:22, 19:23, 20:3, 21:4, 31:3, 33:16, 34:7, 39:16, 39:17, 39:18, 45:4, 45:5, 48:23, 51:12, 53:12, 54:19, 55:3, 57:11, 60:13, 63:4, 66:11, 66:21, 67:2, 68:12, 69:4, 70:24, 72:15, 73:16, 76:8, 77:5, 77:6, 77:19, 78:4, 79:10, 80:18, 80:19, 86:4, 88:8, 89:24, 90:4, 90:6, 90:8, 90:11, 92:17, 92:22, 96:10
**claiming** [2] - 19:20, 80:1
**claims** [19] - 4:10, 5:3, 5:5, 5:23, 6:7, 6:25, 7:24, 8:7, 8:13, 9:25, 15:14, 16:10, 33:12, 33:17, 39:19, 49:4, 68:16, 69:18, 92:15
**Claims** [8] - 9:21, 9:22, 15:7, 15:8, 16:6, 17:9, 39:18
**clarify** [2] - 60:9, 74:9

**classic** [1] - 53:11
**clause** [3] - 25:13, 48:12, 48:13
**clear** [5] - 38:2, 69:8, 73:6, 75:23, 83:19
**clearest** [1] - 92:14
**clearly** [3] - 46:18, 73:9, 85:4
**client** [2] - 66:12, 68:16
**clients** [1] - 6:2
**closer** [1] - 86:19
**clue** [1] - 58:17
**CMO** [2] - 14:15, 95:23
**Coburn** [3] - 2:4, 3:21, 3:23
**code** [1] - 27:15
**Code** [5] - 23:22, 25:8, 27:8, 27:9, 31:18
**codes** [1] - 23:23
**Coll** [4] - 3:21, 6:2, 51:21, 58:13
**COLL** [2] - 2:3, 3:20
**colleague** [1] - 30:18
**colleagues** [2] - 30:5, 56:1
**collections** [2] - 14:3, 17:10
**collective** [1] - 38:21
**COLUMBIA** [1] - 1:1
**Columbia** [15] - 19:24, 21:9, 23:1, 24:4, 24:16, 26:3, 26:9, 29:10, 30:17, 41:14, 42:2, 42:22, 43:9, 47:15, 65:2
**combination** [1] - 21:11
**coming** [1] - 11:23
**commerce** [1] - 40:19
**committee** [1] - 62:6
**common** [1] - 9:23
**Commonwealth** [1] - 46:16
**Compact** [3] - 22:1, 23:21, 38:23
**compact** [1] - 39:3
**company** [1] - 10:2
**comparison** [1] - 23:3
**compelling** [3] - 29:14, 47:11, 50:20
**compensability** [1] - 52:17
**compensation** [5] - 81:5, 81:11, 90:23, 90:24, 93:20
**complain** [4] - 15:13, 63:12, 63:14, 72:13
**complained** [3] - 19:20, 71:18, 72:10

**complaining** [4] -
54:23, 55:14, 64:10
**complaint** [69] - 4:5,
11:3, 12:6, 12:15,
12:19, 12:21, 13:7,
13:14, 13:17, 14:11,
15:3, 15:16, 15:19,
16:16, 17:22, 17:23,
17:25, 18:17, 18:20,
18:24, 19:3, 19:4,
20:12, 20:20, 28:21,
34:2, 51:11, 51:13,
52:7, 52:8, 53:4,
54:4, 54:7, 54:9,
54:10, 57:9, 57:18,
58:18, 59:2, 59:10,
64:20, 65:25, 66:4,
67:2, 68:7, 68:21,
69:8, 69:9, 69:13,
69:23, 71:1, 71:10,
72:3, 72:6, 72:9,
72:15, 73:3, 73:21,
74:3, 79:24, 82:5,
87:15, 95:1, 95:2,
95:6, 95:10, 95:13,
95:15, 95:19
**complaints** [1] - 61:6
**complete** [1] - 96:22
**completing** [1] - 19:12
**compliance** [1] - 56:2
**complies** [1] - 38:12
**Comprehensive** [1] -
28:23
**compromised** [1] -
64:25
**computer** [2] - 2:18,
9:1
**computer-aided** [1] -
2:18
**concede** [1] - 30:25
**conceivably** [1] - 90:7
**concern** [2] - 23:12,
61:6
**concerned** [4] - 19:14,
64:24, 67:11, 68:14
**concerns** [2] - 57:8,
68:1
**conclaves** [1] - 37:19
**concludes** [1] - 96:18
**conclusion** [2] -
67:13, 68:20
**conclusive** [1] - 50:13
**conclusory** [2] -
66:15, 67:1
**conditions** [1] - 31:2
**conduct** [13] - 60:13,
60:14, 63:12, 77:20,
85:12, 86:25, 87:20,
89:8, 93:3, 93:19,
94:16

**conducted** [4] - 56:16,
58:25, 59:1, 59:15
**conducting** [1] - 93:3
**conducts** [1] - 52:15
**confer** [1] - 28:3
**conferral** [2] - 30:7,
50:22
**conferred** [2] - 25:9,
43:25
**conferring** [1] - 40:15
**conflating** [1] - 57:3
**confused** [1] - 68:5
**confusing** [1] - 54:22
**Congress** [6] - 27:22,
28:24, 47:10, 47:22,
50:19, 51:4
**Connecticut** [1] - 1:17
**consider** [1] - 27:4
**considerations** [1] -
43:6
**considered** [3] -
24:15, 41:25, 61:5
**consistent** [6] - 6:23,
19:2, 19:13, 19:15,
20:2, 92:23
**constituent** [1] - 23:25
**constitutes** [1] - 96:21
**construed** [2] - 27:18,
36:19
**contains** [1] - 93:11
**contemplated** [2] -
24:21, 85:14
**content** [2] - 55:3,
55:5
**contentions** [1] - 4:10
**contentious** [1] -
73:11
**context** [6] - 8:14,
31:1, 45:20, 49:24,
56:12, 68:2
**contingent** [1] - 49:8
**continually** [1] - 78:13
**continuance** [1] -
76:17
**continue** [15] - 9:4,
75:16, 76:2, 76:14,
83:8, 83:9, 85:11,
85:12, 87:22, 89:23,
93:8, 93:17, 93:19,
93:24, 94:18
**CONTINUED** [1] - 1:24
**continued** [15] - 2:1,
10:22, 10:24, 75:16,
76:14, 85:6, 85:7,
86:25, 87:1, 87:18,
88:4, 91:21, 92:12,
93:4
**continues** [7] - 8:3,
14:11, 16:19, 16:22,
79:10, 79:11, 87:21

**continuing** [1] - 64:23
**contract** [101] - 6:8,
7:4, 10:6, 10:9,
10:12, 10:20, 10:23,
10:25, 11:1, 11:17,
11:18, 11:19, 14:8,
31:17, 31:19, 31:23,
32:1, 39:4, 66:2,
73:13, 73:16, 73:21,
73:22, 73:23, 73:25,
74:3, 74:4, 74:25,
75:1, 75:16, 75:21,
75:23, 76:4, 76:9,
76:14, 76:17, 77:5,
77:6, 77:12, 77:19,
77:24, 78:4, 78:5,
78:10, 78:20, 78:23,
79:1, 79:2, 79:3,
79:10, 79:14, 80:1,
80:4, 80:7, 80:8,
80:10, 80:19, 80:22,
81:15, 81:25, 82:3,
82:4, 83:5, 83:7,
84:9, 84:15, 84:24,
85:10, 85:11, 85:12,
85:14, 85:22, 85:25,
86:4, 86:20, 87:12,
87:21, 88:8, 88:22,
88:25, 89:1, 89:7,
89:24, 90:1, 90:6,
90:10, 90:11, 90:17,
91:24, 91:25, 92:17,
92:22, 93:1, 94:7,
96:10
**contracted** [2] - 84:8,
84:20
**contracts** [6] - 7:16,
31:22, 37:24, 38:21,
51:25, 93:6
**Contracts** [1] - 90:12
**contractual** [7] - 76:7,
77:11, 78:18, 79:19,
79:22, 84:12, 95:23
**contradict** [1] - 5:16
**contradictory** [1] -
48:17
**contrary** [1] - 94:8
**contrast** [1] - 38:23
**contravenes** [1] -
35:25
**control** [10] - 25:18,
25:22, 29:6, 29:24,
30:1, 30:10, 41:6,
41:9, 42:14, 50:9
**controlled** [1] - 23:7
**controlling** [3] -
36:10, 36:13, 37:20
**convened** [1] - 55:22
**conversations** [1] -
11:2

**convert** [1] - 77:25
**convey** [2] - 74:13,
75:13
**COO** [1] - 11:3
**coordinated** [2] - 5:7,
5:11
**coordination** [1] -
6:10
**copy** [1] - 12:22
**core** [1] - 6:8
**corners** [1] - 28:20
**Corning** [5] - 21:15,
22:9, 26:15, 26:23
**corporate** [1] - 27:11
**Corporation** [8] - 3:4,
3:16, 3:18, 7:14,
29:25, 39:22, 47:14,
81:23
**corporation** [34] -
24:14, 24:17, 24:18,
24:21, 25:1, 25:5,
32:20, 33:2, 36:15,
36:16, 37:23, 38:20,
39:11, 40:3, 40:6,
40:9, 40:12, 40:16,
40:18, 40:23, 40:24,
41:1, 41:5, 41:8,
41:22, 41:23, 42:5,
42:21, 43:8, 43:25,
45:15, 47:17, 47:19,
48:2
**Corporation's** [1] -
39:10
**correct** [2] - 26:22,
63:17
**correcting** [1] - 9:17
**Council** [10] - 8:16,
9:11, 16:24, 18:7,
18:18, 18:25, 70:12,
72:22, 72:25, 73:10
**council** [9] - 8:17,
18:6, 54:18, 62:2,
63:22, 71:5, 71:23,
72:5, 87:8
**Councilman** [2] -
8:19, 9:6
**counsel** [30] - 3:5,
3:17, 3:23, 5:6, 5:8,
8:10, 13:18, 27:16,
28:2, 36:4, 38:12,
40:7, 42:10, 46:12,
53:3, 53:7, 53:18,
58:23, 64:4, 64:7,
66:8, 69:2, 69:7,
73:14, 73:15, 74:10,
81:17, 88:23, 91:11,
95:17
**count** [1] - 70:17
**counter** [2] - 25:19,
91:11

**counter-indicia** [1] -
25:19
**counterintuitive** [1] -
48:19
**countermanding** [1] -
20:8
**Counts** [1] - 73:20
**counts** [3] - 9:21,
15:16, 43:11
**couple** [2] - 48:21,
60:19
**course** [7] - 28:14,
35:4, 77:19, 81:5,
89:8, 93:3, 93:18
**COURT** [191] - 1:1,
1:9, 3:11, 3:19, 3:24,
4:2, 5:14, 5:20, 6:11,
6:19, 6:21, 7:10, 8:3,
8:6, 8:14, 8:17, 8:25,
9:4, 9:7, 10:6, 10:9,
10:11, 10:15, 12:13,
12:18, 14:22, 15:1,
15:6, 15:15, 16:3,
16:12, 17:12, 17:21,
18:11, 18:22, 19:8,
19:18, 20:14, 20:21,
21:3, 22:5, 23:11,
24:2, 24:9, 26:5,
26:18, 28:5, 28:8,
28:10, 28:15, 30:13,
30:22, 30:24, 31:7,
31:11, 32:3, 32:5,
32:7, 32:10, 32:16,
33:21, 34:10, 34:13,
34:18, 35:8, 35:11,
35:14, 35:20, 36:3,
36:23, 37:10, 38:4,
38:11, 38:15, 40:21,
42:24, 43:2, 43:20,
44:1, 44:4, 44:7,
44:9, 44:15, 44:19,
44:23, 45:9, 45:19,
45:24, 46:2, 46:7,
47:4, 47:23, 48:5,
48:15, 48:20, 49:7,
49:21, 50:23, 51:9,
51:17, 53:2, 53:15,
53:22, 54:6, 54:15,
55:18, 56:11, 57:2,
57:22, 58:16, 58:19,
58:22, 59:8, 60:8,
60:12, 60:22, 61:10,
61:19, 62:20, 63:3,
63:10, 63:18, 63:24,
64:3, 65:21, 66:7,
66:19, 67:5, 67:16,
67:22, 67:25, 68:9,
68:22, 69:1, 69:6,
70:13, 70:16, 71:9,
71:21, 73:12, 74:8,

74:16, 74:19, 74:21,
74:24, 75:3, 75:6,
75:11, 75:19, 75:24,
76:5, 76:11, 76:16,
76:22, 77:8, 77:15,
77:17, 78:8, 78:11,
78:16, 79:7, 79:17,
79:21, 80:12, 80:18,
81:3, 81:17, 82:13,
82:20, 82:22, 82:25,
83:11, 83:14, 83:18,
84:17, 85:18, 86:6,
87:2, 87:9, 87:13,
87:25, 88:12, 88:16,
89:5, 90:9, 91:1,
93:5, 94:3, 94:19,
94:25, 96:1
**Court** [22] - 2:14, 2:15,
4:18, 6:17, 17:19,
21:7, 21:13, 26:14,
30:4, 33:4, 35:25,
36:14, 36:24, 39:25,
44:13, 44:22, 46:10,
46:17, 55:24, 90:15,
96:8, 96:25
**court** [8] - 21:22,
21:23, 39:6, 44:2,
44:3, 45:5, 74:14,
96:17
**Court's** [3] - 46:4,
51:16, 81:19
**courthouse** [2] - 23:9,
27:3
**Courthouse** [1] - 2:15
**courtroom** [1] - 6:14
**courts** [7] - 27:2, 33:4,
46:23, 46:25, 49:14,
60:17, 60:18
**cover** [3] - 15:4, 36:6,
85:19
**coverage** [1] - 16:7
**covered** [2] - 17:6,
17:7
**CRAIG** [1] - 1:3
**Craig** [56] - 3:3, 3:9,
7:11, 7:20, 8:9, 9:9,
9:16, 10:4, 10:22,
11:13, 11:25, 12:1,
12:11, 12:21, 13:3,
13:19, 14:6, 15:21,
18:5, 18:16, 19:6,
19:12, 52:11, 53:7,
56:5, 56:7, 58:5,
59:14, 62:6, 64:16,
64:23, 65:3, 65:7,
65:11, 65:25, 66:1,
66:5, 67:6, 69:9,
69:17, 71:3, 71:25,
74:5, 76:18, 76:23,
77:5, 77:24, 78:21,

81:21, 83:2, 83:15,
84:20, 87:16, 89:8,
89:14, 95:21
**craig's** [1] - 82:8
**Craig's** [3] - 60:7,
66:4, 68:5
**created** [8] - 27:6,
40:16, 41:1, 41:24,
43:9, 43:14, 43:15,
50:7
**creates** [2] - 36:15,
37:23
**creating** [1] - 47:17
**credit** [2] - 42:2, 42:13
**crisis** [1] - 41:12
**criteria** [16] - 12:16,
13:1, 13:23, 15:23,
16:18, 17:1, 20:7,
20:17, 49:19, 52:16,
62:15, 65:9, 65:13,
67:8, 70:3, 70:5
**critical** [1] - 59:12
**critically** [2] - 37:8,
37:11
**crossing** [1] - 59:5
**cryptic** [3] - 54:8,
54:14, 55:13
**cryptically** [2] - 53:18,
54:10
**culture** [1] - 34:4, 56:9
**current** [1] - 30:4
**cut** [5] - 10:4, 26:1,
44:23, 82:10

# D

**D.C** [55] - 1:6, 2:12,
2:16, 5:23, 6:13,
7:15, 8:9, 8:16, 9:10,
9:22, 9:23, 15:8,
16:7, 16:24, 17:4,
18:7, 18:18, 18:25,
21:2, 21:13, 21:15,
23:22, 25:25, 26:14,
27:3, 27:8, 27:9,
27:23, 29:5, 29:11,
30:5, 31:18, 31:20,
32:13, 33:4, 36:1,
39:1, 39:17, 42:7,
42:11, 42:13, 45:12,
45:23, 46:11, 46:18,
49:12, 50:2, 50:3,
69:21, 70:12, 72:22,
72:25, 73:10, 90:14
**damages** [2] - 25:2,
33:12
**date** [5] - 82:22, 83:1,
85:13, 86:2, 91:13
**Dated** [1] - 96:23

**Davis** [2] - 93:23,
94:17
**days** [7] - 9:16, 9:20,
13:12, 15:20, 18:7,
55:21, 56:25
**DC** [5] - 1:13, 1:17,
1:22, 2:5, 2:9
**DCCA** [3] - 27:3, 30:4,
36:1
**de** [4] - 22:24, 29:12,
47:9, 47:20
**deal** [5] - 8:7, 9:8,
9:24, 9:25, 40:1
**dealing** [1] - 81:6
**dealt** [1] - 44:9
**Debra** [1] - 3:10
**DEBRA** [1] - 1:15
**debt** [3] - 41:21,
41:24, 41:25
**debts** [3] - 41:15,
41:16, 42:12
**December** [1] - 82:1
**decide** [3] - 86:18,
88:20, 96:8
**decided** [6] - 7:23,
14:2, 19:1, 41:10,
42:16, 84:23
**decides** [3] - 22:13,
35:5, 92:18
**decision** [9] - 6:4,
10:18, 22:9, 32:13,
34:19, 35:17, 50:3,
65:10, 67:9
**decisions** [3] - 10:3,
16:18, 90:16
**deed** [1] - 29:21
**deemed** [1] - 49:20
**defamation** [1] - 8:1
**DEFENDANT** [1] - 2:7
**defendant** [2] - 33:19,
73:15
**defendants** [5] - 4:6,
5:4, 6:22, 73:13,
92:5
**DEFENDANTS** [2] -
1:19, 2:3
**Defendants** [1] - 1:5
**defendants'** [1] - 5:1
**defense** [9] - 5:6,
17:13, 24:23, 33:18,
57:25, 64:6, 69:1,
70:23, 94:11
**defining** [1] - 33:21
**definite** [1] - 83:7
**degree** [1] - 79:18
**delegated** [4] - 26:17,
30:11, 30:12, 32:2
**delegatee** [1] - 27:23
**delegation** [1] - 50:22
**deliberately** [1] -

58:20
**demonstrate** [2] -
60:24, 68:13
**demote** [2] - 14:14
**demotion** [1] - 14:18
**dependent** [2] - 26:24,
27:1
**DEPUTY** [2] - 3:2,
96:17
**derivation** [2] - 21:16,
23:6
**derivative** [4] - 27:21,
28:4, 28:11, 30:16
**derived** [2] - 21:17,
63:6
**describe** [2] - 53:4,
68:7
**described** [3] - 20:20,
52:20, 56:13
**describes** [1] - 87:16
**description** [2] - 6:22,
60:1
**designated** [1] - 20:25
**designed** [1] - 64:13
**detail** [3] - 4:15, 58:14,
62:9
**detailed** [2] - 11:2,
12:21
**details** [2] - 62:18,
82:6
**determine** [3] - 22:13,
78:17, 92:10
**determined** [2] -
59:16, 60:1
**determining** [2] -
49:12, 49:22
**DeWitt** [2] - 60:4,
61:24
**difference** [1] - 50:1
**different** [14] - 11:6,
11:7, 11:8, 15:4,
15:5, 17:18, 24:12,
49:21, 49:25, 50:24,
52:16, 86:14, 96:13
**direct** [2] - 62:19,
62:21
**Direct** [1] - 45:17
**directed** [4] - 28:25,
34:21, 35:1, 65:11
**direction** [2] - 20:8,
34:19
**director** [1] - 56:4
**discharge** [18] - 9:24,
17:14, 17:16, 18:12,
19:10, 19:19, 19:23,
20:3, 69:7, 69:16,
69:19, 69:20, 70:7,
70:17, 71:2, 72:8,
72:15
**disclosure** [2] - 52:4,

61:12
**discount** [1] - 64:8
**discovered** [2] -
63:13, 64:11
**discoverer** [1] - 64:16
**discredit** [1] - 9:15
**discretionary** [8] -
31:13, 32:8, 32:11,
32:14, 33:22, 34:11,
34:12, 43:24
**discriminated** [1] -
61:1
**discuss** [1] - 73:16
**discussed** [2] - 6:25,
12:7
**discussing** [2] -
57:19, 66:4
**discussion** [2] - 4:14,
11:25
**discussions** [1] - 11:6
**dismiss** [8] - 4:5, 5:1,
57:24, 58:7, 70:8,
88:9, 91:8, 92:16
**dismissed** [3] - 5:5,
40:5, 44:3
**dismissing** [1] - 79:24
**dispositive** [1] - 4:4
**dispute** [17] - 21:8,
41:4, 47:4, 51:24,
51:25, 78:19, 79:22,
81:4, 81:18, 82:2,
82:16, 82:19, 83:15,
84:18, 86:17, 88:2,
96:6
**disputed** [1] - 78:1
**disputes** [1] - 84:10
**disputing** [1] - 79:5
**distinct** [1] - 41:2
**distinction** [1] - 19:18
**distracting** [1] - 4:24
**district** [2] - 38:19,
60:18
**District** [72] - 6:15,
19:24, 21:9, 21:11,
21:18, 22:19, 22:20,
22:22, 23:1, 23:6,
23:8, 23:19, 23:20,
24:4, 24:7, 24:11,
24:15, 24:16, 25:10,
26:2, 26:9, 27:11,
28:23, 29:2, 29:9,
29:17, 30:16, 30:17,
30:25, 31:4, 31:15,
31:16, 31:19, 31:24,
33:9, 34:7, 37:18,
40:23, 40:24, 41:2,
41:3, 41:14, 41:25,
42:2, 42:10, 42:22,
43:9, 43:11, 43:15,
46:10, 47:15, 47:19,

47:25, 49:9, 49:11,
49:16, 49:20, 49:23,
50:7, 50:10, 50:17,
50:20, 50:21, 51:5,
51:6, 60:5, 65:2,
70:19, 72:10, 72:13
**DISTRICT** [3] - 1:1,
1:1, 1:9
**District's** [9] - 22:14,
22:15, 26:4, 26:11,
27:10, 32:14, 37:4,
47:14, 50:15
**diversity** [16] - 5:21,
5:22, 21:24, 44:18,
44:20, 45:1, 45:7,
45:12, 45:13, 45:15,
45:16, 48:25, 49:3,
49:7, 49:9, 49:22
**division** [1] - 20:24
**doctor** [4] - 34:19,
34:21, 35:4, 66:16
**Doctor** [1] - 62:8
**doctors** [10] - 13:4,
13:10, 13:23, 15:22,
16:4, 16:15, 20:12,
65:13, 67:21, 93:7
**document** [10] -
20:17, 47:21, 82:3,
82:8, 85:4, 90:11,
91:12, 91:14, 95:14
**documentation** [5] -
9:18, 13:20, 13:22,
65:9, 67:9
**documents** [1] - 95:12
**dollars** [1] - 74:14
**done** [9] - 29:22,
33:18, 34:15, 59:23,
64:15, 67:3, 68:21,
90:20, 90:21
**doubt** [1] - 57:15
**down** [8] - 7:24, 20:11,
23:15, 47:5, 64:22,
77:22, 95:9, 95:11
**Dr** [56] - 7:11, 7:20,
8:9, 9:9, 9:16, 10:4,
10:22, 11:25, 12:1,
12:11, 12:21, 13:3,
13:19, 14:6, 15:21,
18:5, 19:6, 19:12,
52:11, 53:7, 56:3,
56:5, 56:7, 59:14,
60:7, 62:6, 64:16,
64:23, 65:3, 65:7,
65:11, 65:25, 66:1,
66:4, 66:5, 67:6,
68:5, 69:9, 69:17,
71:3, 71:25, 74:5,
76:18, 76:23, 77:5,
77:24, 78:21, 81:21,
82:8, 83:2, 83:15,

84:20, 87:16, 89:8,
89:14, 95:21
**drafted** [1] - 95:12
**drafters** [3] - 24:20,
25:8, 26:19
**draw** [2] - 23:3, 85:7
**dressed** [1] - 51:25
**drill** [2] - 23:15, 47:5
**drive** [3] - 6:3, 52:16,
56:9
**due** [5] - 25:15, 25:19,
47:7, 57:13, 95:16
**duly** [1] - 29:18
**duration** [2] - 51:24,
83:9
**during** [5] - 4:14,
59:12, 83:18, 84:8,
86:12
**duties** [3] - 86:23,
91:10, 93:20

## E

**e.g** [1] - 72:11
**early** [5] - 11:11,
59:25, 61:21, 61:24,
64:23
**easy** [1] - 81:19
**economic** [1] - 70:11
**Edward** [1] - 3:23
**EDWARD** [1] - 2:3
**effect** [9] - 78:21,
84:1, 85:14, 85:25,
89:20, 90:18, 92:1,
92:20, 93:4
**effective** [3] - 74:19,
74:20, 86:1
**effectively** [1] - 86:10
**effort** [8] - 15:13, 16:4,
16:8, 16:10, 16:12,
17:9, 64:14, 64:15
**egray@
thompsoncoburn.
com** [1] - 2:6
**ehirsch@
carltonfields.com**
[1] - 1:23
**eight** [1] - 85:21
**either** [6] - 26:6,
43:20, 43:21, 53:23,
61:13, 88:3
**ELIZABETH** [1] -
96:20
**Elizabeth** [2] - 2:14,
96:25
**elsewhere** [2] - 45:25,
47:3
**Email** [5] - 1:14, 1:18,
1:23, 2:6, 2:10

**embellished** [1] -
53:18
**emergency** [3] - 20:6,
34:16, 65:13
**Emil** [2] - 3:16, 5:10
**EMIL** [1] - 1:19
**employed** [2] - 39:10,
39:21
**employee** [26] - 60:24,
70:18, 75:17, 77:7,
77:9, 77:18, 77:20,
77:25, 78:12, 79:4,
79:10, 80:1, 80:16,
80:23, 80:25, 81:10,
83:3, 84:2, 84:8,
84:21, 84:22, 85:4,
86:8, 86:16, 91:10
**employees** [13] - 7:18,
24:14, 24:15, 39:8,
39:9, 39:12, 39:16,
40:9, 40:13, 57:7,
65:5, 77:10, 80:21
**employer** [4] - 10:19,
70:11, 77:11, 77:19
**employment** [15] -
9:20, 19:1, 38:24,
51:24, 51:25, 76:2,
76:9, 78:18, 79:18,
86:22, 89:13, 89:22,
89:23, 90:22, 92:8
**en** [1] - 32:13
**enabling** [3] - 23:16,
32:20, 37:4
**enclave** [1] - 21:18
**encouraging** [1] -
15:22
**end** [12] - 11:24, 19:1,
42:22, 59:19, 75:4,
75:6, 80:15, 81:8,
82:11, 82:22, 87:9,
91:2
**ended** [5] - 11:24,
75:17, 75:23, 75:25,
83:23
**ends** [4] - 16:22,
42:23, 77:7, 93:2
**enforce** [1] - 70:6
**enforceable** [1] - 39:6
**enforced** [1] - 39:4
**engage** [2] - 61:12,
63:11
**engaged** [4] - 60:25,
61:5, 64:24, 68:19
**engaging** [2] - 63:2,
64:1
**enhanced** [1] - 52:1
**enhancement** [1] -
59:7
**enjoyed** [1] - 39:12
**enjoys** [1] - 26:11

**ensuring** [1] - 71:13
**entered** [1] - 6:16
**entire** [2] - 29:9, 80:7
**entirety** [1] - 36:21
**entities** [1] - 49:15
**entitled** [7] - 21:12,
29:15, 33:11, 72:21,
79:14, 84:12, 84:22
**entity** [20] - 21:10,
25:8, 25:16, 25:24,
26:16, 26:20, 27:6,
27:11, 28:12, 29:3,
29:4, 37:14, 45:11,
45:13, 48:7, 50:7,
50:8, 57:6, 60:15,
61:7
**equipoise** [2] - 94:12,
95:5
**Eric** [1] - 56:5
**Erica** [1] - 56:3
**especially** [1] - 63:21
**essential** [3] - 90:19,
90:25, 91:12
**essentially** [13] - 6:7,
11:20, 13:11, 15:8,
35:23, 37:8, 62:16,
77:24, 83:2, 91:15,
91:18, 92:6, 93:2
**establish** [1] - 92:18
**et** [6] - 1:5, 3:4, 23:14,
63:13, 89:18, 92:13
**evaporated** [1] - 92:6
**eventually** [1] - 14:1
**evidence** [4] - 47:9,
58:3, 84:13, 88:3
**ex** [1] - 95:22
**ex-official** [1] - 95:22
**exact** [1] - 76:15
**exactly** [4] - 8:5, 15:2,
23:23, 49:5
**exaggeration** [1] -
47:8
**example** [2] - 24:13,
41:19
**examples** [3] - 65:7,
67:6, 67:17
**exception** [6] - 93:12,
93:13, 94:5, 94:9,
94:10
**excess** [2] - 57:14,
95:23
**exclusively** [1] - 22:25
**executed** [1] - 31:24
**executive** [2] - 29:18,
29:20
**executives** [1] - 65:15
**exempt** [1] - 25:25
**exercise** [1] - 45:5
**exercised** [3] - 10:19,
50:9, 76:4

**exhaustive** [2] - 21:14,
22:11
**Exhibit** [1] - 28:22,
47:10
**exhibit** [1] - 54:8
**exhibits** [1] - 8:24
**exist** [3] - 27:25,
37:23, 90:4
**existence** [4] - 6:7,
23:20, 26:9, 73:23
**existing** [1] - 91:25
**exists** [3] - 31:10,
31:12, 37:16
**expand** [1] - 16:7
**expectation** [1] - 40:2
**expense** [1] - 40:8
**experienced** [1] -
76:19
**expiration** [5] - 74:11,
80:13, 83:1, 85:13,
93:15
**expired** [4] - 79:2,
79:9, 88:22, 91:14
**expires** [2] - 83:7,
89:17
**explain** [1] - 58:13
**explaining** [2] - 5:2,
5:4
**expressed** [6] - 26:13,
26:24, 26:25, 90:6,
90:9, 93:1
**extant** [1] - 89:1
**extend** [2] - 79:17,
85:16
**extended** [1] - 84:7
**extension** [5] - 11:20,
11:21, 11:22, 12:2,
86:10
**extensions** [5] -
11:17, 12:4, 12:10,
14:7, 66:2
**extensive** [1] - 25:18
**extent** [8] - 31:9, 32:4,
68:16, 70:16, 72:5,
72:12, 80:20, 85:6,
86:16

## F

**face** [2] - 47:20, 95:19
**faced** [1] - 33:16
**facie** [1] - 94:4
**fact** [12] - 15:16,
21:17, 29:5, 36:11,
46:24, 57:16, 62:13,
66:23, 74:6, 88:20,
89:2, 95:3
**facto** [6] - 22:24,
29:12, 30:10, 47:9,

47:20, 55:7
**facts** [18] - 5:2, 5:25, 18:3, 18:4, 18:10, 58:8, 63:24, 66:10, 67:14, 72:19, 72:20, 72:21, 73:2, 73:10, 76:10, 76:11, 89:12, 96:13
**factual** [9] - 5:24, 59:7, 66:9, 66:17, 81:18, 82:12, 84:10, 84:18, 88:2
**factually** [1] - 64:18
**fairly** [2] - 4:24, 72:2
**faith** [3] - 42:2, 42:7, 42:13
**fall** [4] - 34:7, 34:10, 37:17, 64:22
**false** [12] - 8:13, 15:9, 15:14, 16:1, 16:10, 39:19, 53:9, 53:11, 55:12, 57:21, 58:25, 69:18
**False** [8] - 9:21, 9:22, 15:7, 15:8, 16:6, 17:9, 39:18
**falsification** [1] - 53:25
**familiar** [1] - 4:12
**Fannie** [1] - 41:11
**far** [3] - 16:20, 23:9, 57:9
**favoring** [1] - 34:4
**FCA** [19] - 5:23, 7:2, 7:4, 45:4, 48:23, 49:1, 51:12, 51:15, 52:2, 53:11, 55:7, 56:18, 56:19, 60:10, 60:11, 60:12, 63:4, 63:10, 66:11
**FCRR** [3] - 2:14, 96:20, 96:25
**FDIC** [3] - 35:24, 36:11, 37:20, 38:7, 40:17, 41:7, 41:8, 41:9, 41:11, 46:6, 46:13, 47:1
**fear** [1] - 54:12
**February** [13] - 12:21, 15:20, 18:24, 52:9, 54:5, 56:22, 57:17, 59:13, 59:19, 59:25, 61:21, 62:14, 93:23
**federal** [15] - 5:24, 9:22, 15:8, 16:6, 16:11, 21:18, 37:22, 38:19, 45:3, 46:14, 52:1, 52:2, 65:1, 74:13, 75:13
**federally** [1] - 52:14

**Fenty** [2] - 29:15, 30:9
**Fenty's** [1] - 50:21
**few** [4] - 9:16, 15:20, 74:14, 82:9
**field** [3] - 34:15, 34:16, 35:7
**Fields** [1] - 1:20
**figure** [3] - 61:3, 82:15, 84:19
**file** [1] - 54:9
**filed** [5] - 4:6, 6:15, 13:7, 40:12, 58:18
**files** [3] - 28:24, 54:4
**filing** [1] - 71:25
**filings** [1] - 17:23
**final** [3] - 17:12, 87:10, 88:13
**finally** [1] - 12:10
**Financial** [1] - 28:23
**financial** [16] - 22:24, 23:1, 23:7, 29:2, 29:4, 41:11, 42:4, 42:9, 47:16, 47:18, 52:11, 59:14, 60:4, 61:22, 61:23, 65:6
**financials** [1] - 40:22
**findings** [1] - 52:20
**fine** [2] - 80:22, 86:7
**finished** [1] - 88:25
**fire** [5] - 12:11, 54:22, 57:19, 65:24, 70:5
**fired** [15] - 9:9, 18:5, 18:8, 18:17, 18:21, 19:15, 19:22, 20:3, 69:21, 72:1, 72:6, 72:14, 73:1, 84:21
**firing** [8] - 8:8, 9:9, 9:24, 14:10, 14:14, 18:15, 57:19, 66:6
**firings** [1] - 21:25
**first** [21] - 6:24, 8:7, 9:7, 9:8, 9:21, 10:4, 16:9, 17:18, 31:6, 35:17, 38:13, 41:18, 52:6, 52:8, 54:25, 57:16, 64:20, 74:2, 82:11, 84:14, 93:22
**fisc** [1] - 50:15
**fiscal** [2] - 25:21, 42:22
**five** [3] - 10:13, 13:16, 85:15
**fix** [1] - 13:21
**fixed** [1] - 30:6
**Floor** [1] - 1:17
**flunk** [1] - 52:21
**FMP** [1] - 41:15
**focus** [1] - 36:7
**focused** [1] - 39:25
**followed** [3] - 8:8,

16:21, 61:21
**following** [2] - 25:17, 83:18
**footnote** [2] - 36:12, 47:13
**FOR** [7] - 1:1, 1:5, 1:11, 1:19, 1:20, 2:3, 2:7
**forbid** [1] - 5:15
**force** [1] - 90:18
**foreclosed** [1] - 41:18
**foreclosing** [1] - 29:17
**foregoing** [1] - 96:21
**foreshadow** [1] - 44:16
**forget** [1] - 76:17
**form** [3] - 28:4, 28:11, 76:15
**formality** [1] - 12:5
**formed** [2] - 27:11, 57:19
**former** [4] - 29:15, 29:17, 56:1, 95:22
**Fort** [3] - 22:10, 22:12, 43:12
**forth** [2] - 34:5, 71:14
**forward** [6] - 7:8, 47:9, 76:20, 79:3, 92:4, 92:11
**four** [8] - 8:7, 9:7, 9:8, 9:21, 13:8, 28:20, 35:6, 64:22
**framework** [1] - 14:4
**fraudulent** [3] - 13:11, 55:11, 60:14
**Freddie** [1] - 41:11
**free** [1] - 4:14
**FTE** [2] - 86:24, 90:24
**FTEs** [1] - 51:24
**full** [8] - 10:21, 37:19, 42:1, 42:7, 42:12, 57:6, 71:3, 96:21
**fully** [2] - 14:17, 82:3
**function** [3] - 30:11, 31:13, 50:8
**functions** [7] - 26:17, 27:13, 31:14, 32:8, 32:11, 32:15
**fund** [1] - 42:22
**funding** [1] - 7:23
**funds** [2] - 42:20, 60:6
**furtherance** [1] - 70:18
**furthered** [2] - 71:4, 71:17

**G**

**garb** [1] - 52:1

**garden** [1] - 34:14
**garden-variety** [1] - 34:14
**general** [4] - 41:25, 42:21, 72:18, 76:13
**General** [3] - 2:12, 32:13, 40:7
**General's** [1] - 6:13
**generalized** [1] - 55:16
**generally** [3] - 18:2, 70:21, 73:5
**GEOFFREY** [1] - 2:3
**Geoffrey** [1] - 3:21
**George** [1] - 46:8
**given** [7] - 20:9, 32:24, 77:17, 78:3, 82:25, 87:19, 92:11
**God** [1] - 5:15
**govern** [1] - 86:22
**government** [26] - 22:19, 22:21, 22:22, 23:19, 23:20, 24:7, 24:15, 25:18, 27:23, 29:10, 29:11, 31:20, 31:25, 36:15, 36:16, 37:8, 37:21, 37:22, 40:16, 41:3, 41:5, 45:12, 45:22, 72:23
**Government** [10] - 8:12, 15:10, 15:14, 33:24, 41:8, 41:9, 41:10, 41:14, 42:7, 63:9
**governmental** [4] - 22:23, 30:8, 33:11, 37:13
**governments** [2] - 24:1, 37:19
**governs** [1] - 84:20
**grant** [5] - 26:25, 27:6, 28:7, 30:7, 46:19
**granted** [1] - 26:11
**gravamen** [1] - 34:6
**Gray** [4] - 3:23, 8:19, 62:5, 62:12
**GRAY** [1] - 2:3
**great** [2] - 48:10, 76:20
**greater** [1] - 58:14
**grievance** [1] - 40:11
**gross** [1] - 47:8
**ground** [1] - 44:3
**group** [1] - 65:4
**Guantanamo** [1] - 30:6
**guarantee** [1] - 41:16
**guess** [3] - 25:6, 64:6, 68:3

**H**

**half** [1] - 10:22
**handed** [1] - 56:24
**handled** [1] - 22:25
**hands** [1] - 96:9
**handwritten** [1] - 38:14
**hanging** [1] - 11:13
**harm** [2] - 17:3, 17:6
**Hawaiian** [1] - 37:18
**head** [2] - 13:13, 72:25
**headquarters** [1] - 23:9
**health** [1] - 62:5
**hear** [3] - 36:10, 66:7, 83:14
**heard** [3] - 13:3, 46:12, 53:3
**hearing** [4] - 4:3, 4:17, 8:19
**HEARING** [1] - 1:8
**hearings** [1] - 4:23
**heart** [1] - 69:25
**heat** [1] - 35:4
**heavily** [1] - 22:10
**hedged** [1] - 89:4
**held** [1] - 45:19
**Heller** [1] - 1:12
**help** [2] - 4:9, 69:14
**hereby** [4] - 28:3, 29:20, 29:23, 96:20
**Hernandez** [18] - 4:1, 12:9, 13:6, 14:13, 14:18, 15:23, 57:18, 58:15, 58:17, 59:5, 65:4, 65:14, 65:24, 66:5, 66:13, 68:4, 73:19, 80:10
**HERNANDEZ** [1] - 2:8
**Hernandez's** [1] - 66:8
**high** [1] - 65:16
**higher** [1] - 42:6
**highlight** [1] - 45:1
**highlighted** [1] - 41:21
**highlighting** [1] - 38:17
**highly** [1] - 50:19
**himself** [4] - 19:12, 54:12, 55:15, 55:23
**hire** [1] - 42:10
**Hirsch** [6] - 3:16, 5:10, 20:22, 43:13, 46:3, 89:6
**HIRSCH** [83] - 1:19, 3:15, 5:10, 5:15, 5:21, 6:12, 6:20, 20:23, 21:7, 22:7, 23:21, 24:5, 25:11,

26:13, 26:21, 28:6,
28:9, 28:14, 28:18,
30:21, 30:23, 31:5,
31:8, 31:12, 32:4,
32:6, 32:9, 32:12,
33:3, 33:23, 34:12,
34:14, 34:25, 35:10,
35:12, 35:16, 35:21,
46:4, 46:8, 47:7,
48:3, 48:6, 48:17,
49:5, 49:10, 49:25,
51:1, 51:16, 51:18,
53:14, 53:16, 54:3,
54:7, 55:5, 55:20,
56:14, 57:12, 58:9,
58:17, 58:20, 58:23,
59:9, 60:11, 60:16,
61:8, 61:11, 61:20,
62:23, 63:5, 63:17,
63:19, 64:1, 64:12,
88:14, 88:17, 90:2,
90:13, 92:24, 93:9,
94:4, 94:23, 95:16,
96:16
**Hirsch's** [1] - 40:22
**historically** [1] - 21:16
**history** - 37:13
**hold** [1] - 8:25
**holding** [1] - 35:15
**holds** [2] - 46:18,
90:15
**Home** [2] - 21:17,
27:22
**Honor** [54] - 3:2, 3:8,
3:15, 3:20, 3:25,
5:10, 20:23, 21:7,
21:21, 22:1, 22:17,
24:8, 25:11, 26:1,
26:21, 27:8, 27:20,
28:1, 29:8, 30:10,
33:15, 35:12, 36:9,
45:8, 46:4, 50:16,
51:18, 52:3, 53:14,
54:7, 54:14, 55:6,
55:10, 56:6, 57:12,
58:10, 59:11, 60:16,
61:9, 62:1, 62:3,
63:5, 66:14, 67:19,
73:18, 88:19, 88:21,
90:5, 90:14, 92:24,
93:21, 94:5, 95:20,
96:16
**HONORABLE** [1] - 1:8
**hook** [1] - 49:4
**hope** [1] - 11:5
**hopefully** [1] - 90:3
**Hospital** [8] - 3:3,
3:16, 3:18, 7:14,
24:3, 29:24, 32:13,
47:14

**HOSPITAL** [1] - 1:5
**hospital** [39] - 7:12,
10:2, 13:1, 19:25,
20:1, 24:11, 33:16,
34:1, 34:20, 34:21,
42:4, 42:8, 42:19,
42:21, 43:25, 52:19,
52:21, 52:23, 53:21,
54:21, 57:1, 57:5,
57:17, 58:3, 59:20,
59:23, 64:24, 65:5,
71:18, 78:13, 78:23,
79:15, 80:6, 80:11,
81:10, 87:18, 89:9,
89:14
**hospital's** [6] - 47:17,
56:2, 57:2, 65:6,
70:3, 71:11
**Hospital's** [1] - 81:23
**hospitalist** [1] - 65:4
**hospitalists** [3] -
16:16, 20:5, 65:12
**Hospitals** [3] - 7:15,
39:10, 39:21
**hourly** [2] - 11:8,
90:24
**hours** [14] - 10:24,
11:7, 11:8, 51:24,
74:6, 81:5, 81:11,
86:24, 87:16, 87:24,
89:18, 90:21, 92:2,
93:20
**HR** [12] - 12:18, 13:13,
54:4, 54:7, 54:9,
54:17, 55:1, 56:3,
57:18, 58:17, 59:2
**huge** [1] - 62:3
**Huron** [1] - 1:12
**hybrid** [1] - 21:11
**Hyman** [1] - 46:8
**hypothetical** [3] -
76:23, 77:9, 90:5

**I**

**idea** [3] - 33:12, 67:10,
82:4
**illegal** [1] - 19:21
**illuminate** [1] - 4:16
**immaterial** [1] - 95:17
**immediately** [3] -
12:12, 74:19, 74:20
**immunity** [64] - 5:19,
7:1, 14:20, 21:5,
21:12, 21:13, 21:19,
22:14, 22:15, 23:5,
24:23, 25:9, 25:17,
26:4, 26:11, 26:12,
26:24, 26:25, 27:7,

27:14, 27:19, 27:21,
27:22, 28:4, 28:6,
28:12, 29:15, 30:16,
31:1, 31:9, 31:15,
31:19, 32:1, 32:2,
32:14, 33:2, 33:20,
36:5, 36:18, 37:5,
37:13, 37:16, 37:22,
38:1, 40:5, 40:15,
43:10, 43:15, 43:18,
43:22, 43:25, 44:10,
44:13, 44:18, 46:14,
47:3, 48:8, 48:9,
48:11, 48:14, 49:24,
51:10
**impact** [2] - 50:14,
51:6
**impetus** [1] - 61:20
**implemented** [3] -
14:17, 39:15, 82:3
**implication** [3] -
36:20, 36:22, 38:2
**implicit** [1] - 44:12
**implied** [2] - 77:12,
90:18
**imploring** [1] - 88:1
**important** [6] - 9:11,
29:1, 55:6, 55:21,
55:24, 62:7
**impose** [1] - 47:19
**improper** [8] - 12:6,
14:3, 17:10, 19:21,
53:9, 55:7, 56:8
**improperly** [8] - 13:24,
13:25, 20:1, 59:17,
67:4, 68:8, 68:11,
68:15
**improve** [1] - 65:6
**improved** [1] - 62:14
**inadequate** [1] - 35:19
**includes** [1] - 17:4
**including** [8] - 8:10,
10:3, 10:21, 13:13,
27:17, 37:6, 49:14,
95:11
**inconclusive** [1] -
50:11
**inconsistent** [2] -
48:19, 89:25
**increase** [4] - 13:4,
13:5, 20:13, 65:5
**increasing** [1] - 16:25
**indented** [1] - 81:22
**independent** [2] -
62:21, 71:22
**indeterminate** [1] -
79:12
**indicate** [2] - 47:25,
71:17
**indicates** [1] - 85:1

**indicating** [1] - 89:12
**indication** [4] - 26:13,
30:10, 52:22, 53:1
**indications** [2] - 28:1,
28:18
**indicia** [7] - 22:23,
25:16, 25:19, 26:1,
26:19, 29:13, 76:1
**individual** [1] - 65:17
**indulgence** [1] - 51:16
**information** [6] - 4:18,
56:24, 61:6, 63:6,
63:20, 64:10
**informed** [2] - 65:3,
74:18
**initial** [2] - 10:13,
10:14
**initiate** [1] - 55:7
**injected** [1] - 94:8
**injecting** [1] - 94:4
**inserted** [1] - 26:8
**insofar** [1] - 19:14
**instance** [2] - 28:22,
34:1
**instances** [3] - 15:18,
20:19, 27:5
**instant** [1] - 22:6
**instead** [2] - 14:8,
14:13
**institution** [1] - 57:10
**instructed** [1] - 65:14
**instrument** [1] - 84:19
**instrumentalities** [3] -
27:24, 46:15, 46:16
**instrumentality** [13] -
22:2, 22:3, 22:20,
23:18, 23:25, 24:6,
24:7, 25:9, 26:7,
29:6, 30:15, 43:8,
45:14
**insufficient** [9] -
51:14, 52:4, 53:12,
53:16, 53:17, 54:19,
66:9, 68:7
**insufficiently** [1] -
67:10
**insurance** [1] - 24:18
**intended** [4] - 25:8,
28:11, 79:17, 95:4
**intent** [5] - 26:19,
38:3, 50:6, 57:19,
76:1
**intention** [3] - 53:6,
91:14, 92:3
**intentions** [2] - 84:3,
92:11
**interactions** [1] -
42:16
**interest** [2] - 42:6,
64:4

**interested** [1] - 44:24
**interference** [3] - 6:9,
80:2, 80:3
**intermediary** [1] -
52:15
**internal** [6] - 12:5,
12:15, 14:10, 15:19,
18:24, 59:1
**internally** [2] - 19:7,
48:18
**interpret** [1] - 89:12
**interpretation** [1] -
39:23
**interpretations** [1] -
96:13
**interpreted** [5] - 30:3,
33:5, 60:17, 73:5,
84:3
**interrupt** [1] - 4:20
**interviewed** [1] - 60:5
**introduce** [1] - 3:6
**investigate** [1] - 13:19
**investigated** [2] -
60:21, 63:13
**investigating** [2] -
61:13, 68:20
**investigation** [8] -
16:14, 11:20, 56:16,
56:19, 56:23, 58:25,
59:1, 63:7
**invited** [1] - 8:20
**involve** [2] - 33:19,
42:1
**involved** [3] - 20:18,
35:18, 74:22
**involves** [1] - 4:25
**involving** [1] - 46:9
**ipso** [2] - 30:10, 55:7
**islands** [1] - 37:18
**issue** [23] - 5:19, 5:22,
6:8, 8:1, 9:25, 13:20,
14:6, 14:20, 17:20,
17:21, 22:14, 35:23,
35:24, 44:14, 48:4,
48:8, 70:4, 70:5,
73:7, 74:12, 85:5,
92:2, 96:12
**issued** [2] - 14:18,
29:18
**issues** [11] - 4:17,
7:24, 11:13, 14:11,
44:17, 62:17, 65:8,
67:7, 69:18, 72:24,
82:12
**italicized** [1] - 22:21
**itself** [5] - 30:17,
30:25, 37:18, 51:11,
84:7

## J

**Jackson** [2] - 46:25, 95:17
**JACKSON** [1] - 1:8
**January** [2] - 1:5, 96:23
**Jefferson** [1] - 1:21
**jeopardizing** [2] - 13:9, 13:10
**jeopardy** [2] - 54:11, 55:16
**Jessica** [1] - 3:10
**JESSICA** [1] - 1:16
**job** [2] - 90:20, 90:21
**Johnson** [1] - 56:5
**Jorden** [1] - 1:20
**JR** [1] - 2:3
**JUDGE** [1] - 1:9
**Judge** [21] - 21:15, 22:10, 23:4, 23:14, 30:19, 30:24, 33:6, 35:14, 35:16, 35:20, 38:4, 44:10, 46:25, 49:14, 49:16, 49:17, 50:3, 51:2, 74:15, 79:13, 95:17
**judge** [1] - 50:21
**judgment** [4] - 50:14, 51:5, 58:2, 92:19
**judicial** [1] - 45:21
**Julia** [2] - 3:10, 21:15
**JULIA** [1] - 1:12
**Julian** [4] - 3:3, 3:9, 7:11, 11:12
**JULIAN** [1] - 1:3
**July** [4] - 29:16, 82:7, 84:21, 84:23
**June** [9] - 74:1, 74:24, 75:2, 79:20, 82:17, 86:3, 88:22, 92:22, 93:16
**juris** [2] - 22:20, 46:21
**jurisdiction** [17] - 5:22, 21:6, 29:24, 30:1, 30:9, 35:9, 44:13, 44:21, 45:2, 45:4, 45:6, 48:24, 49:3, 49:22, 50:22, 74:13, 75:13
**jurisdictional** [2] - 33:7, 33:14
**jurisdictions** [1] - 22:2
**jury** [19] - 22:24, 29:12, 54:15, 54:20, 54:24, 58:1, 78:16, 78:17, 79:8, 79:23, 81:8, 84:4, 86:18, 88:20, 89:11, 92:10,

92:18, 92:19, 96:8
**justified** [1] - 29:5

## K

**KATZ** [1] - 1:15, 3:12
**Katz** [2] - 1:16, 3:10
katz@kmblegal.com [1] - 1:18
**Kavanaugh** [1] - 51:3
**Kavanaugh's** [2] - 49:17, 50:3
**keep** [6] - 57:3, 57:25, 62:18, 65:15, 75:15, 87:20
**keeper** [1] - 19:25
**KEPRO** [11] - 12:22, 12:23, 52:14, 52:20, 59:24, 61:21, 62:11, 62:12, 62:13, 62:24
**kept** [3] - 11:5, 58:20, 86:16
**KETANJI** [1] - 1:8
**key** [3] - 52:9, 59:4, 84:10
**kind** [12] - 34:22, 43:3, 47:20, 53:11, 54:23, 55:2, 56:12, 66:20, 69:3, 70:6, 91:22, 96:12
**Knight** [3] - 4:1, 66:13, 73:18
**knight** [2] - 6:6, 88:17
**KNIGHT** [40] - 2:7, 3:25, 66:13, 66:22, 67:12, 67:19, 67:24, 68:6, 68:18, 68:25, 73:18, 74:12, 74:17, 74:20, 74:22, 75:1, 75:4, 75:10, 75:12, 75:22, 76:3, 76:10, 76:13, 76:21, 77:6, 77:12, 77:16, 78:6, 78:9, 78:15, 78:23, 79:13, 79:19, 79:25, 80:16, 80:24, 81:12, 87:11, 87:14, 88:10
**knowledge** [5] - 53:9, 57:3, 58:11, 59:4, 62:21
**known** [3] - 7:12, 56:25, 63:20
**knows** [4] - 16:20, 21:21, 59:19, 95:21
**KRISTIN** [1] - 1:20

## L

**labor** [1] - 20:24

**lack** [3] - 5:21, 21:5, 45:6
**lacked** [2] - 65:9, 67:8
**lacking** [1] - 71:7
**lagged** [2] - 86:2, 86:5
**language** [3] - 23:18, 28:10, 43:11
**large** [1] - 12:17
**largest** [1] - 57:14
**last** [8] - 8:1, 9:11, 17:19, 18:20, 48:3, 71:3, 73:10, 81:25
**lastly** [1] - 62:1
**late** [2] - 85:15, 94:17
**law** [39] - 9:23, 18:13, 19:19, 19:24, 20:3, 21:20, 32:12, 38:19, 38:22, 38:25, 46:16, 54:17, 57:9, 61:5, 64:7, 65:2, 70:18, 76:12, 79:9, 79:25, 80:2, 80:12, 82:14, 83:2, 83:6, 86:19, 89:5, 89:6, 89:21, 89:25, 90:1, 90:13, 92:9, 92:21, 92:23, 92:25, 93:9, 96:9, 96:12
**lawsuit** [3] - 22:6, 40:5, 40:11
**lawsuits** [2] - 40:2, 40:4
**lawyer** [4] - 11:12, 13:13, 33:18, 85:20
**lay** [1] - 22:23
**laying** [1] - 5:3
**lays** [1] - 91:12
**lead** [2] - 5:8, 56:19
**learn** [1] - 63:14
**learned** [1] - 59:14
**least** [6] - 10:24, 41:2, 70:7, 76:1, 81:6, 95:9
**legal** [12] - 6:3, 18:1, 22:20, 23:19, 24:5, 26:9, 40:11, 51:19, 57:4, 83:25, 84:7, 88:7
**legally** [2] - 54:18, 55:2
**legislature** [2] - 27:6, 40:14
**legitimate** [1] - 70:24
**lengths** [1] - 48:10
**lesions** [1] - 35:5
**less** [3] - 44:24, 73:1, 77:2
**lesser** [4] - 45:13, 79:4, 79:16, 81:13
**letter** [27] - 8:9, 8:15,

8:20, 8:21, 8:22, 9:13, 9:15, 9:16, 9:19, 16:23, 16:24, 52:14, 52:19, 54:17, 55:1, 55:4, 55:5, 55:8, 55:9, 55:13, 56:4, 62:2, 81:23, 87:15, 91:19, 91:20, 96:2
**letters** [2] - 12:2, 71:5
**level** [5] - 20:19, 34:15, 34:16, 82:9, 95:13
**levels** [1] - 11:7
**liability** [2] - 41:3, 51:5
**liable** [1] - 24:16
**liberally** [1] - 36:18
**license** [2] - 13:9, 55:17
**licenses** [2] - 13:10, 54:13
**lies** [1] - 35:6
**light** [1] - 6:21
**likely** [1] - 59:16
**Lilian** [3] - 52:10, 53:20, 56:24
**limit** [1] - 36:22
**limited** [2] - 31:1, 36:19
**limits** [1] - 4:23
**line** [1] - 43:5
**lines** [1] - 64:22
**listened** [2] - 88:17, 88:18
**litigation** [4] - 40:10, 49:2, 57:23, 66:11
**live** [3] - 41:2, 85:12, 87:1
**LLP** [3] - 1:16, 2:4, 2:8
**lodged** [1] - 62:8
**long-standing** [1] - 14:6
**look** [13] - 18:13, 26:16, 27:10, 28:13, 28:16, 37:8, 37:10, 37:13, 39:25, 41:19, 43:5, 46:16, 62:4
**looked** [2] - 12:24, 17:17, 23:17
**looking** [2] - 23:14, 68:6
**looks** [1] - 89:10
**lose** [3] - 49:1, 51:9, 86:7
**loses** [1] - 92:17
**losing** [2] - 42:9, 54:13
**loss** [1] - 55:17
**LOTH** [1] - 96:20
**Loth** [2] - 2:14, 96:25

**Luis** [2] - 4:1, 66:13

## M

**Mac** [1] - 41:11
**machine** [1] - 2:17
**Mack** [1] - 21:15
**Mae** [1] - 41:11
**maintain** [1] - 51:13
**maintained** [2] - 25:1, 25:5
**major** [1] - 90:15
**majority** [3] - 46:23, 46:24, 46:25
**malfeasance** [2] - 71:6, 71:11
**malpractice** [8] - 25:1, 25:5, 32:22, 33:16, 33:17, 33:18, 34:15, 35:4
**man** [1] - 90:22
**management** [2] - 10:2, 25:21
**manifested** [2] - 70:19, 70:21
**marginalize** [1] - 14:12
**Marshall** [1] - 1:16
**Maryland** [2] - 23:22, 93:11
**massive** [1] - 59:1
**massively** [1] - 60:17
**material** [4] - 88:19, 90:19, 90:25, 91:24
**materials** [1] - 28:20
**matter** [16] - 53:22, 54:17, 61:5, 68:9, 74:6, 74:14, 79:8, 79:25, 80:12, 82:14, 84:7, 92:9, 92:21, 94:11, 96:9, 96:12
**mayor** [3] - 25:22, 25:23
**Mayor** [2] - 29:15, 30:9
**mean** [12] - 17:22, 26:6, 32:19, 36:24, 42:3, 42:24, 45:3, 53:3, 74:16, 82:6, 91:21, 92:14
**meaning** [5] - 30:7, 36:2, 40:17, 50:7, 59:13
**meaningless** [1] - 39:5
**means** [8] - 8:13, 37:4, 39:4, 42:3, 42:4, 44:13, 47:3, 93:18
**meat** [1] - 15:21
**Medicaid** [9] - 8:12,

12:7, 12:17, 14:3, 15:24, 16:11, 17:2, 17:11, 59:17
**Medical** [6] - 7:12, 7:21, 39:9, 39:13, 39:16, 81:24
**medical** [7] - 7:20, 20:17, 24:25, 25:4, 32:21, 64:17, 93:6
**Medicare** [16] - 8:12, 12:7, 12:16, 12:23, 12:24, 13:2, 14:2, 15:24, 16:11, 17:2, 17:10, 52:18, 52:23, 53:10, 53:25, 59:17
**meet** [17] - 12:16, 13:22, 15:23, 16:4, 16:18, 17:1, 20:7, 20:17, 51:1, 58:12, 65:8, 65:12, 67:7, 70:3, 70:5, 94:6
**meeting** [24] - 12:3, 12:5, 13:12, 13:19, 14:9, 15:20, 52:12, 55:22, 55:24, 56:12, 65:24, 66:1, 66:3, 66:6, 67:22, 67:25, 68:2, 78:6, 79:6, 81:9, 90:19, 91:3, 92:7
**meetings** [3] - 16:13, 20:20, 89:10
**Mehta** [7] - 30:22, 30:23, 30:24, 33:7, 35:16, 35:20, 38:4
**Mehta's** [2] - 35:14, 44:10
**member** [4] - 18:8, 65:3, 95:22
**members** [4] - 18:7, 25:22, 42:15, 73:14
**memory** [1] - 35:13
**mention** [4] - 6:12, 36:10, 36:12, 73:8
**mentioned** [2] - 20:23, 69:24
**mentioning** [1] - 54:11
**mere** [4] - 52:25, 94:11, 94:13, 94:14
**merely** [1] - 53:1
**merits** [1] - 51:10
**meruit** [1] - 90:8
**met** [4] - 5:11, 9:14, 11:12, 13:1
**metro** [1] - 22:12
**Meyer** [13] - 35:24, 36:11, 36:23, 37:2, 37:20, 38:7, 40:17, 41:7, 43:12, 46:6, 46:13, 47:1

**Michael** [1] - 6:13
**MICHAEL** [1] - 2:12
**mid** [1] - 12:21
**mid-February** [1] - 12:21
**middle** [2] - 82:10
**might** [5] - 6:24, 36:6, 36:7, 90:4, 90:7
**million** [1] - 14:2, 59:17
**mindful** [1] - 7:3
**minds** [6] - 78:7, 79:6, 81:9, 90:19, 91:3, 92:7
**minimum** [1] - 58:12
**ministerial** [9] - 31:14, 32:15, 33:19, 33:21, 34:18, 34:24, 35:1, 35:2, 35:7
**minute** [1] - 9:2
**mis** [1] - 34:4
**misallocating** [1] - 34:2, 34:5
**mismanagement** [2] - 17:6, 71:6
**misspoken** [1] - 13:16
**misstated** [1] - 53:5
**mode** [1] - 93:18
**modifications** [1] - 94:1
**moment** [1] - 92:11
**money** [16] - 11:16, 13:2, 17:1, 34:22, 37:24, 40:8, 41:17, 42:6, 42:9, 42:11, 42:16, 42:19, 75:8
**month** [13] - 33:6, 74:12, 74:15, 74:22, 75:2, 75:10, 75:12, 77:1, 83:22, 91:19, 95:7
**months** [8] - 73:11, 74:4, 82:9, 85:21, 86:2, 86:5
**moot** [1] - 64:18
**morning** [14] - 3:8, 3:11, 3:12, 3:13, 3:14, 3:15, 3:19, 3:20, 3:24, 3:25, 4:2, 4:15, 7:9, 7:10
**mosaic** [1] - 51:23
**Moss** [1] - 30:22
**Moss'** [1] - 30:19
**most** [9] - 11:8, 17:18, 33:16, 36:8, 40:4, 42:15, 50:2, 55:13, 59:6
**MOTION** [1] - 1:8
**motion** [8] - 28:19, 28:22, 57:24, 58:7,

70:8, 88:9, 91:8, 92:16
**motions** [6] - 4:3, 4:4, 4:5, 4:11, 4:19, 5:1
**move** [1] - 58:10
**moving** [1] - 4:8
**MR** [188] - 3:8, 3:15, 3:20, 3:25, 5:10, 5:15, 5:21, 6:12, 6:20, 7:9, 7:11, 8:5, 8:7, 8:16, 8:18, 9:5, 9:8, 10:8, 10:10, 10:12, 10:16, 12:14, 12:20, 14:24, 15:4, 15:7, 15:18, 16:4, 16:14, 17:17, 18:1, 18:19, 18:23, 19:17, 20:4, 20:15, 20:23, 21:7, 22:7, 23:21, 24:5, 25:11, 26:13, 26:21, 28:6, 28:9, 28:14, 28:18, 30:21, 30:23, 31:5, 31:8, 31:12, 32:4, 32:6, 32:9, 32:12, 33:3, 33:23, 34:12, 34:14, 34:25, 35:10, 35:12, 35:16, 35:21, 36:9, 37:6, 37:11, 38:6, 38:13, 38:16, 41:4, 43:1, 43:17, 43:21, 44:2, 44:5, 44:8, 44:11, 44:16, 44:20, 45:8, 45:10, 45:21, 46:1, 46:4, 46:8, 47:7, 48:3, 48:6, 48:17, 49:5, 49:10, 49:25, 51:1, 51:16, 51:18, 53:14, 53:16, 54:3, 54:7, 55:5, 55:20, 56:14, 57:12, 58:9, 58:17, 58:20, 58:23, 59:9, 60:11, 60:16, 61:8, 61:11, 61:20, 62:23, 63:5, 63:17, 63:19, 64:1, 64:12, 65:22, 66:13, 66:22, 67:12, 67:19, 67:24, 68:6, 68:18, 68:25, 69:17, 70:15, 71:1, 71:20, 72:17, 73:18, 74:12, 74:17, 74:20, 74:22, 75:1, 75:4, 75:10, 75:12, 75:22, 76:3, 76:10, 76:13, 76:21, 77:6, 77:12, 77:16, 78:6, 78:9, 78:15, 78:23, 79:13, 79:19, 79:25, 80:16, 80:24, 81:12, 81:18, 82:18, 82:21,

82:23, 83:6, 83:13, 83:17, 84:9, 85:9, 85:24, 86:19, 87:3, 87:11, 87:14, 88:10, 88:14, 88:17, 90:2, 90:13, 92:24, 93:9, 94:4, 94:23, 95:16, 96:16
**MS** [3] - 3:12, 3:13, 3:14
**multiple** [4] - 11:2, 11:14, 15:18, 38:6
**municipal** [6] - 21:10, 27:11, 33:11, 45:15, 69:11, 71:25
**must** [5] - 36:18, 39:5, 40:5, 60:24, 66:10

# N

**name** [5] - 7:13, 7:18, 37:25, 42:15, 67:16
**narrative** [1] - 5:24
**narrow** [1] - 32:17
**nature** [1] - 19:9
**necessarily** [3] - 37:12, 48:1, 92:8
**necessary** [6] - 4:14, 4:16, 27:13, 74:1, 78:25, 90:14
**need** [7] - 4:9, 43:23, 45:1, 60:2, 73:3, 86:21, 96:14
**needed** [1] - 85:18
**needs** [3] - 4:18, 22:21, 73:17
**neglect** [1] - 17:3
**neglected** [1] - 20:24
**negligence** [3] - 24:25, 25:4, 32:22
**negotiable** [1] - 10:18
**negotiating** [1] - 93:6
**negotiations** [1] - 83:4
**never** [16] - 10:25, 16:20, 33:18, 42:17, 43:3, 43:14, 43:18, 73:23, 77:18, 81:1, 81:16, 82:3, 89:7, 91:6, 91:9, 91:23
**nevertheless** [1] - 26:10
**new** [2] - 58:5, 69:12
**next** [8] - 9:25, 10:22, 11:22, 39:7, 39:24, 44:16, 54:4, 58:10
**NFP** [6] - 7:14, 44:6, 44:7, 44:20, 44:22, 45:15
**NFPHC** [1] - 81:25

**nobody** [2] - 8:1, 16:21
**non** [1] - 49:14
**non-11th** [1] - 49:15
**nonchoice** [1] - 33:24
**nondiscriminatory** [1] - 80:17
**none** [4] - 11:9, 11:10, 12:25, 40:3
**nonexistence** [1] - 6:8
**nonfederal** [1] - 46:15
**nonpolicy** [1] - 33:23
**nonrenewal** [2] - 81:21, 81:24
**normal** [1] - 40:17
**Nossaman** [2] - 2:8, 4:1
**NOT** [2] - 1:5, 1:20
**Not-for-Profit** [11] - 3:3, 3:16, 3:18, 7:14, 22:15, 24:3, 29:24, 43:8, 47:13, 81:23, 88:15
**not-for-profit** [1] - 27:25
**NOT-FOR-PROFIT** [1] - 1:20
**noted** [1] - 38:24
**notes** [1] - 96:21
**nothing** [7] - 26:5, 26:6, 26:10, 27:18, 57:8, 67:12, 93:17
**notice** [6] - 32:24, 81:20, 81:24, 82:5, 87:6, 87:19
**notification** [1] - 33:8
**notified** [1] - 95:4
**notion** [3] - 26:2, 47:1, 48:22
**notwithstanding** [2] - 27:16, 40:25
**November** [3] - 8:8, 9:9, 16:23
**nullified** [1] - 91:15
**number** [10] - 22:8, 30:5, 30:6, 50:8, 51:3, 65:7, 65:11, 67:6, 67:17, 69:17
**numbers** [4] - 11:7, 38:14, 65:6, 65:16
**numerous** [2] - 60:17, 60:18
**nurse** [1] - 14:15
**nurses** [1] - 93:7
**NW** [5] - 1:13, 1:17, 1:21, 2:4, 2:8
**nylon** [1] - 34:23

# O

**Oberdorfer** [1] - 49:15
**Oberdorfer's** [1] - 49:17
**obligated** [1] - 42:17
**obligation** [2] - 41:25, 47:16
**obligations** [3] - 39:12, 39:14, 48:1
**observed** [1] - 88:22
**obviously** [2] - 5:11, 73:7
**occasions** [2] - 65:11, 95:9
**occurred** [1] - 66:24
**occurrences** [1] - 24:17
**OCFO** [2] - 23:8, 25:21
**odds** [2] - 18:23, 20:9
**OF** [2] - 1:1, 1:8
**offer** [1] - 51:19
**offered** [3] - 51:20, 64:7, 79:15
**offering** [1] - 79:5
**Office** [1] - 2:12
**office** [2] - 6:13, 89:10
**officer** [9] - 13:14, 23:1, 52:11, 56:2, 59:15, 60:4, 61:22, 61:23, 64:17
**Officer** [2] - 7:12, 7:21
**officers** [3] - 24:14, 40:9, 40:12
**official** [6] - 8:23, 47:20, 81:24, 95:22, 95:25, 96:25
**Official** [1] - 2:15
**officials** [1] - 52:12
**often** [3] - 10:24, 21:22, 29:3
**Ogugua** [2] - 30:19, 30:21
**old** [1] - 30:3
**omissions** [1] - 33:20
**once** [7] - 75:17, 77:7, 84:1, 88:21, 89:21, 91:13, 93:16
**one** [80] - 5:16, 8:25, 9:2, 10:3, 10:13, 10:14, 11:20, 11:21, 11:23, 14:7, 14:13, 14:17, 16:6, 16:7, 17:12, 17:18, 21:18, 29:13, 30:15, 30:18, 31:25, 44:21, 44:24, 44:25, 45:24, 48:19, 48:22, 50:6, 50:12, 50:13, 51:2, 51:3,

52:13, 53:17, 56:1, 56:19, 56:20, 56:21, 60:25, 61:13, 61:14, 64:21, 67:2, 69:18, 73:14, 73:15, 73:22, 74:3, 74:11, 74:12, 74:15, 74:22, 75:10, 75:12, 75:17, 76:21, 76:22, 77:2, 77:7, 77:8, 77:23, 78:14, 78:21, 79:2, 79:9, 80:6, 80:9, 81:8, 81:20, 84:9, 85:16, 85:17, 87:6, 87:11, 92:14, 93:2
**one-year** [9] - 10:14, 11:21, 14:7, 73:22, 74:3, 74:11, 75:17, 77:23, 79:2
**ones** [2] - 17:18, 25:19
**operate** [1] - 26:20
**operates** [1] - 23:8
**operating** [4] - 34:16, 34:23, 77:25, 85:11
**operation** [1] - 35:5
**operations** [3] - 22:25, 23:7, 47:17
**operative** [1] - 14:8
**operator** [1] - 7:22
**opinion** [3] - 21:14, 22:11, 30:19
**opposed** [2] - 33:22, 35:6
**opposing** [1] - 69:21
**option** [4] - 74:4, 76:3, 76:4, 88:25
**oral** [3] - 8:9, 83:22, 90:17
**orally** [1] - 9:13
**order** [8] - 4:16, 4:18, 29:19, 29:20, 61:11, 65:6, 65:15, 85:19
**ordinarily** [1] - 19:9
**ordinary** [1] - 4:22
**org** [1] - 40:24
**organic** [15] - 7:17, 7:19, 22:18, 23:2, 25:24, 27:10, 33:6, 38:3, 38:9, 38:16, 39:7, 39:15, 41:13, 41:20, 47:2
**organizational** [2] - 29:9, 29:10
**original** [5] - 10:23, 11:18, 64:16, 85:25, 91:4
**originating** [1] - 28:16
**otherwise** [4] - 21:5, 38:3, 39:5, 94:20
**ought** [1] - 26:3

**outgoing** [1] - 10:17
**outlook** [1] - 65:7
**outside** [5] - 13:18, 28:18, 28:20, 29:13, 40:7
**overall** [1] - 75:7
**overbilling** [2] - 55:10, 62:10
**overcome** [1] - 38:2
**overrule** [1] - 16:17
**overruled** [1] - 16:15
**oversight** [1] - 62:5
**overtures** [1] - 11:15
**overwhelming** [1] - 46:24
**owe** [1] - 11:15
**owed** [1] - 11:4
**Owens** [5] - 22:15, 22:9, 26:15, 26:23
**Owens-Corning** [5] - 22:15, 22:9, 26:15, 26:23
**own** [11] - 7:17, 21:12, 37:4, 37:25, 40:8, 42:10, 53:8, 80:13, 93:21, 94:5
**owner** [2] - 29:18, 47:15

# P

**P.A** [1] - 1:20
**p.m** [1] - 96:18
**packet** [2] - 41:20, 42:20
**page** [10] - 28:25, 29:8, 38:18, 39:7, 39:24, 41:19, 42:20, 62:4, 64:22
**pages** [1] - 86:21
**paid** [15] - 10:25, 39:17, 78:11, 78:12, 79:11, 79:14, 79:15, 81:12, 83:16, 84:12, 84:15, 86:3, 86:12, 86:13, 92:12
**pains** [1] - 24:10
**paper** [3] - 63:1, 84:1, 84:25
**papers** [1] - 7:13
**paperwork** [1] - 19:12
**paragraph** [19] - 19:3, 38:19, 39:8, 40:6, 40:20, 41:21, 41:24, 59:10, 64:20, 65:22, 65:25, 67:6, 71:1, 71:15, 74:2, 78:25, 81:20, 81:22
**paragraphs** [2] - 40:1,

87:15
**parse** [1] - 43:23
**part** [16] - 8:24, 11:11, 20:4, 20:9, 22:18, 23:22, 33:5, 41:3, 41:21, 50:5, 50:6, 50:20, 50:21, 71:10, 76:1
**partake** [2] - 22:15, 25:16, 31:16
**partakes** [1] - 22:13
**partaking** [1] - 26:4
**particular** [9] - 11:4, 21:23, 29:6, 35:5, 48:4, 55:9, 90:3, 90:4, 92:2
**particularity** [1] - 66:20
**particulars** [1] - 68:2
**parties** [26] - 3:7, 4:7, 10:21, 21:8, 74:1, 75:20, 76:1, 76:8, 77:13, 78:7, 81:2, 81:6, 81:14, 82:21, 82:24, 83:1, 83:6, 84:3, 85:10, 86:25, 89:23, 91:5, 91:23, 93:2, 93:14
**parties'** [4] - 86:9, 91:14, 92:3, 92:11
**partner** [1] - 3:17
**parts** [1] - 4:8
**party** [2] - 78:25, 90:16
**pass** [1] - 38:10
**passed** [2] - 11:22, 21:19
**passing** [1] - 36:12
**patient** [25] - 7:23, 12:6, 12:25, 17:3, 19:5, 54:10, 59:15, 59:18, 62:17, 64:25, 66:17, 66:25, 67:4, 67:14, 68:8, 68:10, 69:24, 71:14, 71:16, 72:4, 72:7, 72:24, 89:10
**patient's** [1] - 67:16
**patients** [19] - 12:15, 12:24, 13:2, 13:20, 15:23, 15:24, 16:17, 16:25, 17:3, 20:7, 20:16, 56:8, 56:10, 65:7, 65:12, 65:15, 67:7, 68:14, 70:2
**Paul** [3] - 4:1, 66:13, 73:18
**PAUL** [1] - 2:7
**pauses** [1] - 9:3
**pay** [23] - 9:25, 10:3,

10:5, 10:20, 11:4, 11:7, 11:13, 14:6, 37:24, 42:6, 42:12, 60:2, 63:9, 76:20, 76:24, 77:2, 77:13, 79:5, 79:16, 82:8, 84:11, 86:4, 86:23
**payable** [1] - 41:22
**payment** [2] - 15:10, 95:13
**pending** [3] - 4:4, 4:11, 4:19
**people** [12] - 13:13, 13:16, 13:24, 63:15, 70:12, 71:22, 71:23, 72:13, 80:9, 89:11, 93:6, 95:10
**per** [4] - 11:8, 60:1, 83:20, 83:22
**percent** [1] - 52:21
**perfect** [1] - 64:16
**perform** [1] - 26:17
**performance** [1] - 8:10
**performs** [1] - 50:8
**perhaps** [2] - 58:1, 68:1
**peril** [1] - 80:14
**period** [12] - 14:5, 59:12, 75:17, 81:7, 83:18, 84:5, 84:8, 84:14, 85:23, 86:13, 89:20, 91:16
**periodic** [1] - 52:15
**periods** [1] - 14:5
**permission** [1] - 46:5
**person** [4] - 10:16, 10:17, 19:20, 45:23
**personal** [1] - 53:8
**personally** [1] - 20:18
**personnel** [3] - 7:16, 38:20, 39:4
**persons** [1] - 25:2
**perspective** [2] - 53:13, 84:20
**persuade** [2] - 28:21, 90:3
**pertaining** [3] - 30:24, 51:14, 53:24
**physical** [1] - 84:25
**physicians** [2] - 20:6, 54:12
**pick** [1] - 51:7
**picked** [1] - 51:8
**piece** [2] - 84:1, 84:25
**pieces** [1] - 51:22
**pivot** [1] - 48:21
**pknight@nossaman. com** [1] - 2:10
**place** [2] - 41:18, 80:7

**places** [1] - 40:24
**plaintiff** [6] - 3:9, 7:1,
  7:7, 18:14, 33:19,
  58:8
**Plaintiff** [1] - 1:3
**PLAINTIFF** [1] - 1:11
**plaintiff's** [13] - 4:5,
  7:4, 17:15, 34:6,
  36:4, 48:23, 53:3,
  53:6, 64:3, 68:11,
  69:6, 74:9, 81:17
**plaintiffs** [3] - 5:2,
  6:24, 53:10
**platter** [1] - 56:24
**plausibility** [2] - 94:7,
  94:14
**plead** [10] - 18:3, 70:9,
  72:19, 72:20, 73:6,
  82:6, 82:7, 87:14
**pleading** [3] - 93:13,
  93:21, 94:2
**pled** [7] - 18:4, 70:14,
  70:15, 72:21, 81:12,
  90:7, 93:13
**plethora** [1] - 21:21
**PLLC** [1] - 1:12
**plus** [2] - 55:15
**podium** [1] - 3:6
**point** [31] - 10:7,
  14:21, 27:19, 35:8,
  46:5, 48:3, 49:2,
  55:13, 58:11, 60:8,
  62:20, 64:2, 65:23,
  67:1, 67:13, 73:25,
  74:2, 75:17, 79:4,
  79:6, 80:5, 82:17,
  85:19, 85:20, 86:15,
  88:14, 89:16, 90:3,
  92:7, 95:7, 96:3
**pointed** [1] - 47:24
**pointing** [1] - 40:22
**points** [2] - 13:8
**policies** [4] - 34:8,
  71:4, 71:14, 71:18
**policy** [22] - 17:15,
  17:19, 17:24, 18:13,
  18:14, 19:14, 19:16,
  21:1, 35:1, 69:11,
  69:15, 69:21, 70:19,
  70:21, 71:11, 71:22,
  72:3, 87:21, 89:3,
  95:20, 95:21
**population** [1] - 12:17
**port** [1] - 50:4
**Ports** [1] - 49:18
**posit** [1] - 90:5
**position** [14] - 31:8,
  31:17, 32:6, 33:1,
  33:5, 33:15, 36:23,
  58:9, 64:17, 76:7,

79:13, 79:21, 82:13,
  82:14
**positions** [4] - 48:12,
  48:17, 48:18, 68:4
**possibility** [3] - 68:14,
  94:13, 94:14
**possible** [1] - 84:2
**possibly** [1] - 58:4
**post** [2] - 78:5, 83:3
**Post** [3] - 60:3, 61:24,
  62:22
**post-written-
contract** [1] - 78:5
**potential** [2] - 49:3,
  55:16
**power** [6] - 10:19,
  25:23, 27:12, 30:12,
  46:19, 70:11
**powers** [1] - 27:13,
  46:19, 46:20
**Pozefsky** [3] - 11:12,
  13:13, 56:2
**practices** [2] - 64:24,
  65:1
**precedent** [3] - 36:1,
  36:2
**precise** [1] - 56:17
**precisely** [2] - 85:20,
  96:12
**predecessor** [1] - 30:3
**premise** [1] - 46:12
**prepared** [3] - 6:22,
  51:11, 73:15
**PRESENT** [1] - 2:12
**present** [2] - 5:24,
  6:18
**presentations** [1] - 5:7
**presented** [4] - 73:1,
  73:9, 88:3, 88:5
**pressure** [1] - 13:6
**pressured** [3] - 13:4,
  13:23, 20:13
**pressuring** [1] - 65:5
**presumptively** [1] -
  38:1
**presupposes** [1] -
  32:21
**pretentions** [1] - 26:3
**pretty** [3] - 17:7,
  36:21, 75:8
**prevail** [1] - 49:19
**previously** [1] - 17:20
**Price** [1] - 3:22
**PRICE** [1] - 2:3
**prima** [1] - 94:4
**primarily** [2] - 66:14,
  93:10
**principal** [1] - 93:9
**principle** [6] - 76:13,
  90:13, 92:25, 94:6,

94:9, 94:10
**principles** [1] - 6:3
**printout** [1] - 38:16
**prioritize** [1] - 7:23
**private** [3] - 29:18,
  39:10, 45:22
**probing** [1] - 43:13
**problem** [8] - 32:18,
  54:14, 54:15, 57:1,
  57:10, 59:24, 62:4,
  62:16
**problems** [3] - 7:22,
  16:25, 57:6
**procedure** [1] - 4:22
**proceeding** [3] - 9:3,
  40:11, 96:18
**proceedings** [1] -
  96:22
**Proceedings** [1] - 2:17
**process** [1] - 55:7
**procurement** [2] -
  31:22, 31:23
**produced** [1] - 2:18
**product** [3] - 35:17,
  35:18, 56:23
**PROFIT** [2] - 1:5, 1:20
**Profit** [11] - 3:3, 3:16,
  3:18, 7:14, 22:15,
  24:3, 29:24, 43:8,
  47:13, 81:23, 88:15
**profit** [1] - 27:25
**profits** [1] - 34:4
**promised** [1] - 13:18
**promising** [1] - 82:8
**prompted** [1] - 13:11
**promulgated** [1] -
  29:18
**prong** [1] - 56:18
**pronounce** [1] - 30:20
**proper** [1] - 71:15
**property** [1] - 25:2
**proposed** [1] - 66:6
**proposition** [2] - 52:3,
  92:25
**propositions** [1] -
  43:18
**prospective** [2] -
  11:22, 12:11
**prospectively** [1] -
  85:17
**protected** [21] - 9:10,
  9:11, 15:3, 15:10,
  16:2, 16:5, 16:11,
  17:11, 52:4, 52:5,
  56:13, 56:15, 59:11,
  60:22, 60:25, 61:5,
  61:12, 63:11, 64:2,
  64:8, 68:19
**Protection** [2] - 9:23,
  17:4, 21:2

**prove** [1] - 15:11
**provide** [3] - 4:15,
  40:8, 47:16
**provision** [3] - 32:20,
  35:15, 42:18
**provisions** [3] - 29:1,
  47:25, 52:2
**public** [21] - 17:6,
  17:15, 18:12, 18:14,
  19:13, 19:15, 21:1,
  26:17, 30:11, 69:15,
  69:21, 70:19, 70:20,
  71:4, 71:10, 71:18,
  71:22, 72:3, 72:7,
  89:3
**publicly** [1] - 63:20
**published** [1] - 60:4
**Puerto** [3] - 37:17,
  49:18, 50:3
**punish** [1] - 70:11
**punishment** [1] -
  69:22
**purchases** [1] - 24:18
**purporting** [1] - 85:15
**purpose** [4] - 4:17,
  42:1, 45:24, 58:7
**purposes** [5] - 15:9,
  22:6, 27:12, 45:23,
  91:7
**purveying** [1] - 63:20
**purview** [1] - 95:24
**push** [1] - 16:19
**put** [11] - 8:23, 15:21,
  20:9, 41:17, 42:9,
  42:16, 77:10, 85:3,
  90:9, 95:5

**Q**

**qualifications** [1] -
  14:15
**qualifies** [1] - 34:18
**qualify** [2] - 23:5, 37:1
**quality** [1] - 62:17
**quantum** [1] - 90:7
**questions** [8] - 4:19,
  8:21, 14:24, 27:4,
  30:13, 30:18, 48:6,
  62:7
**quickly** [2] - 48:21,
  64:5
**Quinn** [1] - 3:10
**QUINN** [2] - 1:12, 3:13
**quite** [2] - 41:9, 43:1
**quote** [1] - 81:20
**quoted** [1] - 28:25
**quotes** [1] - 36:19
**quoting** [1] - 46:17

**R**

**raise** [3] - 31:4, 55:2,
  66:11
**raised** [8] - 19:6, 19:9,
  35:23, 44:11, 68:1,
  68:16, 69:3, 69:17
**raising** [3] - 57:8,
  70:1, 70:2
**range** [1] - 40:15
**rate** [9] - 11:8, 36:6,
  52:21, 76:25, 84:16,
  84:18, 86:23, 87:5,
  90:24
**rates** [1] - 11:1
**ratification** [1] - 78:24
**ratified** [1] - 79:3
**rationale** [1] - 47:1
**reach** [1] - 91:23
**reaction** [1] - 12:14
**read** [7] - 8:20, 32:19,
  62:22, 62:25, 64:7,
  67:6, 72:2
**reading** [4] - 24:19,
  24:24, 62:18, 63:10
**reality** [1] - 91:1
**really** [11] - 4:23, 7:24,
  18:20, 19:1, 35:9,
  35:10, 51:23, 63:15,
  72:8, 84:7, 86:11
**realm** [1] - 37:2
**reason** [5] - 45:10,
  47:12, 58:24, 80:17
**reasonable** [3] -
  15:12, 89:11, 92:19
**reasonably** [1] - 65:1
**reasoning** [1] - 23:13
**reasons** [2] - 22:8,
  25:17
**rebut** [1] - 46:5
**rebutted** [1] - 30:2
**received** [5] - 43:10,
  43:14, 43:18, 52:13,
  81:21
**receives** [1] - 89:11
**recent** [1] - 50:2
**recently** [1] - 17:19
**reciting** [3] - 62:21,
  62:23, 62:24
**reconcilable** [1] -
  48:12
**record** [5] - 3:6, 9:17,
  19:25, 20:1, 82:5
**recordkeeping** [11] -
  19:5, 19:14, 19:16,
  69:10, 69:25, 70:4,
  71:13, 71:16, 72:4,
  72:7, 72:24
**records** [3] - 53:25,

59:15, 89:10
**recovery** [1] - 13:2
**reduce** [1] - 95:4
**reduced** [8] - 74:7,
74:11, 74:18, 87:23,
87:24, 88:5, 96:5
**reducing** [1] - 34:5
**reduction** [1] - 96:2
**redundant** [1] - 5:12
**refer** [1] - 7:13
**reference** [5] - 17:24,
18:1, 55:16, 66:16
**referenced** [2] - 70:10,
87:11
**referring** [1] - 70:25
**refresh** [1] - 35:13
**refusal** [1] - 70:18
**refuse** [1] - 45:25
**refused** [1] - 93:25
**refuted** [1] - 94:16
**refutes** [1] - 93:8
**regard** [15] - 5:8, 5:23,
6:9, 6:25, 23:14,
31:8, 31:12, 31:14,
31:17, 35:12, 45:6,
46:15, 51:14, 62:10,
62:17
**regarding** [4] - 12:6,
21:5, 66:8, 92:7
**regardless** [3] - 8:4,
24:17, 84:16
**regional** [2] - 22:3,
23:24
**regulation** [6] - 70:20,
70:22, 71:25, 72:1,
72:12, 72:14
**regulations** [6] - 19:5,
69:24, 70:6, 70:25,
72:7, 72:11
**regulatory** [2] - 54:11,
55:16
**reimbursability** [1] -
52:17
**reimburse** [1] - 14:2
**reimbursed** [1] - 13:24
**reimbursement** [1] -
12:16
**reject** [2] - 46:22,
46:25
**rejected** [1] - 46:23
**related** [1] - 78:18
**relates** [1] - 70:17
**relationship** [5] -
47:18, 73:11, 76:2,
89:13, 89:23
**relayed** [1] - 66:4
**relaying** [3] - 63:6,
63:19, 64:9
**relevant** [3] - 45:10,
57:3, 81:21

**relied** [3] - 22:9, 38:5,
38:6
**relief** [1] - 72:21
**relies** [1] - 94:9
**rely** [5] - 38:7, 66:17,
84:24, 88:10, 96:4
**relying** [3] - 92:25,
93:11, 94:6
**remainder** [1] - 49:4
**remarks** [1] - 74:10
**remedial** [2] - 52:1,
59:20
**remediate** [1] - 63:8
**remediation** [1] -
61:17
**remove** [1] - 25:23
**removed** [1] - 44:22
**removes** [1] - 45:16
**rendering** [1] - 9:1
**reneged** [1] - 14:9
**renew** [4] - 74:4, 76:3,
87:7, 88:24
**renewable** [1] - 10:13
**renewal** [5] - 82:23,
82:25, 83:4, 85:21,
94:21
**renewed** [3] - 74:5,
74:6, 87:23
**renewing** [1] - 85:10
**Reorganization** [1] -
30:4
**repeatedly** [2] - 93:25,
94:16
**repetitive** [1] - 5:13
**report** [10] - 12:22,
28:24, 29:7, 29:8,
47:10, 51:4, 53:8,
53:23, 62:13, 62:24
**Report** [1] - 28:23
**reported** [3] - 2:17,
12:8, 57:7
**reporter** [1] - 16:9
**Reporter** [3] - 2:14,
2:15, 96:25
**reporting** [2] - 14:15,
56:15
**representation** [3] -
40:8, 45:20, 53:3
**representations** [3] -
68:5, 77:20, 83:22
**represented** [1] -
95:10
**representing** [1] - 4:1
**required** [6] - 65:17,
65:18, 82:23, 85:10,
86:1
**requires** [5] - 34:9,
66:23, 78:24, 82:4,
95:25
**reserve** [2] - 33:13,

61:23
**reserved** [1] - 60:6
**resolve** [1] - 11:13
**resolved** [2] - 62:16,
79:23, 79:24
**resources** [3] - 34:2,
34:5
**respect** [21] - 4:3,
4:10, 4:23, 17:14,
19:19, 25:15, 25:19,
32:7, 32:10, 41:2,
45:4, 47:7, 51:11,
57:13, 69:3, 70:23,
78:21, 81:9, 91:24,
92:4, 95:16
**respond** [6] - 5:4,
14:22, 36:5, 54:1,
64:4, 67:20
**response** [9] - 7:1,
7:5, 30:14, 40:21,
64:6, 69:5, 70:3,
70:4, 87:10
**responsibilities** [1] -
86:23
**responsibility** [1] -
29:3
**rest** [1] - 54:19
**restate** [1] - 4:14
**restore** [1] - 82:8
**result** [5] - 53:11,
56:16, 59:1, 63:7
**retain** [1] - 40:7
**retained** [1] - 52:14
**retains** [1] - 25:23
**retal** [1] - 18:12
**retaliate** [1] - 57:7
**retaliated** [4] - 18:9,
39:20, 61:1, 68:17
**retaliation** [16] - 9:10,
14:10, 15:11, 18:8,
54:19, 55:3, 56:18,
57:5, 57:11, 57:20,
59:5, 60:13, 63:10,
68:10, 68:12, 69:3
**retroactive** [5] - 11:20,
12:10, 85:18, 94:1,
95:13
**retroactively** [1] -
85:16
**return** [2] - 17:1, 59:16
**returned** [1] - 12:2
**revenues** [2] - 13:5,
41:22
**revert** [1] - 42:21
**reviews** [1] - 52:15
**Rico** [3] - 37:17,
49:18, 50:4
**rights** [5] - 7:18,
39:12, 39:13, 39:20,
39:22

**rise** [1] - 96:17
**risky** [2] - 42:8
**room** [5] - 20:6, 34:16,
34:23, 65:14
**root** [1] - 18:15
**Rorschach** [1] - 43:4
**RPR** [3] - 2:14, 96:20,
96:25
**Rule** [4] - 21:17,
27:22, 66:20, 73:5
**rule** [6] - 4:18, 43:10,
46:13, 46:14, 54:16,
72:20
**ruling** [1] - 44:14
**run** [1] - 40:23
**running** [1] - 10:2

**S**

**safety** [2] - 54:10,
64:25
**SAINT** [1] - 96:20
**Saint** [2] - 2:14, 96:25
**SAINT-LOTH** [1] -
96:20
**Saint-Loth** [2] - 2:14,
96:25
**salary** [11] - 74:7,
74:10, 74:18, 79:4,
79:15, 83:13, 85:7,
88:5, 89:11, 95:5,
96:5
**sale** [1] - 29:21
**Salzman** [1] - 1:12
**sampling** [1] - 12:24
**save** [1] - 34:22
**saw** [3] - 13:3, 65:7,
67:6
**scenario** [2] - 90:4,
91:22
**scholarly** [1] - 21:14
**scope** [2] - 31:9, 57:14
**seated** [3] - 6:14, 6:16,
68:24
**second** [6] - 8:25,
9:16, 11:23, 20:4,
31:5, 71:3
**second-to-last** [1] -
71:3
**Section** [5] - 31:18,
38:18, 39:8, 39:24,
41:20
**section** [5] - 27:15,
27:17, 42:19, 56:18,
71:15
**sector** [3] - 29:18,
39:11, 45:22
**see** [7] - 5:25, 7:2, 7:5,
42:24, 57:25, 72:11,

86:21
**seeking** [1] - 90:23
**seem** [2] - 23:12,
92:22
**sense** [3] - 48:13,
73:8, 92:16
**sent** [4] - 52:19, 54:17,
56:4, 87:15
**sentence** [1] - 71:3
**separate** [9] - 22:20,
23:19, 24:5, 24:11,
26:2, 26:7, 26:8,
26:20, 73:7
**separation** [1] - 46:6
**serious** [2] - 21:20,
62:8
**served** [1] - 87:17
**serves** [1] - 81:23
**set** [5] - 14:2, 43:5,
71:14, 77:14, 79:20
**sets** [2] - 7:25, 14:18
**setting** [2] - 10:3,
78:18
**shall** [12] - 23:19,
24:14, 24:16, 26:8,
27:18, 38:20, 39:2,
39:11, 41:22, 41:24,
42:1, 42:21
**Shepard** [1] - 3:18
**SHEPARD** [1] - 1:20
**short** [1] - 13:7
**shorthand** [1] - 2:17
**show** [7] - 53:4, 66:23,
67:14, 68:18, 69:20,
73:22, 93:8
**showing** [4] - 9:17,
38:2, 72:20, 92:12
**shown** [1] - 90:21
**shows** [6] - 38:3, 58:3,
76:18, 86:3, 87:4,
89:9
**shred** [1] - 67:2
**sic** [4] - 44:22, 50:15,
53:10, 59:13
**sides** [1] - 88:3
**signatory** [1] - 38:25
**signed** [8] - 12:1,
14:7, 66:1, 73:25,
74:1, 82:7, 91:4,
95:14
**significantly** [2] -
11:11, 53:18
**silence** [1] - 93:17
**silent** [2] - 93:18
**similar** [1] - 15:9
**similarly** [1] - 70:9
**single** [2] - 36:10, 67:4
**situation** [3] - 27:25,
50:18, 90:22
**six** [5] - 33:6, 44:5,

44:7, 73:11, 85:20
**six-month** [1] - 33:6
**sizeable** [1] - 75:8
**skipping** [1] - 40:10
**slash** [1] - 52:4
**so-called** [1] - 16:20
**Sodexo** [1] - 45:18
**softball** [1] - 45:21
**sole** [1] - 47:15
**solely** [1] - 41:22
**solemn** [2] - 47:21, 47:24
**someone** [5] - 31:23, 60:20, 78:2, 83:21
**somewhat** [1] - 49:25
**sorry** [9] - 8:3, 8:14, 34:10, 35:14, 37:10, 58:16, 67:24, 73:14, 94:5
**sort** [7] - 6:23, 14:3, 24:23, 47:5, 47:6, 54:24, 96:4
**sorting** [1] - 4:9
**sound** [2] - 40:14, 40:16
**sovereign** [61] - 5:19, 7:1, 14:20, 21:5, 21:12, 21:13, 23:5, 24:23, 25:9, 25:17, 26:11, 26:12, 26:24, 26:25, 27:7, 27:14, 27:19, 27:21, 28:3, 28:4, 28:6, 28:12, 29:15, 30:7, 30:11, 30:12, 30:16, 31:1, 31:9, 31:15, 31:19, 32:1, 32:2, 33:2, 36:5, 36:17, 37:5, 37:12, 37:16, 37:21, 37:22, 40:4, 40:15, 43:10, 43:14, 43:18, 43:22, 43:24, 44:9, 44:12, 44:18, 47:3, 48:8, 48:9, 48:11, 48:14, 49:24, 50:6, 50:9, 51:10
**Specialty** [3] - 7:15, 39:10, 39:21
**specific** [4] - 26:23, 66:15, 67:10, 67:14
**specifically** [5] - 24:13, 27:5, 41:13, 67:21, 87:21
**specificity** [1] - 67:3
**specifics** [1] - 62:9
**Spencer** [1] - 32:13
**spoken** [1] - 50:17
**spokesman** [1] - 20:25
**sponte** [1] - 35:23

**square** [1] - 33:3
**squared** [1] - 32:25
**staff** [1] - 7:20
**stage** [6] - 5:1, 57:23, 57:24, 65:20, 66:10, 70:8
**stand** [4] - 41:10, 41:14, 42:11, 61:8
**standard** [2] - 66:22, 94:7
**standards** [1] - 57:4
**standing** [1] - 14:6
**start** [5] - 5:6, 52:3, 64:21, 82:22, 86:2
**started** [3] - 10:2, 57:18, 77:21
**starting** [1] - 14:21, 15:19, 94:17
**starts** [1] - 57:20, 76:23
**state** [6] - 3:6, 21:10, 28:3, 45:11, 46:25
**statement** [3] - 56:12, 67:5, 96:4
**statements** [3] - 54:18, 94:23, 95:7
**STATES** [2] - 1:1, 1:9
**states** [2] - 24:13, 38:25
**status** [7] - 43:8, 49:13, 79:12, 82:15, 83:25, 84:9, 88:4
**statute** [53] - 7:17, 7:19, 18:2, 18:3, 21:2, 22:18, 23:2, 23:16, 23:17, 24:2, 24:10, 24:21, 25:24, 26:5, 26:7, 26:10, 27:10, 27:18, 28:11, 28:16, 28:19, 29:13, 32:20, 32:22, 33:5, 33:6, 33:8, 33:10, 33:14, 37:2, 37:4, 38:3, 38:9, 38:17, 39:7, 39:15, 41:13, 41:20, 42:24, 47:2, 47:24, 60:16, 60:23, 63:11, 70:10, 70:15, 70:20, 70:22, 71:8, 73:4, 73:6
**statutes** [3] - 15:4, 70:25, 72:19
**statutory** [4] - 26:19, 31:21, 32:19, 47:24
**stays** [1] - 59:18
**stenographic** [1] - 96:21
**STEPHEN** [1] - 1:11
**Steve** [1] - 3:9
**Steven** [1] - 11:12

**still** [14] - 10:6, 37:16, 41:3, 52:10, 56:22, 57:7, 59:13, 66:23, 72:20, 78:17, 83:4, 84:22, 85:1, 92:20
**stop** [12] - 15:13, 16:5, 16:8, 16:10, 16:12, 17:10, 20:6, 56:21, 61:15, 64:14, 64:15, 64:17
**stopped** [1] - 62:14
**strands** [1] - 60:19
**straw** [1] - 18:21, 73:10
**stream** [1] - 90:15
**Street** [4] - 1:13, 1:21, 2:4, 2:8
**strike** [1] - 88:7
**stronger** [1] - 23:4
**structure** [2] - 27:7, 27:9
**struggle** [1] - 27:4
**struggling** [1] - 29:3
**stuff** [1] - 43:24
**sua** [1] - 35:23
**subdivision** [1] - 45:14
**subject** [8] - 23:6, 23:10, 25:21, 38:19, 38:21, 38:25, 39:1, 39:2
**submission** [3] - 47:14, 50:19, 55:12
**submit** [1] - 22:7, 39:25
**submitted** [7] - 8:9, 9:15, 9:16, 9:18, 17:18, 17:20, 71:4
**subsection** [2] - 32:18, 42:1
**substantial** [1] - 84:13
**substantially** [1] - 77:2
**suddenly** [1] - 58:5
**sue** [21] - 7:17, 25:13, 35:15, 35:24, 36:2, 36:17, 36:25, 37:3, 37:7, 37:12, 37:17, 37:25, 40:18, 43:11, 43:19, 46:19, 46:20, 47:1, 47:2, 48:12, 48:13
**sue-and-be-sued** [11] - 25:13, 35:15, 35:24, 36:2, 36:25, 37:12, 37:17, 43:11, 46:19, 48:12, 48:13
**sue-or-be-sued** [1] - 43:19
**sued** [29] - 7:17,

21:22, 21:23, 24:21, 25:13, 27:12, 34:1, 35:15, 35:24, 36:2, 36:17, 36:25, 37:3, 37:7, 37:12, 37:17, 37:25, 40:18, 43:11, 43:19, 45:11, 45:12, 46:19, 47:2, 48:12, 48:13, 49:9
**sues** [1] - 31:23
**suffices** [1] - 6:4
**sufficiency** [1] - 49:2
**sufficient** [3] - 37:1, 55:2, 95:5
**suggest** [11] - 18:17, 24:20, 25:20, 55:4, 69:14, 76:6, 81:6, 88:3, 92:5, 92:6, 92:21
**suggested** [2] - 94:20, 95:12
**suggesting** [9] - 19:11, 43:13, 56:11, 56:14, 66:20, 77:23, 79:8, 92:16, 96:11
**suggestion** [9] - 24:22, 25:3, 25:7, 61:4, 68:3, 71:9, 75:19, 95:3
**suggests** [5] - 32:24, 36:25, 40:3, 40:25, 79:17
**sui** [2] - 22:19, 46:21
**Suite** [4] - 1:13, 1:21, 2:4, 2:8
**summarized** [1] - 8:21
**summarizing** [1] - 9:5
**summary** [2] - 58:2, 92:19
**summer** [1] - 16:22
**super** [1] - 64:5
**Superior** [1] - 44:22
**supervisor** [1] - 14:16
**supplemental** [5] - 17:23, 45:5, 48:24, 69:12, 71:24
**Supply** [1] - 45:17
**support** [4] - 18:4, 47:16, 65:10, 67:9
**supported** [1] - 82:5
**suppose** [1] - 34:7
**supposed** [5] - 25:16, 78:1, 78:3, 79:23, 80:14, 83:15, 84:4, 85:1, 85:7, 86:12, 86:18, 96:8
**supposedly** [1] - 82:9
**supreme** [1] - 46:25
**Supreme** [4] - 35:25, 36:14, 36:24, 46:17

**surely** [2] - 90:22, 90:23
**survives** [1] - 45:5
**suspicion** [1] - 15:12
**sustain** [1] - 47:17
**suture** [1] - 35:5
**suturing** [1] - 35:6
**sworn** [1] - 63:22
**szc@hellerhuron.com** [1] - 1:14

### T

**tab** [2] - 51:7
**table** [4] - 3:7, 3:17, 3:23, 20:25
**talks** [3] - 54:10, 54:11, 54:12
**tampering** [1] - 60:13
**tasked** [1] - 26:17
**taxation** [1] - 25:25
**teach** [1] - 90:1
**technical** [1] - 7:13
**ten** [1] - 12:25
**term** [10] - 10:13, 10:14, 30:2, 30:3, 81:1, 81:11, 83:7, 93:2
**terminal** [1] - 50:4
**terminate** [2] - 81:7, 84:24
**terminated** [6] - 9:20, 78:22, 80:17, 82:17, 82:19, 92:3
**terminates** [2] - 85:5, 89:22
**terminating** [1] - 87:6
**termination** [6] - 21:1, 80:19, 83:3, 83:19, 88:6, 89:3
**terminations** [1] - 21:25
**terms** [32] - 15:15, 36:25, 49:2, 49:22, 50:20, 78:1, 78:19, 79:22, 80:5, 81:11, 82:23, 83:8, 83:11, 83:13, 83:20, 86:11, 86:22, 88:2, 89:15, 89:19, 90:19, 90:23, 90:25, 91:6, 91:12, 91:15, 91:18, 91:20, 91:24, 92:16, 93:6, 93:19
**territories** [1] - 37:19
**territory** [1] - 60:10
**test** [16] - 26:14, 26:15, 26:16, 26:23, 43:4, 49:12, 49:13,

49:16, 49:17, 49:19, 49:21, 49:23, 50:5, 50:16, 50:25
**testified** [5] - 9:13, 18:9, 18:25, 71:5, 72:25
**testifies** [1] - 16:24
**testify** [4] - 8:20, 63:12, 63:15, 71:22
**testifying** [2] - 64:9, 70:12
**testimony** [16] - 8:9, 8:24, 9:10, 9:17, 17:7, 18:6, 18:18, 62:1, 62:2, 62:6, 63:22, 71:24, 72:2, 72:22, 73:10, 87:8
**texted** [1] - 10:17
**THE** [194] - 1:1, 1:8, 1:11, 3:2, 3:11, 3:19, 3:24, 4:2, 5:14, 5:20, 6:11, 6:19, 6:21, 7:10, 8:3, 8:6, 8:14, 8:17, 8:25, 9:4, 9:7, 10:6, 10:9, 10:11, 10:15, 12:13, 12:18, 14:22, 15:1, 15:6, 15:15, 16:3, 16:12, 17:12, 17:21, 18:11, 18:22, 19:8, 19:18, 20:14, 20:21, 21:3, 22:5, 23:11, 24:2, 24:9, 26:5, 26:18, 28:5, 28:8, 28:10, 28:15, 30:13, 30:22, 30:24, 31:7, 31:11, 32:3, 32:5, 32:7, 32:10, 32:16, 33:21, 34:10, 34:13, 34:18, 35:8, 35:11, 35:14, 35:20, 36:3, 36:23, 37:10, 38:4, 38:11, 38:15, 40:21, 42:24, 43:2, 43:20, 44:1, 44:4, 44:7, 44:9, 44:15, 44:19, 44:23, 45:9, 45:19, 45:24, 46:2, 46:7, 47:4, 47:23, 48:5, 48:15, 48:20, 49:7, 49:21, 50:23, 51:9, 51:17, 53:2, 53:15, 53:22, 54:6, 54:15, 55:18, 56:11, 57:2, 57:22, 58:16, 58:19, 58:22, 59:8, 60:8, 60:12, 60:22, 61:10, 61:19, 62:20, 63:3, 63:10, 63:18, 63:24, 64:3, 65:21, 66:7, 66:19,

67:5, 67:16, 67:22, 67:25, 68:9, 68:22, 69:1, 69:6, 70:13, 70:16, 71:9, 71:21, 73:12, 74:8, 74:16, 74:19, 74:21, 74:24, 75:3, 75:6, 75:11, 75:19, 75:24, 76:5, 76:11, 76:16, 76:22, 77:8, 77:15, 77:17, 78:8, 78:11, 78:16, 79:7, 79:17, 79:21, 80:12, 80:18, 81:3, 81:17, 82:13, 82:20, 82:22, 82:25, 83:11, 83:14, 83:18, 84:17, 85:18, 86:6, 87:2, 87:9, 87:13, 87:25, 88:12, 88:16, 89:5, 90:9, 91:1, 93:5, 94:3, 94:19, 94:25, 96:1, 96:17
**themselves** [1] - 93:4
**theory** [2] - 32:2, 94:9
**therefore** [3] - 13:1, 34:22, 46:22
**THERESA** [1] - 1:12
**third** [4] - 50:12, 50:13, 51:2
**Thomas** [1] - 1:21
**Thompson** [3] - 2:4, 3:21, 3:23
**three** [12] - 4:5, 7:25, 9:25, 13:12, 17:17, 22:2, 35:5, 44:11, 50:5, 51:1, 53:14, 69:23
**three-part** [1] - 50:5
**threshold** [4] - 25:7, 25:12, 25:14, 58:12
**throughout** [2] - 11:2, 84:14
**thwart** [1] - 53:24
**TILGHMAN** [1] - 2:12
**Tilghman** [1] - 6:13
**timing** [2] - 7:2, 18:6
**Title** [1] - 27:16
**today** [7] - 53:5, 60:23, 69:13, 73:22, 74:10, 80:8
**together** [2] - 7:4, 40:1
**took** [2] - 5:16, 7:15
**top** [1] - 64:21
**tort** [8] - 31:3, 31:4, 31:12, 32:7, 32:9, 32:14, 33:1, 34:6
**tortious** [3] - 6:9, 80:2, 80:3
**torts** [1] - 31:1
**totality** [1] - 51:22

**totally** [5] - 46:22, 58:25, 61:17, 67:1, 86:14
**Totten** [2] - 22:10, 22:12
**tragedy** [1] - 22:12
**TRANSCRIPT** [1] - 1:8
**transcript** [7] - 2:18, 8:23, 9:1, 62:5, 96:21, 96:22
**transcription** [1] - 2:18
**transfer** [4] - 29:21, 29:23, 30:9, 39:8
**transferred** [2] - 29:16, 39:11
**treated** [1] - 55:15
**tried** [4] - 14:14, 22:12, 74:9
**trigger** [1] - 88:25
**triggered** [2] - 93:13, 94:11
**troubled** [1] - 29:4
**true** [8] - 16:1, 57:23, 66:10, 82:24, 95:3, 95:15, 96:21, 96:21
**try** [5] - 4:20, 16:5, 16:19, 28:21, 54:1
**trying** [10] - 9:15, 22:12, 36:22, 61:3, 70:6, 76:5, 80:8, 82:15, 83:25, 84:19
**Tunely** [1] - 94:7
**Tunley** [1] - 58:13
**tunnel** [1] - 46:9
**turn** [1] - 17:13
**turned** [1] - 41:10
**turns** [1] - 85:9
**two** [35] - 6:6, 8:8, 11:17, 13:8, 13:12, 14:5, 14:7, 19:4, 30:13, 30:18, 37:17, 43:17, 48:6, 50:8, 50:11, 50:13, 51:4, 54:3, 55:21, 56:18, 56:24, 57:1, 60:25, 62:7, 62:10, 66:2, 69:24, 71:4, 71:14, 73:1, 81:2, 81:14, 85:16, 88:24, 95:9
**two-prong** [1] - 56:18
**type** [4] - 33:25, 55:7, 68:8, 90:8
**typical** [2] - 34:14, 35:3
**typically** [1] - 21:23

## U

**U.S** [2] - 2:15, 46:10
**ultimate** [1] - 6:4
**ultimately** [5] - 11:9, 11:15, 14:16, 41:10, 92:18
**UMC** [29] - 1:20, 7:12, 7:13, 7:22, 8:10, 8:23, 9:14, 9:19, 10:21, 11:12, 12:17, 13:5, 13:14, 14:1, 18:8, 36:16, 37:7, 41:15, 52:11, 52:12, 59:16, 62:9, 65:5, 65:8, 65:11, 67:7, 71:6, 95:4, 95:20
**UMC's** [5] - 11:9, 36:12, 36:21, 94:16
**unadorned** [1] - 59:6
**unambiguously** [1] - 46:18
**unchanged** [1] - 7:18
**unconventional** [1] - 4:25
**uncovered** [1] - 85:23
**under** [36] - 6:5, 10:6, 17:9, 24:22, 31:18, 32:1, 34:8, 34:10, 34:19, 39:17, 39:18, 40:17, 41:20, 43:12, 46:17, 49:13, 49:16, 52:17, 58:12, 66:22, 70:7, 75:22, 76:10, 76:11, 76:12, 77:25, 79:19, 83:7, 85:11, 85:12, 87:1, 87:18, 88:10, 90:4, 94:7, 96:15
**undermine** [1] - 95:3
**understandings** [1] - 84:3
**understood** [10] - 6:19, 19:8, 20:8, 20:11, 36:3, 47:23, 48:15, 53:7, 91:1
**undertaking** [1] - 95:23
**unfortunate** [1] - 35:18
**unilaterally** [2] - 10:4, 78:9
**unit** [1] - 34:17
**United** [4] - 39:9, 39:13, 39:16, 81:24
**UNITED** [2] - 1:1, 1:9
**units** [3] - 31:20, 31:21, 32:1
**unjustifiable** [5] -

8:11, 8:13, 16:1, 55:18, 72:23
**unless** [5] - 25:2, 28:1, 32:23, 55:1, 75:20
**unliquidated** [2] - 25:2, 33:12
**up** [21] - 10:13, 10:14, 14:18, 16:21, 16:22, 38:10, 42:10, 47:21, 51:7, 51:8, 51:25, 56:9, 57:16, 61:21, 76:18, 84:10, 86:3, 87:4, 90:21, 92:12, 93:8
**uses** [1] - 26:15

## V

**vague** [4] - 66:15, 67:13, 67:19, 68:20
**valid** [4] - 48:23, 78:4, 78:13, 78:17
**variety** [1] - 34:14
**various** [4] - 4:10, 23:13, 57:4, 80:9
**vast** [1] - 46:24
**vehicle** [1] - 55:2
**Veritas** [16] - 3:21, 7:23, 10:1, 10:18, 10:19, 13:5, 13:6, 15:22, 18:5, 18:10, 20:8, 20:11, 20:13, 65:4, 65:14, 72:23
**Veritas'** [2] - 8:10, 71:5
**VERITAS/C** [1] - 2:3
**Veritas/UMC** [1] - 18:5
**versus** [11] - 3:3, 6:7, 21:15, 32:13, 36:11, 37:20, 38:7, 40:17, 41:7, 85:8, 90:24
**view** [1] - 34:19
**viewed** [1] - 50:21
**views** [1] - 50:18
**Vincent** [1] - 62:5
**violate** [1] - 70:18
**violated** [3] - 10:20, 65:1, 69:15
**violates** [1] - 17:16
**violating** [1] - 77:21
**violation** [10] - 18:12, 21:1, 69:10, 69:11, 69:14, 69:21, 71:13, 72:1, 72:6, 89:3
**violations** [1] - 64:15
**Virginia** [4] - 23:22, 46:10, 46:17
**vote** [1] - 12:4
**voting** [2] - 25:22,

95:22
**vs** [1] - 1:4

# W

**wage** [2] - 21:2, 39:16
**Wage** [1] - 39:18
**wages** [1] - 51:24
**waived** [4] - 32:2,
  32:10, 48:8, 48:11
**waiver** [17] - 25:7,
  25:12, 25:13, 26:24,
  27:19, 28:1, 30:24,
  31:18, 35:15, 36:17,
  36:18, 37:1, 37:12,
  38:1, 43:12, 43:19,
  48:13
**walk** [3] - 38:8, 52:5,
  80:14
**wall** [6] - 42:4, 42:10,
  43:1, 46:6, 47:7,
  47:9
**Walton** [3] - 22:10,
  23:5, 23:14
**wants** [1] - 42:5
**Washington** [12] - 1:6,
  1:13, 1:17, 1:22, 2:5,
  2:9, 2:16, 3:22, 11:3,
  60:3, 61:24, 62:22
**waste** [1] - 17:6
**ways** [4] - 24:12, 43:3,
  46:1, 48:22
**week** [4] - 10:24, 11:9,
  17:19, 66:2
**weeks** [2] - 8:8, 73:1
**well-known** [1] - 56:25
**West** [1] - 1:21
**Westerman** [1] - 3:10
**WESTERMAN** [2] -
  1:16, 3:14
**whatnot** [1] - 21:25
**whistleblower** [8] -
  19:8, 19:22, 59:21,
  60:10, 63:3, 69:3,
  69:19, 72:9
**Whistleblower** [3] -
  9:23, 17:4, 21:2
**whole** [3] - 46:12,
  92:15, 95:5
**win** [1] - 49:1
**window** [1] - 16:9
**wishes** [2] - 6:17,
  79:15
**WMATA** [18] - 21:22,
  22:1, 22:6, 22:8,
  22:13, 23:4, 23:5,
  23:6, 23:8, 23:21,
  23:24, 27:24, 28:15,
  38:23, 38:24, 46:9

**WMATA's** [2] - 23:17,
  28:16
**woman** [1] - 94:19
**word** [4] - 24:6, 31:21,
  43:4, 90:9
**worded** [1] - 27:5
**words** [19] - 19:11,
  19:18, 22:3, 22:19,
  26:8, 28:2, 31:2,
  33:9, 33:23, 35:23,
  37:3, 45:3, 54:16,
  61:16, 62:15, 87:1,
  88:13, 93:16, 95:6
**works** [1] - 72:8
**world** [7] - 37:23,
  68:10, 78:5, 86:15,
  91:6, 91:8, 95:1
**worried** [2] - 13:23,
  68:23
**worry** [1] - 48:25
**writes** [1] - 16:23
**writing** [9] - 16:23,
  31:22, 31:24, 55:1,
  64:9, 87:12, 87:17,
  87:22, 87:24
**written** [31] - 10:9,
  10:12, 13:7, 21:15,
  75:20, 75:24, 75:25,
  76:7, 76:14, 76:17,
  77:1, 77:5, 77:22,
  77:24, 78:5, 80:13,
  82:16, 82:18, 83:21,
  84:1, 84:25, 86:15,
  87:19, 89:7, 89:17,
  89:19, 89:20, 89:22,
  90:11, 90:18, 91:4
**wrongful** [17] - 9:24,
  17:14, 18:12, 19:10,
  19:19, 19:23, 20:3,
  21:1, 69:7, 69:19,
  69:20, 70:7, 71:2,
  72:8, 72:15, 89:3

# Y

**year** [32] - 10:14,
  10:22, 11:21, 11:23,
  14:7, 42:23, 73:22,
  74:3, 74:11, 75:17,
  76:20, 76:21, 76:22,
  76:25, 77:7, 77:8,
  77:23, 78:14, 78:21,
  79:2, 79:9, 81:8,
  81:13, 82:11, 82:22,
  84:13, 84:14, 86:17,
  87:17, 93:2
**year-long** [1] - 82:22
**years** [3] - 10:13,
  85:15, 85:16

**you-all** [4] - 5:7, 76:19,
  83:14, 92:5
**yourself** [2] - 63:12,
  64:10