UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JULIAN CRAIG,

        *Plaintiff*,

    **v.**                            Civil Action No. 18-347 (FYP)

**NOT FOR PROFIT HOSPITAL
CORPORATION, *et al.*,**

        *Defendants*.

## MEMORANDUM OPINION

In 2015, Dr. Julian Craig became the Chief Medical Officer of the Not-for-Profit Hospital Corporation ("the Hospital"), a District of Columbia government hospital that is commonly known as the United Medical Center. The year after he assumed his role, the Hospital hired a management company, Veritas of Washington, LLC ("Veritas"), to run its operations. With Veritas at the helm, Craig's hours were slashed by a third, and his compensation was likewise reduced. Craig developed concerns that the Hospital was trying to improve its financial situation by pressuring its employees to improperly increase patient admissions so that it could submit claims for reimbursement from Medicare and Medicaid. Craig filed an official complaint with the Hospital. He also reported Veritas's mismanagement and malfeasance to the D.C. Council, which led to his public testimony about the Hospital's problems. Two weeks after his testimony, the Hospital terminated his employment.

Craig sued the Hospital, Veritas, and officers of Veritas, bringing claims of retaliation under the federal False Claims Act and its D.C. equivalent, *see* 31 U.S.C. § 3730(h), D.C. Code § 2-381.04; whistleblower discrimination under the D.C. Whistleblower Protection Act, *see* D.C.

Code § 2-223.02; wrongful discharge; breach of contract; violation of the D.C. Wage Payment and Collection Law, *see* D.C. Code § 32-1302; tortious interference with his employment contract; and defamation.  He seeks a declaratory judgment, as well as compensatory, liquidated, and punitive damages.  Now before the Court are motions to dismiss filed by (1) the Hospital, (2) Veritas and two of its officers, and (3) Luis Hernandez, Veritas's Chief Restructuring Officer. The defendants collectively challenge each cause of action in the Complaint, except for the defamation claim.  For the following reasons, the Court will dismiss Craig's wrongful discharge claim, Count IV.  The Court will otherwise deny the Motions.

## BACKGROUND

Craig is a physician working in Washington, D.C.  *See* ECF No. 3 (Amended Complaint), ¶ 2.  On June 3, 2015, he accepted the position of Chief Medical Officer ("CMO") at the Hospital.  *See id.*, ¶ 17.  That same day, Craig signed an offer letter, which specified that he would work 32 hours per week, would earn an annual salary of $320,000, and would receive benefits.  *See id*.  Later, Craig entered a written employment contract with the Hospital.  *See id.*, ¶ 18.  In addition to reiterating the hours and salary promised in the offer letter, the contract stated that it would last for one year, with the option of being renewed year by year, for up to five years.  *See id*.  Further, the contract provided that it could be modified "only by a written instrument signed by both Parties."  *See id.*  The contract was executed by Craig and the Hospital, and it was ratified by the Hospital's Board of Directors.  *See id.*

On April 15, 2016, almost a year into Craig's tenure, Veritas "assumed control" of the Hospital's operations.  *See id.*, ¶¶ 2, 21–22.  The Hospital's Board engaged Veritas because the D.C. Department of Health Care determined "that a management company needed to assume

control of [Hospital] operations after significant financial losses in 2015." *See id.*, ¶ 21.  Luis Hernandez was the Veritas employee who served as the Hospital's Chief Restructuring Officer, "overs[eeing] the operations of all of the departments," as well as supervising its then-CEO Andrew Davis. *See id.*, ¶ 22.  Chrystie Boucree, the President of Veritas, and Corbett Price, the Executive Chairman, were the "final decision-makers for all important matters" related to the Hospital's operations. *See id.*, ¶ 23; *see also id.*, ¶¶ 13–14, 22, 24.

Shortly after taking control, Veritas decided that the Hospital did not need a full-time CMO. *See id.*, ¶ 25.  Then-CEO Davis therefore informed Craig that his hours would be reduced to 20 per week and his annual salary reduced to $100,000. *See id.*  Boucree and Price allegedly "made the decision to reduce Dr. Craig's pay." *See id.*, ¶ 26.  On April 29, 2016, Davis sent a letter with the new terms to Craig. *See id.*, ¶ 27.  Craig did not agree in writing to modify his employment contract. *See id.*, ¶ 28.  He continued to work the minimum of 32 hours required by his original contract while the Hospital "paid him less than his contract required." *See id.*

On July 22, 2016, Craig and the Hospital's Chief Operating Officer, Charletta Washington, signed an agreement to renew his employment contract under terms that maintained Craig's 32-hour work week and $320,000 annual salary. *See id.*, ¶ 33.  In July or August of 2016, however, Washington told Craig that Hernandez, now CEO, would not restore Craig's compensation, even though Hernandez knew that Craig was continuing to work 32 hours per week. *See id.*, ¶¶ 31, 35.

Beginning in the fall of 2016 and continuing through 2017, Craig developed concerns that "the Hospital was engaged in some practices that compromised patient care and safety, and other practices that he reasonably believed violated federal and District of Columbia law." *See*

3

*id.*, ¶ 41.  Specifically, Craig learned that Hernandez and Veritas were directing Hospital employees to bolster the Hospital's financials by increasing patient admissions.  *See id.*  Craig "saw a number of examples of patients admitted to [the Hospital] for issues that did not meet admissions criteria, or for whom there lacked appropriate documentation to support an admission decision."  *See id.*  Further, on February 23, 2017, the Hospital's Chief Financial Officer met with Craig and the Hospital's Directors of Quality and Medical Records and shared a 2016 letter from KEPRO, a Medicare beneficiary.  *See id.*, ¶ 43.  The letter detailed KEPRO's findings that none of the charts it reviewed for patients with short stays at the Hospital met admission criteria, indicating that the Hospital should not have billed Medicare for those patients' stays.  *See id.*  Around the same time, Craig learned that the Chief Financial Officer had conducted an internal audit of patient admission records and determined that the Hospital would likely have to return $5 million to Medicare and Medicaid for improperly billed patient stays.  *See id.*, ¶ 49.

On February 24, 2017, Craig submitted an official complaint to the Hospital's Director of Human Resources, Eric Johnson.  *See id.*, ¶ 45.  The complaint explained that Hernandez's actions to increase patient admissions put the Hospital "at serious federal regulatory and financial risk."  *See id.*  The complaint further stated that Veritas's actions had put the Hospital's staff's careers and medical licenses in jeopardy.  *See id.*

Within two days, Craig met with Johnson and the Hospital's attorneys to discuss his complaint.  *See id.*, ¶ 46.  Craig "reported that he had learned from physicians that Mr. Hernandez had pressured [Hospital] employees to increase hospital admissions, without regard to medical necessity and proper documentation, to improve [the Hospital]'s finances," reiterating that "he and other physicians could lose their licenses by participating in this illegal behavior."

*See id.*  Craig also voiced his concern that Hernandez and Veritas "had deliberately undermined his role as CMO by excluding him from meetings with fellow doctors and reducing his pay . . . ." *See id.*  Johnson and others acknowledged that these were "serious" concerns and promised to investigate.  *See id.*, ¶ 47.  Craig believes that Hernandez and other Veritas officials soon learned of his official complaint and "became even more determined to remove him as CMO."  *See id.*, ¶ 48.

On April 21, 2017, an attorney for the Hospital presented Craig with modifications "to his original contract that would have resolved [his] concerns about the Hospital's unilateral reduction in his pay."  *See id.*, ¶ 53.  Specifically, those modifications would have made the terms of Craig's original employment contract retroactively effective from June 1, 2016, to May 31, 2017, and they also would have extended those terms to May 31, 2018.  *See id.*  Craig signed the agreement, but the contract modifications required the approval of the Hospital's Board to become effective.  *See id.*

On April 29, 2017, the Board met and discussed Craig's complaint against Veritas and his employment at the Hospital.  *See id.*, ¶ 55.  Hernandez told the Board that an official complaint had been made against Veritas, and that the concerns raised were being investigated.  *See id.*, ¶ 55.  The referenced complaint was the one that Craig made to Johnson in February 2017, and Craig believes that some members of the Board knew that Craig was the one who had filed it.  *See id.*  When the Board later discussed Craig's employment, Hernandez, at the direction of Boucree and Price, "urged the Board not only to reject the contract modifications but to remove Dr. Craig as CMO altogether."  *See id.*, ¶ 55–56.  Craig alleges that the Board did not

approve the modifications to his employment contract because of Hernandez's statements at the Board meeting. *See id.*, ¶ 55.

Meanwhile, public scrutiny of the Hospital began to mount. The *Washington Post* published an article on the Hospital's Medicare billing errors and its potentially dire financial straits in May 2017, and the D.C. Department of Health provisionally closed the Hospital's obstetrics program in August 2017. *See id.*, ¶¶ 61, 65. The D.C. Council's Committee on Health then held a hearing on the program's closure, which spurred the Council to investigate Veritas's stewardship of the Hospital. *See id.*, ¶¶ 67, 71. On November 3, 2017, the Committee on Health held a public oversight hearing on Veritas's management. *See id.*, ¶ 72. Craig submitted a letter to the Council that day, reporting that Veritas had mismanaged the Hospital and had engaged in other improper conduct that harmed the institution and its patients. *See id.*, ¶ 73. He explained that Veritas emphasized finances over quality and safety, reduced personnel who were necessary to ensure quality of care, and encouraged doctors to admit patients for the express purpose of maintaining high admissions numbers, resulting in "unjustifiable charges to the government." *See id.* Craig then testified at the hearing about his concerns regarding Veritas's malfeasance and mismanagement of the Hospital. *See id.*, ¶ 74.

On November 5, 2017, Boucree responded to the letter that Craig had sent to the D.C. Council in a letter to a Board member. *See id.*, ¶ 75. Boucree called sections of Craig's letter "false" and "misleading," and blamed Craig for some of the Hospital's shortcomings. *See id.*, ¶¶ 76–85. Craig alleges that Boucree "created the false implication that Dr. Craig had been derelict in his duties," *see id.*, ¶ 76, and knowingly made false and misleading statements about him. *See id.*, ¶¶ 81, 85.

6

On November 6, 2017, Craig sent a second letter to the D.C. Council, reiterating his concerns and rebutting the assertions made in Boucree's letter. *See id.*, ¶ 86. The next day, the Council voted not to extend Veritas's contract to manage the Hospital. *See id.*, ¶ 88. Two members of the Council stated that Craig's testimony regarding Veritas's mismanagement of the Hospital was an important factor in their decision to vote against renewal. *See id.* Craig alleges that Veritas and the Board "became livid" with him for testifying and "swiftly retaliated." *See id.*, ¶ 89. On November 8, 2017, Craig attended an executive leadership team meeting where Boucree claimed that Craig did not fulfill his duties in supervising the Hospital's primary care clinic and threatened to close it. *See id.*, ¶ 90. Two days later, Craig sent a letter to the Hospital's Board stating that Boucree was "attempting to discredit [him] and harm [his] professional reputation," and that Boucree was "retaliating against [him] for reporting Veritas's conduct to the City Council." *See id.*, ¶ 91. He requested that the Board take action to protect him from retaliation. *See id.*

On November 17, 2017, the Hospital informed Craig that it would not renew his contract, and that Craig would no longer be the CMO as of December 18, 2017. *See id.*, ¶ 92. D.C. councilmembers told the *Washington Post* that Craig had "provided valuable testimony about the operations at [the Hospital]" and that his termination "looks like [] classic retaliation." *See id.*, ¶ 94. On December 18, 2017, Craig left his employment as CMO. As a result of his termination, he alleges that he has suffered financial losses, emotional distress, and reputational damage. *See id.*, ¶ 98.

Six days before Craig's departure, on December 12, 2018, Veritas announced that the Hospital would need a "$17.1 million taxpayer bailout" to stay afloat. *See id.*, ¶ 96. Of that amount, $2 million was needed to repay Medicare for improper billing. *See id.*

## PROCEDURAL HISTORY

Craig filed suit on February 15, 2018; and he amended his Complaint on March 22, 2018. *See generally* ECF No. 1 (Complaint); Am. Compl. His Amended Complaint names five Defendants: (1) the Hospital, (2) Veritas, (3) Price, (4) Hernandez, and (5) Boucree. *See* Am. Compl., ¶¶ 1, 4–5. (Because they filed a single Motion to Dismiss, this Court will refer to Veritas, Boucree, and Price, collectively as the "Veritas Defendants.") Craig sues the Hospital and Veritas for retaliation under the False Claims Act, *see* 31 U.S.C. § 3730(h); retaliation under the D.C. False Claims Act, *see* D.C. Code § 2-381.04; whistleblower discrimination under the D.C. Whistleblower Protection Act, *see* D.C. Code § 2-223.02; and wrongful discharge. *See* Am. Compl., ¶¶ 100–41. Craig also brings a breach of contract claim against the Hospital, *see id.*, ¶¶ 142–47, and alleges that all Defendants violated the D.C. Wage Payment and Collection Law, *see* D.C. Code § 32-1302. *See* Am. Compl., ¶¶ 148–57. Finally, Craig contends that the Veritas Defendants and Hernandez tortiously interfered with his employment contract, *see id.*, ¶¶ 158–62; and that the Veritas Defendants defamed him, *see id.*, ¶¶ 163–68.

On June 4, 2018, Defendants filed three separate Motions to Dismiss Craig's Amended Complaint, arguing that their Motions should be granted under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See generally* ECF No. 15 (Hernandez's Motion to Dismiss); ECF No. 18 (Veritas Defendants' Motion to Dismiss); ECF No. 19 (Veritas Defendants' Memorandum Re Motion to Dismiss); ECF No. 20 (Hospital's Motion to Dismiss). Craig filed a combined

Memorandum in Opposition on August 3, 2018.  *See generally* ECF No. 26 (Plaintiff's Memorandum in Opposition to Motions to Dismiss).  Pursuant to Local Civil Rule 7(o)(1), the District of Columbia filed an amicus brief in support of the Hospital on December 18, 2018.  *See generally* ECF No. 30 (Amicus Brief of the District of Columbia); *see also* LCvR 7(o)(1) ("[A] state may file an amicus curiae brief without the consent of the parties or leave of Court.").  The Court held a motion hearing on January 22, 2019,[1] and the parties filed post-hearing memoranda afterwards.  *See* Minute Entry of January 22, 2019; ECF No. 36 (Hospital Post-Hearing Memorandum); ECF No. 38 (Plaintiff's Response to Defendant's Post-Argument Filings).

On January 17, 2019, Craig filed a Notice of Additional Authority, seeking to bolster his wrongful discharge claim.  *See* ECF No. 32 (Plaintiff's Notice of Additional Authority).  Then, on April 28, 2021, the Hospital requested leave to file a supplementary brief discussing how recent amendments to the D.C. Code supported its jurisdictional defenses.  *See generally* ECF No. 45 (Hospital's Motion for Leave to File Supplementary Brief).[2]  Subsequently, on two occasions in May 2021, the Hospital, the Veritas Defendants, and Hernandez requested that the Court take judicial notice of the Hospital's funding structure for 2021.  *See* ECF No. 48 (Defendants' First Motion to Take Judicial Notice); ECF No. 52 (Defendants' Second Motion to Take Judicial Notice).  On October 14, 2021, the Court granted the Hospital's request to file supplemental briefing and Defendants' requests to take judicial notice.  *See* ECF No. 54 (Order of October 14, 2021).  The parties then submitted briefs regarding the effect of the D.C.

---

[1]     A predecessor judge presided over the motion hearing.  After the hearing, the Veritas Defendants filed a Notice of Supplementary Authority.  *See* ECF No. 34.  Craig also filed a Notice of New Authority on May 10, 2019, *see* ECF No. 39, and the Hospital and Veritas Defendants filed a response, *see* ECF No. 40.

[2]     Craig opposed the Hospital's Motion, contending that more briefing would be "futile," *see* ECF No. 50, and the Hospital filed a Reply in support of its request, *see* ECF No. 53.

Council's 2019 and 2021 amendments to the Hospital's funding structure on this Court's jurisdiction.  *See generally* ECF No. 55 (Hospital's Supplemental Memorandum); ECF No. 56 (Plaintiff's Response to Supplemental Memorandum); ECF No. 57 (Hospital's Reply to Supplemental Memorandum).  The Motions to Dismiss are now ripe for review.

## LEGAL STANDARD

### I.    Subject-Matter Jurisdiction

When a defendant brings a Rule 12(b)(1) motion to dismiss, the plaintiff must demonstrate that the court has subject-matter jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000).  "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  *See Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  As a result, "the plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  *See id.* at 13–14 (cleaned up).

In policing its jurisdictional bounds, the court must scrutinize the complaint, treating its factual allegations as true and granting the plaintiff the benefit of all reasonable inferences that can be derived from the alleged facts.  *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020).  The court, however, need not rely "on the complaint standing alone," as it may also look to undisputed facts in the record or resolve disputed ones.  *See Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citations omitted).  By considering documents outside the pleadings on a Rule 12(b)(1) motion, a court does not convert the motion into one for

summary judgment, as "the plain language of Rule 12(b) permits *only* a 12(b)(6) motion to be converted into a motion for summary judgment" when a court considers documents extraneous to the pleadings.  *See Haase v. Sessions*, 835 F.2d 902, 905 (D.C. Cir. 1987) (emphasis original).

## II.    Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim upon which relief can be granted.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *see id.*, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

When considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor, "treat[ing] the complaint's factual allegations as true" and granting the plaintiff "the benefit of all inferences that can be derived from the facts alleged."  *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)).  Although a plaintiff may survive a Rule 12(b)(6) motion even if "'recovery is very remote and unlikely,'" *see Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," *see id.* at 555.

## ANALYSIS

The Court first addresses the threshold issue of whether sovereign immunity bars suit against the Hospital and the Veritas Defendants.  The Court then considers Defendants' challenges to the claims in Craig's Amended Complaint.  Because the Veritas Defendants do not

contest Count VIII, which alleges defamation, the Court does not address it.

I.     **Sovereign Immunity**

The Hospital contends that Craig's claims against it are barred by sovereign immunity because it is an instrumentality of the District of Columbia under D.C. Code § 44-951.02.  *See* ECF No. 20 (Hosp. MTD) at 12–18; ECF No. 28 (Hosp. Reply) at 2–10.  In its amicus brief, the District agrees that the Hospital should enjoy sovereign immunity because it is an instrumentality that "performs delegated public functions."  *See* ECF No. 30 (D.C. Amicus Brief) at 3–4.  The Veritas Defendants add that they are also immune from suit, contending that they enjoy derivative sovereign immunity as contractors for the Hospital.  *See* ECF No. 19 (Veritas MTD) at 5, 28; ECF No. 29 (Veritas Reply) at 6.

Although the District of Columbia holds sovereign immunity, *see Nealon v. Dist. of Columbia*, 669 A.2d 685, 690 (D.C. 1995), *Rieser v. Dist. of Columbia*, 563 F.2d 462, 474–75 (D.C. Cir. 1977), *modified on reh'g*, 580 F.2d 647 (D.C. Cir. 1978) (en banc), that immunity does not automatically extend to the Hospital.  Rather, to share the District's immunity the Hospital must be sufficiently a part of the District's government.  *See P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 872–74 (D.C. Cir. 2008) (analyzing whether entity was an "arm of the State," by considering "(1) the State's intent as to the status of the entity . . . ; (2) the State's control over the entity; and (3) the entity's overall effects on the state treasury"); *see also Galvan v. Fed. Prison Indus., Inc.*, 199 F.3d 461, 463 (D.C. Cir. 1999) (considering similar factors in deciding whether federal entity was "part of the sovereign" benefiting from United States' immunity).[3]  Next, even if the Hospital is entitled to shared immunity, that immunity must not be

---

[3]     Notably, these cases, relied on by the parties, address whether federal or Eleventh Amendment sovereign

waived by statute.  *See Tucci v. Dist. of Columbia*, 956 A.2d 684, 695 (D.C. 2008) (recognizing that sovereign immunity may be waived by statute).  Finally, the Hospital may claim sovereign immunity only for alleged actions that are discretionary, not ministerial.  *See Nealon*, 669 A.2d at 690.

The Court declines to decide whether the Hospital qualifies as an "arm" of the District. The parties have not provided detailed briefing on that issue of first impression, *see* Hosp. MTD at 13–14; Hosp. Reply at 3–4, 8; ECF No. 26 (Pl. Opp.) at 4–8; D.C. Amicus at 3–4, and the Court need not reach it.  Even assuming the Hospital could share the District's immunity, the Court concludes that the Hospital is not immune here:  Any immunity the Hospital could have enjoyed was waived; and, in any event, its alleged actions were ministerial.[4]

A.     The Hospital's Enabling Act Waives Any Sovereign Immunity

"A waiver of sovereign immunity must be 'unequivocally expressed in statutory text.'" *See Tucci*, 956 A.2d at 695 (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)).  Here, the Hospital's implementing statute, the Not-for-Profit Hospital Corporation Act ("NFPHC Act"), *see* D.C. Code §§ 44-951.01, *et seq.*, unequivocally waives immunity, at least for the employment-related claims Craig alleges.  The Act empowers the Hospital to "[s]ue and be sued in its corporate name."  *See* D.C. Code § 44-951.06(1).  Although a sue-and-be-sued provision

---

immunity apply.  The parties do not address whether a similar test should apply to entities of the District — which is not a state or the federal government.  *See Rieser*, 563 F.2d at 474 (addressing District's unique status).

[4]     Both the Hospital and the District contend that the Hospital is akin to the Washington Metropolitan Area Transit Authority ("WMATA"), and thus, like that agency, should enjoy the protection of sovereign immunity as a part of the District.  *See* Hosp. MTD at 13–14; D.C. Amicus at 5–6.  The comparison is inapt.  WMATA was created by an interstate Compact that designates it as an agency of the District of Columbia (as well as of Virginia and Maryland, which enjoy sovereign immunity under the Eleventh Amendment).  *See Morris v. Wash. Metro. Area Transit Auth.*, 781 F.2d 218, 220, 225 (D.C. Cir. 1986).  That Compact specifies that it waives sovereign immunity for "torts . . . committed in the conduct of any proprietary function," but preserves it for "torts occurring in the performance of a governmental function."  *See* D.C. Code § 9-1107.01(80).  No such language exists in the Hospital's governing statute.

alone is insufficient to show a waiver of immunity,[5] such a provision can "sustain the conclusion that there exists a general liability to be sued without reference to consent" if that conclusion is consistent with the statute as a whole.  *See People of Porto Rico v. Rosaly y Castillo*, 227 U.S. 270, 275 (1913); *see also Lott*, 373 F. Supp. 3d at 97 (determining NFPHC Act's "sue and be sued" clause in context establishes that Hospital is not immune from employment-law suits).

The statutory context supports the Hospital's amenability to suit.  The NFPHC Act explicitly grants the Hospital's employees the "same rights and obligations they enjoyed as employees" of the Hospital's predecessor, which was a private hospital subject to employee-protection laws and related common-law actions.  *See* D.C. Code § 44-951.10(a); *Lott*, 373 F. Supp. 3d at 96.  Further, the Act provides that the Hospital will "establish[] a personnel system subject to applicable laws," *see* D.C. Code § 44-951.08(b), language incompatible with a finding of immunity from those same laws.  *See Lott*, 373 F. Supp. 3d at 97.  Finally, the NFPHC Act allows the Hospital to retain outside counsel for litigation.  *See* D.C. Code § 44-951.14(c).[6] "This provision demonstrates that the District anticipated that [the Hospital], as an entity engaged in a commercial enterprise, would need to defend against a host of potential claims from a variety of litigants."  *See Lott*, 373 F. Supp. 3d at 97.

---

[5]     Craig argues that the NFPHC Act's "sue and be sued" provision creates a presumption that the Hospital has no immunity, citing *Ogugua v. Not-For-Profit Hospital Corporation*, 217 F. Supp. 3d 76, 78 (D.D.C. 2016).  *See* Pl. Opp. at 5.  This court has more recently determined that "its finding of a presumption of waiver in *Ogugua* was a mistake."  *See Lott v. Not-For-Profit Hosp. Corp.*, 373 F. Supp. 3d 92, 95 (D.D.C. 2019).  *Ogugua* relied on the Supreme Court's determination that *federal* instrumentalities with organic statutes that contain sue-and-be-sued clauses have presumptively waived sovereign immunity.  *See Ogugua*, 217 F.Supp.3d at 78 (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)).  The law is silent on whether sue-and-be-sued clauses create such a presumption for District agencies or instrumentalities.  *See Lott*, 373 F. Supp. 3d at 95; *see also George Hyman Const. Co. v. Wash. Metro. Area Transit Auth.*, 816 F.2d 753, 759–60 (D.C. Cir. 1987) (looking to Virginia law, not federal law, to determine whether WMATA's sue-and-be-sued clause created the presumption of waiver).

[6]     The provision states: "The Corporation may retain outside counsel, other than the Attorney General, at its own expense to provide representation for the Corporation and its officers and employees in actual or anticipated litigation related to their official duties and functions or in any other legal proceeding, lawsuit, grievance, or arbitration filed against the Corporation, its officers, or its employees."  *See* D.C. Code § 44-951.14(c).

The Hospital relies on statutory provisions governing the District of Columbia's immunity to argue that it, too, is immune from suit.  *See* Hosp. MTD at 15–18.  The Hospital points out that D.C. Code § 1-102, which established the District as a corporate body, contains a "sue and be sued" provision yet the District maintains immunity.  *See* Hosp. MTD at 16.  Indeed, the D.C. Code expressly preserves the District's immunity.  *See* D.C. Code § 1-109(d) ("Nothing in this section shall be construed as a waiver of sovereign immunity . . . .").  The D.C. Code also waives sovereign immunity for the District in "action[s] based upon a written procurement contract executed on behalf of the District government."  *See* D.C. Code § 2-359.04.  In the Hospital's view, these latter two sections would be superfluous if the District's sue-and-be-sued clause waived the District's immunity.  *See* Hosp. MTD at 16–17.  Therefore, the Hospital contends, these provisions demonstrate that the sue-and-be-sued clause in the Hospital's enabling act also does not waive the Hospital's immunity.  *See id.*

That analysis is incomplete, at best.  Reading the District's establishing provisions as a whole, and comparing them to the NFPHC Act, the statutes cited by the Hospital actually support the conclusion that the NFPHC Act waives the Hospital's immunity.  *See Am. Fed'n of Gov't Emps., Local 2782 v. Fed. Lab. Rels. Auth.*, 803 F.2d 737, 740 (D.C. Cir. 1986) ("It is a generally accepted precept of interpretation that statutes or regulations are to be read as a whole").  The sections of the D.C. Code cited by the Hospital demonstrate only that the sue-and-be-sued provision in the NFPHC Act might be ambiguous if viewed in isolation, *see People of Porto Rico*, 227 U.S. at 275, but the Act includes specific references to the Hospital's susceptibility to suit, discussed *supra*, that are not included in the District's establishing provisions.  The Hospital utterly fails to grapple with those highly significant parts of the

NFPHC Act.  *See* D.C. Code. §§ 44-951.10(a), 44-951.08(b), 44-951.14(c).  Moreover, as the Hospital acknowledges, the D.C. Code expressly preserves the District's immunity (subject to specific exceptions), *see* D.C. Code § 1-109(d); but the NFPHC Act contains no similar provision, *see* D.C. Code § 44-951.01, *et seq*.  The Court therefore is unpersuaded by the Hospital's attempt to analogize the sue-and-be-sued provision in the NFPHC Act to the similar provision in the legislation establishing the District.

      B.      <u>The Hospital's Alleged Conduct was Ministerial</u>

In any event, even if the Hospital shared the District's immunity, its alleged actions would not be protected under the circumstances Craig alleges.  Sovereign immunity applies "only if the act complained of was committed in the exercise of a discretionary function," not a ministerial one.  *See Wade v. Dist. of Columbia*, 310 A.2d 857, 860 (D.C. 1973).  Discretionary acts "involve the formulation of policy" and generally "require personal deliberation, decision and judgment."  *See Nealon*, 669 A.2d at 690 (citations omitted).  In contrast, "ministerial acts involve the execution of policy[,] . . . require little or no judgment, and generally constitute mere obedience to orders or performance of a duty."  *See id.* (citations omitted). The "discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action" for "governmental actors" to follow.  *See Casco Marina Dev., LLC v. Dist. of Columbia Redev. Land Agency,* 834 A.2d 77, 81–82 (D.C. 2003) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).

Craig's claims under the federal and D.C. False Claims Act, D.C. Whistleblower Protection Act, and D.C. Wage Payment and Collection Law rely on the Hospital's failure to perform ministerial acts.  *See* Am. Compl., ¶¶ 100–32, 148–57.  Each of the cited statutes

prescribes specific courses of action for the Hospital, requiring it to pay its employees in a timely manner, *see* D.C. Code § 32-1302, and prohibiting it from taking adverse personnel actions because an employee has engaged in certain protected activities, *see* 31 U.S.C. § 3730(h); D.C. Code § 2-381.04; D.C. Code § 2-223.02.  Because Craig's claims are premised on the Hospital's alleged violation of these mandatory statutory directives, the Hospital cannot benefit from discretionary immunity.  *See Casco Marina Dev.,* 834 A.2d at 82.

Craig's breach-of-contract claim similarly implicates ministerial acts.  *See* Am. Compl., ¶¶ 142–57.  "[P]erformance under a . . . contract neither requires nor leaves room for discretion." *See Casco Marina Dev.*, 834 A.2d at 81.  Thus, once a contract existed, the Hospital was "ministerially bound as a contracting party . . . unless and until *both parties to the contract agree*[*d*] to amend it."  *See id.* at 82 (emphasis original).  Craig alleges that the parties never altered their contract, and this Court must accept that allegation at this stage.  *See Sparrow*, 216 F.3d at 1113; *see also infra* Section V.  The Hospital was thus ministerially bound to follow the contract's terms.  *See Casco Marina Dev.*, 834 A.2d at 81–83.[7]

C.    Veritas's Claim of Derivative Sovereign Immunity

Veritas has no derivative sovereign immunity.  Federal contractors may benefit from sovereign immunity so long as their actions are "'authorized and directed by the Government of the United States,' and 'performed pursuant to the Act of Congress' authorizing the agency's activity."  *See In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019) (quoting *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166–67 (2016)).  Veritas cites

---

[7]     The Court does not address Craig's wrongful discharge claim (Count IV) because it determines, *infra* Section IV, that the claim must be dismissed.  Moreover, it has already sufficiently determined that the Hospital waived immunity on those claims, *supra* Section I.A, such that this Court can exercise jurisdiction at this stage.

no authority applying this doctrine to District of Columbia contractors.  *See In re Fort Totten Metrorail Cases Arising Out of Events of June 22, 2009*, 895 F. Supp. 2d 48, 74 (D.D.C. 2012) (noting that derivative immunity "has been almost exclusively applied in cases involving *federal* government contractors").  In any event, because the Hospital is not immune, Veritas cannot be either.  *See In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d at 70 (determining that federal contractor could not derive immunity that agency had waived).

## II.    Retaliation under the Federal False Claims Act and D.C. False Claims Act

Turning to the merits, the Hospital and Veritas argue that Craig's claims under the anti-retaliation provisions of the federal and District of Columbia False Claims Acts, *see* Am. Compl., ¶¶ 100–122 (Count I and II), must be dismissed.  *See* Hosp. MTD at 25–27; Veritas MTD 14–23.  There is no material difference between the two Acts' anti-retaliation provisions,[8] so the Court considers these claims together.  *See Hicks v. Dist. of Columbia*, 183 F. Supp. 3d 159, 162 (D.D.C. 2016) (explaining that Acts are almost identical and analyzing claims under

---

[8]     Under the federal False Claims Act:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

*See* 31 U.S.C. § 3730(h)(1).  While under the D.C. False Claims Act:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this subchapter or other efforts to stop one or more violations of this subchapter.

D.C. Code § 2-381.04(a); *see also id.* § 381.02 (covering only "false or fraudulent claims").

18

them together).

To state a claim for unlawful retaliation under either Act, Craig must allege that he engaged in a protected activity, that the Defendants had notice of that activity, and that he was retaliated against because of that activity.  *Compare Singletary v. Howard Univ.*, 939 F.3d 287, 293 (D.C. Cir. 2019) (explaining federal Act requires plaintiff to plead "(i) that she engaged in protected activity, (ii) because of which she was retaliated against," and "(a) that the employer knew she was engaged in protected activity, and (b) that the retaliation was motivated at least in part by her protected activity" (internal citations omitted)), *with Clayton v. Dist. of Columbia*, 374 F. Supp. 3d 119, 140 (D.D.C. 2019) (explaining District Act requires plaintiff to plead "(1) that . . . []he engaged in protected activity  . . . , (2) that the defendant had knowledge that the plaintiff engaged in such protected activity, (3) that the defendant terminated the plaintiff's employment, and (4) that there was a causal connection").  Craig's allegations satisfy each of these elements.[9]

Protected activities include "investigating" or "attempting to prevent" false or fraudulent claims that "reasonably could lead" to a False Claims Act suit.  *See U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998) (addressing federal Act); *see also Clayton*, 374 F. Supp. 3d at 140 (defining protected activity under D.C. Act as "investigat[ing] or otherwise attempt[ing] to prevent" false claims).  Here, Craig claims that, under Veritas's direction, the Hospital was billing Medicaid and Medicare for improper patient admissions.  *See*

---

[9]     Defendants initially argued that these claims are subject to the higher pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure.  *See* Hosp. MTD at 1–2, 21–27; Veritas MTD at 13–19.  They now concede that retaliation claims under the federal False Claims Act "need satisfy only Rule 8's general pleading requirements." *See U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004); Hosp. Reply at 11; Veritas Reply at 1.

Am. Compl., ¶¶ 41, 43–49.  Such improper billing could reasonably form the basis of a claim

under the Acts.  *See* 31 U.S.C. § 3729(a)(1)(A)–(B); D.C. Code § 2-381.02(1)–(2).[10]  Craig

allegedly investigated and tried to stop the improper billing by discussing the issue with other

doctors, *see* Am. Compl., ¶ 41; "direct[ing] . . . hospitalists not to admit patients who did not

meet admissions criteria," *see id.*; submitting an official complaint to Johnson in Human

Resources, *see id.*, ¶¶ 44–45; meeting with Johnson and Hospital attorneys, *see id.*, ¶¶ 46–47;

and providing a letter and testimony on the issues to the D.C. Council, *see id.*, ¶¶ 73–74, 86.

Craig therefore allegedly engaged in protected activity.  *See U.S. ex rel. Schweizer v. Oce N.V.*,

677 F.3d 1228, 1240 (D.C. Cir. 2012) (sharing concerns about potential false claims and

evidence documenting such claims with supervisors and counsel is protected activity); *see also*

*Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 100 (D.D.C. 2014) ("'protected activity'

should be interpreted broadly" (quoting *Yesudian*, 153 F.3d at 740)).

Craig's allegations also meet the Acts' other requirements.  He claims that the Hospital

and Veritas knew about all his protected activities, *see* Am. Compl., ¶¶ 104, 106–07; and that is

the only type of notice required.  *See Schweizer*, 677 F.3d at 1238 (employer need only be aware

of employee's protected activity, not the potential for a false-claims suit).  Additionally, Craig

---

[10]      An additional clarification is in order.  Craig bases his claims under the federal and D.C. False Claims Acts
on false claims that the Hospital submitted to Medicare and Medicaid. *See* Pl. Opp. at 19–21.  While Medicaid is
funded through a federal-state partnership, Medicare is funded entirely by the federal government.  *Compare Nat'l
Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 541–42 (2012) ("Enacted in 1965, Medicaid offers federal funding to
States to assist pregnant women, children, needy families, the blind, the elderly, and the disabled in obtaining
medical care"), *with Univ. of Colorado Health at Mem'l Hosp. v. Becerra*, 531 F. Supp. 3d 10, 13–14 (D.D.C. 2021)
("Medicare is a federal program that funds health insurance for the elderly and disabled.").  Because the D.C. False
Claims Act covers only false claims made to the D.C. government, Craig's claim for retaliation under the D.C. False
Claims Act can be premised only on protected activity relating to fraudulent Medicaid claims, while his federal
False Claims Act claim can be based on both false Medicare and Medicaid claims.  *See Hicks*, 183 F. Supp. 3d at
162 (explaining that D.C. False Claims Act concerns false claims to the District, not the federal government).

claims that the Hospital and Veritas retaliated against him by "excluding him from meetings, marginalizing him and stripping his duties and responsibilities," as well as ultimately "terminating his employment," *see* Am. Compl., ¶¶ 105–108, as the Acts prohibit.  *See* 31 U.S.C. § 3730(h)(1) (prohibiting discharge, demotion, harassment, and "any other manner" of discrimination); D.C. Code § 2-381.04(a) (same).  Finally, Craig alleges that the Hospital and Veritas took these adverse actions because of his protected activities, specifically pointing to the fact that they terminated his employment just two weeks after his testimony before the D.C. Council.  *See* Am. Compl., ¶ 109; *Schweizer*, 677 F.3d at 1240 (determining that a causal connection existed where relator was fired two weeks after disclosing fraud suspicions to defendants).[11]

The Hospital and Veritas argue that Craig's claims still fail because news media reported on the Hospital's Medicare overbilling before Craig testified to the D.C. Council.  *See* Hosp. MTD at 26, 27 n.22, 28; Veritas Reply at 4.  Although the federal and D.C. False Claims Acts require courts to dismiss claims based on "allegations or transactions" that have already been disclosed by "news media," *see* 31 U.S.C. § 3730(e)(4)(A)(iii), D.C. Code § 2-381.03(c-1)(1)(C), those limitations only "block[] *qui tam* suits" where private citizens bring claims on the government's behalf.  *See U.S. ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 86 (D.C. Cir. 2014); *see also* D.C. Code § 2-381.03(c-1)(2)(A) ("A court shall not dismiss an action or claim as provided in paragraph (1) of this subsection if: The action is brought by the Attorney

---

[11]     Because the Court denies Defendants' Motions to Dismiss the federal False Claims Act count, the Court has federal question jurisdiction over this case, *see* 28 U.S.C. § 1331, and can exercise supplemental jurisdiction over claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See* 28 U.S.C. § 1367; *infra* Sections VI–VII.  Therefore, the Court need not to consider whether the Hospital is amenable to diversity jurisdiction.  *See* Hosp. MTD at 19–20.

General for the District of Columbia").  The anti-retaliation provisions of the Act are not so limited: they protect employee activities furthering not only *qui tam* suits, but also claims that may be brought by the federal or District governments.  *See* 31 U.S.C. § 3730(h)(1); D.C. Code § 2-381.04(a); *Schweizer*, 677 F.3d at 1237 ("it is important to recognize that when § 3730(h) speaks of acts 'in furtherance of an action under this section' it is not referring only to *qui tam* actions . . . [:] an employee's actions may further a *qui tam* suit or a suit by the United States").  In fact, an employee may bring a retaliation action even if he cannot pursue, or never considers pursuing, a *qui tam* action.  *See Schweizer*, 677 F.3d at 1238; *see also Pencheng Si*, 71 F. Supp. 3d at 99 ("[A]n action brought under the FCA's retaliation provision can survive even when the underlying FCA fraud counts have been dismissed." (citation omitted)).  The Court therefore is not persuaded that the public-disclosure bar applies to the Acts' anti-retaliation provisions and declines to dismiss Craig's claims on that basis.

The Hospital and Veritas further contend that Craig's alleged protected activities were consistent with his job responsibilities as CMO, and so they cannot form the basis of a False Claims Act action.  *See* Hosp. Reply at 14; Veritas's Notice of Supplementary Authority at 1–3 (citing *Brady v. Liquidity Services, Inc.*, No. 18-cv-1040, 2018 WL 6267766 (D.D.C. Nov. 20, 2018)).  Yet Craig alleges that he testified about his employer's conduct before the D.C. Council, an activity that is surely beyond the scope of a CMO's ordinary duties.  *See* Am. Compl., ¶¶ 73–74.  His anti-retaliation claims therefore survive the Defendants' motions to dismiss.

## IV.    Whistleblower Protection Act

The Hospital and Veritas move to dismiss Count III of Craig's Amended Complaint, which claims that they violated the D.C. Whistleblower Protection Act ("DCWPA"), D.C. Code

§ 2-223.02(a).  *See also* D.C. Code § 2-223.01(3) (defining employees under this section of the Act to include those of "an instrumentality of the District government").  To bring a claim under the Act, a plaintiff must allege that "(1) he made a protected disclosure and/or refused to comply with an illegal order; (2) Defendant took an adverse employment action against him; and (3) Plaintiff's disclosure and/or refusal to comply with an illegal order was a 'contributing factor' to Defendant's decision to take the adverse employment action."  *See Kakeh v. United Plan. Org., Inc.*, 655 F. Supp. 2d 107, 115 (D.D.C. 2009); *accord Crawford v. Dist. of Columbia*, 891 A.2d 216, 218 (D.C. 2006).

Craig alleges that he made three protected disclosures.  For a disclosure to be protected, an employee must "reasonably believe" his disclosure evinces one of the circumstances delineated in the Act, such as "gross misuse or waste of public resources or funds;" or "a violation of a federal, state, or local law, rule, or regulation."  *See* D.C. Code § 2-223.01(7)(A)–(E); *Kakeh*, 655 F. Supp. 2d at 116.  Craig's first two disclosures came in February 2017, when he filed his official complaint with Johnson reporting that "Hernandez had put the hospital at serious federal regulatory and financial risk"; and then met with Johnson and the Hospital's attorneys to elaborate that "Hernandez was pressuring doctors to admit patients without regard to medical necessity and proper documentation."  *See* Am. Compl., ¶¶ 45–46, 127.  His next disclosure was in November 2017, when he "wrote a letter to the City Council and testified . . . that Veritas . . . violate[d] the law when Mr. Hernandez pressured doctors to admit patients who did not meet the admissions criteria."  *See id.*, ¶¶ 73–74, 128.  An outside audit allegedly documented the same type of behavior.  *See id.*, ¶ 43 (alleging that 2016 external audit report detailed "findings that 100% of the charts that were audited . . . did not meet criteria for inpatient

23

admission"). The Amended Complaint thus easily meets the standard for alleging protected disclosures; and further establishes that Craig's beliefs were not "purely subjective," and were therefore reasonable. *See Zirkle v. Dist. of Columbia*, 830 A.2d 1250, 1259–60 (D.C. 2003).

Further, Craig sufficiently alleges that he experienced prohibited personnel actions and that the actions were motivated by his disclosures. *See Kakeh*, 655 F. Supp. 2d at 115. He claims that the Hospital and Veritas did not renew his contract in April 2017, and then terminated him in November 2017. *See* Am. Compl., ¶¶ 55–57, 92, 130. "[T]ermination," "demotion," and "failure to hire . . . or take other favorable personnel action" are all prohibited personnel actions. *See* D.C. Code § 2-223.01(6). The Amended Complaint also details how Craig's disclosures were "contributing factors" in the Hospital's decision to take action against him. *See* D.C. Code § 2-223.01(2) ("'Contributing factor' means any factor which, alone or in connection with other factors tends to affect in any way the outcome of the decision."). Craig alleges that the Board's failure to approve the renewal of his contract and the restoration of his original contract terms occurred right after Hernandez informed the Board the Craig had filed an official complaint against Veritas. *See* Am. Compl., ¶¶ 55 (Hernandez "advised [the Board] that an official complaint had been made against Veritas" and "some members of the Board . . . were aware" that Craig filed it), 127–28. In addition, Craig's employment was terminated just two weeks after his testimony before the D.C. Council. *See id.*, ¶¶ 92, 130, 131. The Amended Complaint therefore sufficiently states each element of a DCWPA claim.

None of Veritas's or the Hospital's contrary arguments is persuasive. On the first element, the Hospital urges that Craig's February 2017 complaints were too vague to qualify as public disclosures because he did not identify specific instances of overbilling. *See* Hosp. MTD

at 28.  Yet Craig's allegations demonstrate that his concerns went beyond particular patients and sought to address a "culture" and pattern of unlawfully increasing patient admissions.  *See* Am. Compl., ¶¶ 45–46, 127.  Veritas and the Hospital do not explain why complaints about such behavior would be unprotected.  Similarly, the Hospital argues that Craig's testimony to the D.C. Council could not provide the basis for a whistleblower claim because it was already publicly known.  *See* Hosp. MTD at 28–29.  The authority it cites for a purported bar on reiterating public matters, however, is scant.  *See* Hosp. MTD at 28–29 (citing *Wilburn v. Dist. of Columbia*, 957 A.2d 921, 925 (D.C. 2008)).[12]  Even if such a requirement existed, the Court finds at this preliminary stage that Craig's alleged disclosures were sufficient—they provided details and context not yet publicly addressed.  *See* Pl. Opp. at 26; Am. Compl., ¶¶ 73–74, 86.

For its part, Veritas contends that Craig's claim is untimely.  Veritas measures the statute of limitations from when Craig allegedly became aware of its malfeasance, *see* Veritas MTD at 5, but the appropriate measure of time is from its alleged retaliation.  *See, e.g., McCall v. Dist. of Columbia Hous. Auth.*, 126 A.3d 701, 705–07 (D.C. 2015) (calculating statute of limitations period based on time of alleged retaliatory acts).  Because Craig filed suit on February 15, 2018, which is within one year of the allegedly prohibited personnel actions in April and November 2017, his DCWPA claim is timely and may proceed.  *See* D.C. Code § 2-223.03(a) ("A civil action shall be filed within 3 years after a violation occurs or within one year after the employee first becomes aware of the violation, whichever occurs first.").

---

[12]     *Wilburn* cites *Meuwissen v. Department of Interior*, which interprets the federal Whistleblower Protection Act, and whose holding on protected disclosures was later superseded by statute. *See* 234 F.3d 9, 13 (Fed. Cir. 2000); *see also O'Donnell v. Merit Sys. Prot. Bd.*, 561 F. App'x 926, 930 (Fed. Cir. 2014) ("The legislature's . . . objection to the holding in *Meuwissen* was the idea that 'disclosures of information already known are not protected.'" (citing S. Rep. No. 112–155, 2012 U.S.C.C.A.N. 589 at 5)).

IV.     **Wrongful Discharge**

The Hospital and Veritas argue that Craig's fourth claim, alleging that his discharge was

wrongful and against public policy, must be dismissed.  *See* Hosp. MTD at 29–31; Veritas MTD

at 25.  This Court agrees.

"The tort of wrongful discharge in violation of public policy is a limited exception to the

general rule in the District of Columbia that an at-will employee may be discharged 'at any time

and for any reason, or for no reason at all.'"  *See Clay v. Howard Univ.*, 128 F. Supp. 3d 22, 27

(D.D.C. 2015) (quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C.1991)).

Even assuming that Craig's employment was at will at the time of his termination,[13] he has not

alleged a wrongful-discharge claim.  To do so, a "plaintiff must point to 'some identifiable

policy that has been officially declared in a statute or municipal regulation, or in the

Constitution,' and a 'close fit between' the policy 'and the conduct at issue in the allegedly

wrongful termination.'"  *See id.* (quoting *Davis v. Cmty. Alternatives of Wash., D.C., Inc.*, 74

A.3d 707, 709–710 (D.C. 2013) (cleaned up).  A plaintiff may not bring a wrongful discharge

action, however, "where the very statute creating the relied-upon public policy already contains a

specific and significant remedy for the party aggrieved by its violation."  *See Elemary v. Philipp*

*Holzmann A.G.*, 533 F. Supp. 2d 116, 136 (D.D.C. 2008) (quoting *Nolting v. Nat'l Cap. Grp.,*

*Inc.*, 621 A.2d 1387, 1390 (D.C. 1993)).

Craig's claim is foreclosed to the extent that it is premised on the public policy against

---

[13]     Although Craig contends that he was never an at-will employee at some points in his opposition, he appears
to argue in the alternative that he was an at-will employee for the purpose of analyzing his wrongful-discharge
claim.  *See* Pl. Opp. at 44.  If Craig was not an at-will employee at the time of his termination on November 17,
2017, then he cannot make out a claim for wrongful discharge, and his fourth count must be dismissed for that
reason.  *See Clay*, 128 F. Supp. 3d at 27.

discharging or otherwise punishing whistleblowers.  *See* Am. Compl., ¶¶ 133–41.  The DCWPA

"already contains a specific and significant remedy for the [plaintiff] aggrieved by its violation,"

and Craig seeks to avail himself of that remedy.  He therefore cannot also invoke the tort of

wrongful discharge.[14]  *See Elemary*, 533 F. Supp. 2d at 136; *see also Jones v. Dist. of Columbia*

*Water and Sewer Auth.*, 943 F. Supp. 2d 90, 96 (D.D.C. 2013) (dismissing wrongful-termination

claim on the grounds that the DCWPA already provides relief).

Craig protests that he also relies on his actions directing physicians and employees to stop

admitting patients who did not meet eligibility criteria in violation of local patient record-

keeping regulations 22-B D.C. Mun. Regs. § 2024 and § 2030.  *See* Hearing Transcript at 20:4–

10; Am. Compl., ¶¶ 41, 135.  Even if those regulations evince a "clear mandate of public policy,"

Craig still needs to allege that his actions were the "predominant cause" of his termination.  *See*

*Davis*, 74 A.3d at 710.  He has not done so.  Craig's attempts to countermand Veritas's

admissions decisions purportedly began "in the fall of 2016 and continu[ed] through early 2017,"

*see* Am. Compl., ¶ 41, and the Hospital and Veritas were aware of those efforts, *see id.*, ¶ 137.

Yet Craig was not terminated until November 2017.  *See id.*, ¶ 92.  Because there was nearly a

year between the beginning of his attempts to follow the regulations and his termination, the

timing of those events cannot support a reasonable inference that he was terminated because of

his actions to warn hospital employees and physicians.  *Cf. Wilson v. Mabus*, 65 F. Supp. 3d 127,

133 (D.D.C. 2014) (explaining that four months between protected act and alleged retaliation

---

[14]     The Court has taken note of Craig's citation to *Carl v. Children's Hosp.*, 702 A.2d 159 (D.C. 1997), for the
proposition that testifying on issues affecting public policy can provide a basis for a wrongful-discharge claim.  The
Court is not persuaded by that decision.  *See* Pl. Notice of Add'tl Authority.  *Carl* is a deeply fractured opinion, with
one opinion of the court, four separate concurrences, and one dissent.  *See Carl v. Children's Hosp.*, 702 A.2d 159.
Plaintiff cherry-picks one of those concurrences to support his position; the remarks in the concurrence, however, do
not amount to an authoritative statement of law.

was too attenuated to support a Title VII retaliation claim); *see also Rae v. Children's Nat'l Med. Ctr.*, No. 15-cv-736, 2020 WL 7693612, at *10 (D.D.C. Dec. 28, 2020) (discussing case law on timing in Title VII retaliation claims as analogous to wrongful-discharge claims). Craig does not allege any other connection between his attempts to enforce those regulations and his firing. Tellingly, his counsel asserted that Craig was fired chiefly because of his testimony to the D.C. Council. *See* Hearing Transcript at 18:11–21 ("Our complaint alleges that [his testimony to the D.C. Council] was really the last straw; that's what got him fired."). But, as noted, Craig's testimony is otherwise protected by the DCWPA, *see supra* at 27, and therefore cannot support a wrongful discharge claim. Accordingly, the Court will grant the motion to dismiss Count IV.

## V.      Breach of Contract

The Hospital next contends that Craig's fifth count, which alleges that the Hospital breached his employment contract by paying him less than promised after May 2016, should be dismissed because the contract ended before the Hospital reduced Craig's salary. *See* Hosp. MTD at 31–32. The Court finds the Hospital's argument unconvincing.

Craig alleges all four elements of a breach of contract claim: the existence of a contract, his performance of its obligations, the Hospital's breach, and damages. *See Badwal v. Bd. of Trs. of Univ. of Dist. of Columbia*, 139 F. Supp. 3d 295, 319 (D.D.C. 2015). He claims that he and the Hospital formed an annual contract, dated June 3, 2015, to work 32 hours per week for a base salary of $320,000 per year that continued to control his employment absent a written modification. *See* Am. Compl., ¶¶ 144–45. Despite the Hospital's contrary arguments, the Amended Complaint also establishes that this contract continued to govern after June 2016. *See id.*, ¶ 145. Neither party "clearly and manifestly indicate[d]" that it no longer wished to be

28

bound by the terms of the original contract, and so its material terms survived. *See Hahn v. Univ. of Dist. of Columbia*, 789 A.2d 1252, 1258 (D.C. 2002) (citations omitted).[15]  Craig "did not execute a written modification to the Employment Contract as required by the original contract's terms."  *See* Am. Compl., ¶ 28.  Further, after his pay was cut, the Hospital's representatives, including its Chief Operating Officer and attorney, made multiple overtures "to restore him to his original pay rate, with back pay."  *See id.*, ¶ 40; *see also id.* ¶¶ 35, 53–54.  Indeed, when the Hospital's Board declined to approve contract modifications that would have restored Craig's pay prospectively and retroactively, the attorney told Craig that "the Board did not vote on his contract and needed more time to obtain information," not that the Board wished to sever the Hospital's relationship with Craig.  *See id.*, ¶ 57.

Craig also alleges that he performed his material obligations, as he "continued to work a minimum of 32 hours per week" throughout his tenure at the Hospital.  *See id.*, ¶ 28.  Nevertheless, the Hospital allegedly breached by paying him less than the contract required.  *See id.*, ¶ 146 ("Beginning in May 2016 and continuing to the last date of his employment, December 17, 2017, [the Hospital] paid Dr. Craig less than he was owed under his contract.").  Finally, as a result of this breach, Craig alleges that he "has suffered economic damages."  *See id.*, ¶ 147.  His breach of contract claim easily survives the Hospital's Motion to Dismiss.

## VI.    D.C. Wage Payment and Collection Law

---

[15]    The Hospital argues that it clearly rejected Craig's request to return to work at his original salary and hours. *See* Hosp. Reply at 18–19 (citing Am. Compl., ¶ 35).  Although the Hospital is correct that the Amended Complaint states that "Hernandez and Veritas [did] not agree to restore his compensation" in the summer of 2016, there are concurrent and later statements that indicate representatives of the Hospital were trying to restore Craig's compensation consistent with his original contract. *See* Am. Compl., ¶¶ 35, 40, 53–54.  On a motion to dismiss, the Court must construe a complaint liberally in the plaintiff's favor, "treat[ing] the complaint's factual allegations as true" and granting the plaintiff "the benefit of all inferences that can be derived from the facts alleged."  *Sparrow*, 216 F.3d at 1113.

The Hospital, the Veritas Defendants, and Hernandez move to dismiss Craig's claim that they violated the D.C. Wage Payment and Collection Law ("DCWPCL").  *See* Hosp. MTD at 32–34; Veritas MTD at 26; ECF No. 15 (Hernandez MTD) at 3–4; ECF No. 27 (Hernandez Reply) at 3–4; Am. Compl., ¶¶ 148–57 (Count VI).  That statute requires an employer to "pay all wages earned to his or her employees on regular paydays designated in advance by the employer and at least twice during each calendar month."  *See* D.C. Code § 32-1302.  While Craig's contract provided for a $320,000 annual salary in exchange for 32 hours of work per week, *see* Am. Compl., ¶ 154, the Hospital paid him only $100,000 per annum based on a proposed 20-hour work week beginning in May 2016.  *See id.*, ¶ 156.  Because Craig allegedly continued to work at least 32 hours per week without being properly compensated for his time, *see id.*, ¶ 154, he adequately pleads a violation of the DCWPCL.

The Hospital contends that this claim should nevertheless be dismissed because the Hospital is an "agency" of the District of Columbia and therefore not an employer subject to liability under the DCWPL.  *See* Hosp. MTD at 32–34; Hosp. Reply at 19–21; *see also* D.C. Code § 32-1301(1B) (excluding District agencies from definition of employer under the DCWPL).  As the Hospital has argued in this and other litigation, however, it is an "instrumentality," not an agency.  *See* D.C. Code § 44-951.02; *see also UMC Dev., LLC v. Dist. of Columbia*, 982 F. Supp. 2d 13, 18 (D.D.C. 2013) (distinguishing instrumentalities and agencies, and stating that "[t]he Council of the District of Columbia created NFPHC as 'an instrumentality of the District'").  Since "the definition of an employer is to be broadly construed," *Partridge v. Am. Hosp. Mgmt. Co., LLC*, 289 F. Supp. 3d 1, 14 (D.D.C. 2017), and the DCWPCL does not specify any exception for instrumentalities, the Court determines that the

Hospital qualifies as an employer.[16]

The Veritas Defendants and Hernandez similarly dispute their status as employers under the Act.  *See* Veritas MTD at 26; Hernandez MTD at 3–4; Hernandez Reply at 3–4.  To determine whether an entity or person is an employer, courts consider "the totality of the circumstances of the relationship between the plaintiff/employee and defendant/employer to determine whether the putative employer has the power to hire and fire, supervise and control work schedules or conditions of employment, determine rate and method of pay, and maintain employment records."  *See Partridge*, 289 F. Supp. 3d at 14.  Here, the Amended Complaint establishes that Veritas and its employees "had control over [Craig's] employment" and have been his "joint employers" since April 15, 2019.  *See* Am. Compl., ¶¶ 150–51; *Partridge*, 289 F. Supp. 3d at 14 ("an employee may have more than one employer under the law").  Veritas allegedly exercised "operational control" over the Hospital, *see Partridge*, 289 F. Supp. 3d at 14, with Hernandez specifically serving as the Chief Restructuring Officer and then as the CEO.  *See* Am. Compl., ¶¶ 150, 22–23.  Further, the Veritas Defendants directed Hernandez to reduce

---

[16]     The Hospital additionally argues that it is not an employer because, even if it is not an agency, it is a "governmental organization" that is part of the District.  *See* Hosp. Reply at 19–22.  In support, it contends that the DCWPL is similar to the DCWPA and cites a case determining that the Hospital could be sued under the DCWPA because there was no reason to treat the Hospital, "as an 'instrumentality' of the District government . . . any differently from the government entities listed in" the DCWPA.  *See id.* at 21 (quoting *Lott v. Not-for-Profit Hosp. Corp.*, 319 F. Supp. 3d 277, 284 (D.D.C. 2018)).  Although overlooked in *Lott*, District of Columbia law actually distinguishes between employees of instrumentalities and employees of the District and its agencies in setting forth protections for whistleblowers.  *Compare* D.C. Code § 2-223.01(3) (defining employee under subchapter addressing "Instrumentality Whistleblower Protection" as "[a]ny person who is a former or current employee of or an applicant for employment by an instrumentality of the District government") *with* § 1-615.52 (defining employee in subchapter addressing "Whistleblower Protection" as "any person who is a former or current District employee, or an applicant for employment by the District government, including but not limited to employees of subordinate agencies, independent agencies, the District of Columbia Board of Education, the Board of Trustees of the University of the District of Columbia, the District of Columbia Housing Authority, and the Metropolitan Police Department, but excluding employees of the Council of the District of Columbia.").  The fact that the D.C. Code addresses whistleblower protection for instrumentalities separately supports the conclusion that instrumentalities are distinct from the District and its agencies, and that the Hospital should not be exempted from liability just because the District and its agencies are.

Craig's pay.  *See id.*, ¶¶ 25–26.  Given these alleged circumstances, Craig has sufficiently pled that the Veritas Defendants and Hernandez were his joint employers and are subject to DCPWCL liability.

## VII.   Tortious Interference

Finally, the Veritas Defendants and Hernandez move to dismiss Craig's claim that they tortiously interfered with his employment contract by reducing his annual compensation and by participating in the decision to terminate his employment.  *See* Veritas MTD at 26–28; Hernandez MTD at 4–6; Am. Compl., ¶ 158–62.  "[T]he elements of tortious interference with contract are: "(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach."  *See Casco Marina Dev.*, 834 A.2d at 83 (quoting *Paul v. Howard Univ.*, 754 A.2d 297, 309 (D.C. 2000)).  Here, Craig alleges that he had an employment contract with the Hospital,[17] and that the Veritas Defendants and Hernandez were aware of the contract, *see* Am. Compl., ¶ 160.  Craig further alleges that those Defendants "decided to reduce Dr. Craig's pay" and "to terminate his employment" despite the terms of his contract with the Hospital.  *See id.*, ¶ 161; *see also id.*, ¶ 5.  Finally, Craig asserts that he incurred "significant economic, reputational, and emotional damages" from the reduction of his pay and termination.  *See id.*, ¶¶ 159–162.  The Court concludes that the facts alleged by Craig support a claim of tortious interference.

Hernandez, however, argues that Craig makes "no factual allegation that Hernandez directed or advised [the then-Hospital] CEO Davis" to "reduce[] Dr. Craig's hours and salary

---

[17]      Hernandez and the Veritas Defendants both argue that Craig's tortious interference claim necessarily fails because Craig was at at-will employee at the time they allegedly procured a breach of his contract.  *See* Hernandez Mot. at 5–6; Veritas Mot. at 26–27.  But, as addressed, Craig adequately pleads that his contract continued to govern throughout his employment at the Hospital.  *See supra* Section V.

approximately one month shy of his one-year contract date." *See* Hernandez MTD at 5. On the contrary, the operative complaint states that Hernandez "decided to reduce Dr. Craig's pay and that decision was carried out by Mr. Davis at the direction of Mr. Hernandez." *See* Am. Compl., ¶ 161. Taking a different approach, the Veritas Defendants urge the Court to decline supplemental jurisdiction over this claim for reasons of "judicial economy, convenience, fairness or comity." *See* Veritas MTD at 28–29. The Court has already concluded that Craig's federal False Claims Act count survives the Motions to Dismiss. *See supra* Section II. The Court will exercise supplemental jurisdiction over Craig's tortious interference claim because it is "so related to claims in the action within such original jurisdiction that [it] form[s] part of the same case or controversy under Article III." *See* 28 U.S.C. 1367(a).

**CONCLUSION**

For the foregoing reasons, the Court will deny Defendant Hernandez's Motion to

Dismiss, which challenges Counts VI and VII; and will grant in part and deny in part the Veritas

Defendants' and the Hospital's Motions to Dismiss.  Count IV of the Amended Complaint will

be dismissed, and the Motions are denied as to the remaining counts.  A separate Order will issue

this day.

_____
FLORENCE Y. PAN
United States District Judge

Date:   September 9, 2022